## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MARK DIMONDSTEIN, et al.                         )
                                                 )
                  Plaintiff,                      )
                                                 )
          v.                                      )          Case No. 1:13-cv-1228 (CKK)
                                                 )
AMERICAN POSTAL WORKERS UNION,                    )
                  Defendant.                       )
_____)

### DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

Defendant American Postal Workers Union, AFL-CIO ("APWU" or "Union") hereby respectfully moves the Court to grant summary judgment in its favor.  There are no genuine issues of material fact and the APWU is entitled to judgment as a matter of law.  In support of this Motion, the APWU is submitting a Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Defendant's Motion for Summary Judgment; a separate Statement of Material Facts Not in Dispute in accordance with L.Cv.R.7.1(h), and a proposed order.

Dated August 16, 2013                 Respectfully submitted,

                                       O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                       By:_/s/ Darryl J. Anderson_____
                                       Darryl J. Anderson
                                       DC Bar Number 154567
                                       1300 L Street NW Suite 1200
                                       Washington, DC 20005-4178
                                       Telephone: (202) 898-1707
                                       Facsimile: (202) 682-9276
                                       danderson@odsalaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                               )
MARK DIMONDSTEIN, et al.                       )
                                               )
                    Plaintiffs,                )
                                               )
            v.                                 )            Case No. 1:13-cv-1228 (CKK)
                                               )
AMERICAN POSTAL WORKERS UNION,                 )
                                               )
                    Defendant.                 )
_____)


**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

In support of its Motion for Summary Judgment, the American Postal Workers Union, AFL-CIO (APWU) states the following material facts as to which there is no genuine issue, in accordance with L.Cv.R. 7.1(h).

**1.**      Plaintiffs Mark Dimondstein, Tony McKinnon and Violetta Ward are members of defendant American Postal Workers Union, AFL-CIO (APWU) within the meaning of 29 U.S.C § 402 (o).  Complaint ¶ 3.

**2.**      Defendant APWU is a labor organization within the meaning of 29 U.S.C § 402 (i).

**3.**      Plaintiffs are running as candidates for elective office in a national-officer election of the APWU that will be conducted by referendum ballot, with the ballots to be mailed September 12 and 13, 2013.  Complaint ¶ 5; Powell Dec. Exh. H.

**4.**      Plaintiffs are seeking a preliminary injunction compelling the APWU to send Plaintiffs' campaign literature through the Internet using e-mail addresses that Plaintiffs contend comprise

1

"lists" that must be made available to Plaintiffs under § 401 (c) of the Labor-Management Reporting and Disclosure Act of 1959.

5.     The APWU has approximately 193,000 members, of whom approximately 41,000 are retiree-members. Cronk Dec. ¶¶ 5, 7.

6.     The APWU maintains a database concerning its membership using software known as iMIS. That database contains approximately 27,000 e-mail addresses.  Cronk Dec. ¶ 5.

7.     The APWU does not know and has no way of knowing how many of the 27,000 e-mail addresses in its database are valid e-mail-addresses. Cronk Dec. ¶¶ 5, 6.

8.     The APWU has not used the e-mail addresses in its database to send communications to the members corresponding to those 27,000 e-mail addresses.  Cronk Dec. ¶¶ 6, 10.

9.     The e-mail addresses in the APWU database have been collected in several different ways:

  a.  APWU members attending conferences, meetings and seminars are asked to register and, sometimes, pay a fee. If they wish to receive confirmation of their registration or a receipt for their feed by e-mail, they are requested to provide an e-mail address for that purpose. E-mail addresses obtained in that way our input into the database by APWU employees.  Powell Dec. ¶7.

  b.  APWU members attending meetings, conferences, seminars and conventions are asked to register and may provide their e-mail addresses at that time, but is not required that they provide their e-mail addresses.  Powell Dec. ¶7.

2

c. Some APWU members are asked for e-mail addresses when they join the union and sign a

Form 1187. However, that practice is inconsistent; it did not begin until approximately 2008;

and some APWU locals and APWU members resist that practice. Powell Dec. ¶7.

d.  Members are permitted to go to the members-only portion of the APWU webpage to see

their member profile data. If they choose to do so, they may add an e-mail address to their

member profile. But that is not required. Cronk Dec. ¶¶ 12, 14.

10.     Many APWU members have been members of the APWU since before e-mail existed.

The median age of APWU members is.  See Powell Dec.

11.     The APWU Legislative Department has a program it calls "e-Alert."  That program is

used to send e-mails about current legislative issues to its list of subscribers.  Individuals who go

to the APWU web page, both APWU members and members of the public, are offered an

opportunity to sign up to receive e-Alert e-mails from the APWU.  That list of subscribers is not

maintained in iMIS.  Cronk Dec. ¶ 9.

12.     The e-Team was created because lobbying is time-sensitive. Since the terrorist attack on

the post office using anthrax in 2001, mail directed to Congress is diverted to a site away from

Congress where it is irradiated before being delivered. This delay in the delivery of mail has

increased the importance of timely personal visits and phone calls from APWU members.  Reid

Dec. ¶ 3.

13.     Because of the delay in mail to Congress, APWU decided to create an e-mail list to

facilitate prompt timely contacts with members of Congress on legislative issues. The program

was announced on March 20, 2006.  Reid Dec. ¶4, Exhibit A.

14.     The purpose of e-Team News Updates, which are sent once per week, is to generate interest and action by APWU members to support the APWU legislative program. An example of this would be calling on e-Team members to support or defeat particular legislation affecting the Postal Service.  Reid Dec. ¶8 and Exh. B.

15.     The position of the Postal Service is dire. The future of the Postal Service is hanging in the balance. It is very important that APWU members be informed so they are in a position to take action to influence the outcome of postal legislation.  Reid Dec. ¶ 9.

16.     It is difficult but not impossible for APWU lobbying efforts to have an effect on postal legislation. In 2012, APWU lobbying efforts did have a positive effect on the content of a bill that passed the United States Senate. Reid Dec. ¶ 10.

17.     If candidates for union offices were permitted to have access to the e-Team list for making political mailings that would result in people receiving messages about internal union politics when they have no interest in receiving them. The impact of opening up the legislative alert system to other uses could be detrimental to the APWU's legislative program at the most critical time in the Union's history.  Reid Dec. ¶11.

18.     There are several sources of members for the APWU e-Team. It was begun by creating sign up options on the APWU web page. APWU officers also began speaking at all available APWU conferences and meetings asking people to sign up for the e-Team. Officers distributed sign-up forms at union conferences, meetings and conventions. These activities have been ongoing since the beginning of the e-Team.  Reid Dec. ¶5.

19.     The APWU also, on a one-time basis, added e-mail addresses to the e-Team system from the iMIS system.  A prominent "unsubscribe" button was displayed on the messages sent during

the period shortly after that transfer of addresses from iMIS to make it easy for non-consenting participants to withdraw from the e-Team.  Reid Dec. ¶6

20.     The e-mail list for the e-Team is maintained as a separate database that is not a part of the APWU iMIS system. That database is used to generate e-mail messages called News Updates. Reid Dec. ¶7 and Exh. B.

21.     The e-Team has about 21,000 members.  Powell Dec. ¶6.

22.     The APWU Retiree Department sends out weekly "Friday Alerts" which are prepared by the Alliance for Retired Americans.  These Friday Alerts are sent by e-mail to approximately 3,739 people.  Of the 41,000 members of the Retiree Department, the Department has only the e-mail addresses it uses to send.  Beard Dec. ¶¶ 2, 3.

23.     The Retiree Department e-mail list is not maintained as part of iMIS.  On two occasions, the Retiree Department asked for and received retiree e-mail addresses from the iMIS system. On the first occasion, in February 2013, the Department was given all the e-mail addresses for retiree members in the iMIS system. At that time, there were about 5,000 e-mail addresses associated with the approximately 41,000 retiree members.  Cronk Dec. ¶7.

24.     The second occasion was in April. At that time, the APWU IT Department created a list of 2,435 APWU members who had agreed to accept an incentive for voluntary early retirement. Those 2,435 employees for whom the APWU had e-mail addresses were all there were with associated e-mail addresses out of a total of approximately 22,000 APWU members who took voluntary early retirement.  Cronk Dec. ¶8.

25.     Other than the e-Team list of approximately 21,000 e-Team members and the Retiree Department list of approximately 3,739 out of 41,000 Retiree Department members, the APWU

does not maintain any e-mail list for the purpose of communicating with its members.  Powell Dec. ¶6.

26.     Because we are a union of postal workers, we have a strong tradition within our union of sending official communications to each other by U.S. Mail.  Many of our members and many of our union leaders oppose the use of e-mail for sending union communications to our members. Powell Dec. ¶ 7.

27.     Until a few years ago, the APWU did not seek to collect e-mail addresses from new members who join the union.  Membership in the APWU is ordinarily obtained by filling out a form called an "1187" that also authorizes automatic payroll deduction of dues.  That form did not provide a place for collection of e-mail addresses.  A few years ago, union leadership changed the form to add a place for e-mail addresses to be provided.  This sparked a protest that led to a floor debate and vote at the 2010 Biennial National Convention.  Powell Dec. ¶8.

28.     APWU convention delegates, usually numbering around 2,000 people, are selected to represent their locals and attend Biennial Conventions from every state and territory in the United States.  The Biennial National Convention is the highest ranking governing body of the APWU.  Powell Dec. ¶9.

29.     On August 26, 2010, at the APWU 20th Biennial Convention the delegates defeated a resolution that would have required the addition of a place for e-mail addresses on the Form 1187 used to sign up new members.  After debate for and against the resolution, the resolution was defeated by a voice vote of the delegates.  Powell Dec. ¶ 10, and Exhibit A.

30.     At this time, some of the 1187 forms used to sign up new members include a place for e-mail addresses and some do not.  The form available on the internet does provide a place, but

6

most members are signed up in person at new employee orientation using whatever form of the 1187 the local chooses to use.  Powell Dec. ¶11; see Exhibits B through E.

31.     The 1187 form, in its newer version, provides a place for e-mail information, but the provision of that information is voluntary and is not a condition on membership.  It would be contrary to the will of the membership as expressed at the 2010 Biennial Convention to require prospective members to provide e-mail addresses.  Some APWU locals continue to use the older form that does not make provision for e-mail addresses.  Powell Dec. ¶12.

32.     The three plaintiffs in this case all were present at the 2010 Biennial Convention.  Ms. Ward and Mr. KcKinnon were delegates, and Mr. Dimondstein was present and campaigning for election to the position of Organization Director.

33.     The APWU 21st Biennial Convention in August 2012 again considered the use of electronic communication in APWU national officer elections.  The Convention amended Article 11, Section 3.(c) of the APWU Constitution and Bylaws by adding a provision for 1,000-word statements from candidates for national office to be posted on the APWU web page during national officer elections.  Powell Dec. ¶ 14, Exhibit F at page 32 of the Constitution and Bylaws (last page of Exhibit F).

34.     The three plaintiffs in this case were present at the 21st Biennial Convention in August 2012, Ms. Ward and Mr. McKinnon as delegates and Mr. Dimondstein as a visitor.  Powell Dec. ¶ 14.

35.     Articles 11 and 12 of the APWU Constitution and Bylaws establish the basic procedures and timetables for the nomination and referendum election of National Officers.  Powell Dec. ¶ 15, Exhibits F and G.

36.     Under Articles 11 and 12 of the APWU Constitution and Bylaws, the Union's triennial National Officer election campaigns are five months long, from the time election rules are announced until the ballots are mailed to the members and then returned to be counted by an independent ballot association.  A list of "Important Election Dates" is provided to any member who asks for a nominating petition.  Powell Dec. ¶ 16, Exhibit H.

37.     In addition to "campaigning at the entrances to workplaces" and sending "postal mail" as plaintiffs describe their campaigns, the plaintiffs are campaigning by:

1. Having a 300-word statement by each candidate printed in the American Postal Worker Magazine which has been mailed to every member of the APWU at union expense and also made available to members on the members only section of the APWU web page.

2. Having an additional 1,000-word statement by each candidate presently posted on the members-only section of the APWU web page at no cost to the candidates.

3. Having the support of a dissident web page about APWU matters called the "21st Century Postal Worker," a web page that has been visited nearly two million times.

4. Having their own team and individual campaign web pages linked to the 21st Century Postal Worker web page.

5. Maintaining their own campaign Facebook pages.

6. Maintaining e-mail accounts, and

7. Maintaining twitter accounts

Powell Dec. ¶ 17.

38.     The 21st Century Postal Worker web page is a web page maintained by APWU members who are critical of the incumbent officers of the Union.  That web page shows that it has been accessed more than 1.9 million times. It shows a link to the "APWU 2013

National Election." When one follows that link, the first web page listed on the next page is a link to the Plaintiffs' team campaign web page. Powell Dec. ¶ 18.

39.        A copy of the plaintiffs' team web page is Powell Dec. Exhibit J.

40.        The plaintiffs also maintain individual campaign web pages.  Copies of their web pages are Exhibits K, L and M to the Powell Declaration.

41.        Under Article 11 of the APWU Constitution and Bylaws, Section 3(c), the National Union publishes candidate statements for all candidates for national office at no cost to the candidates.  Every candidate may provide a 300-word statement for publication in the July-August edition of the American Postal Worker magazine, which is the official publication of the APWU.  By this means, the National Union mails the candidates' 300-word statements to every member of the Union during the campaign period and also posts them on-line in the members-only section of the APWU web page at no cost to the candidates.  Powell Dec. ¶20.

42.        The 300-word statements of each of the plaintiffs in this case have been published in the July-August issue of the American Postal Worker.  Copies of those statements are Exhibits N (Dimondstein), O (McKinnon), and P (Ward) to the Powell Declaration.

43.        Mr. Dimondstein's 300-word statement (Exhibit N) that has been distributed by mail to every APWU member at no cost to Mr. Dimondstein, and which also is posted on the APWU web page at no cost to Mr. Dimondstein, includes the following passage:

> For more information please visit our website:
> www.apwumebersfirst.org or contact me directly at
> votemarkd@yahoo.com

This reference to Mr. Dimondstein's campaign web page and yahoo account also is included in Mr. Dimondstein's 1,000-word candidate statement that is posted on the members only section of the APWU web page.  Powell Dec. ¶22.

44.      Although Mr. KcKinnon and Ms. Ward submitted 300-word statements and 1,000 word statements that have been published and distributed by the National Union, and both of them maintain individual campaign web pages linked to the 21st Century Postal Worker web page, neither Mr. McKinnon nor Ms. Ward included a reference to their campaign web page in their union-published statements.  Powell Dec. ¶22.

45.      The 1,000-word candidate statements of the three plaintiffs that are posted on the APWU web page are Exhibits M (Dimondstein), N (McKinnon), and O (Ward) to the Powell Declaration.

46.      The political history of the APWU provides many examples of how effectively the APWU democratic processes work.  Examples include the following instances involving full-time elected offices at APWU headquarters in Washington, DC.  Officers in bold-faced type were elected to offices that are, ex officio, a part of the 13-member APWU National Executive Board, which is the highest ranking governing body of the Union between Biennial Conventions:

- In APWU 1980 election,

  o Moe Biller defeated an incumbent **President**, Emmett Andrews.

  o John Richards defeated an incumbent **Director of Industrial Relations**, Forest Newman.

  o Bill Burrus (later to be elected President) won the office of **Executive Vice President** running as an outsider on a team with Biller and Richards.

  o Sam Anderson defeated incumbent Mike Benner for the office of **Special Delivery Messenger Craft Director.**

- In APWU 1983 election,

  o George McKeithen defeated incumbent Sam Anderson for **Special Delivery Messenger Craft Director.**

- In APWU 1992 Election,

  o Jim Lingberg defeated an incumbent, Tom Freeman, for the position of **Maintenance Craft Director**.

- In APWU 1998 election,

  o Bob Pritchard defeated an incumbent **Motor Vehicle Services Director**, Don Ross.

  o Joe Williams defeated an incumbent Motor Vehicle Services Assistant Director, Teddie Days.

- In APWU 2001 election,

  o Bill Burrus, the long-time Executive Vice President and heir apparent to Moe Biller was elected **President**; however

  o Cliff Guffey, running as an insurgent candidate, defeated Bill Burrus's chosen running mate for the office of **Executive Vice President**, Steve Albanese.

  o Steve Raymer defeated an incumbent **Maintenance Craft Director**, Jim Lingberg. Lingberg was on the Burrus team.

  o Sue Carney defeated an incumbent Director of Human Relations, Sidney Brooks. Brooks was on the Burrus team.

Powell Dec. ¶25.

47.    Mr. Dimondstein wrote a letter dated July 2, 2013, requesting access to e-mail addresses of APWU members to use in his campaign. Mr. Dimondstein's letter was answered by Election Committee Chair Anthony Turner in a certified letter mailed to Mr. Dimondstein's home in Greensborough, NC on July 15, 2013. That letter was received in Greensborough, and delivery

11

was attempted at Mr. Dimondstein's house on July 17, 2013.  If Mr. Dimondstein had accepted that certified letter from APWU headquarters, he would have been informed on July 17, 2013, that his request had been denied.  Powell Dec. ¶27, Exhibit T.

48.   Mr. Dimondstein is a veteran APWU staff member whose identity, ideas and proposals are very well known to APWU members.  He was appointed as a full-time union organizer for the APWU in 1995.  He spent at least 15 years travelling all over the country as a full-time APWU organizer.  He has run for national union office unsuccessfully three previous times, in 1992 (Southern Regional Coordinator), 1998 (Director of Organization), and 2010 (Director of Organization).  His 300-word campaign statement has been mailed to every APWU member and posted on the APWU web page, and his 1,000 word statement is posted on the APWU web page. Powell Dec. ¶ 28.


Dated August 16, 2013                    Respectfully submitted,

                                         O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                              By:   /s/ Darryl J. Anderson
                                              Darryl J. Anderson
                                              DC Bar Number 154567
                                              1300 L Street NW Suite 1200
                                              Washington, DC 20005-4178
                                              Telephone: (202) 898-1707
                                              Facsimile: (202) 682-9276
                                              danderson@odsalaw.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MARK DIMONDSTEIN, et al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-1228 (CKK) |
| | ) | |
| AMERICAN POSTAL WORKERS UNION, | ) | |
| Defendant. | ) | |

_____)

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated August 16, 2013                    O'DONNELL, SCHWARTZ & ANDERSON, P.C.

By: /s/ Darryl J. Anderson_____
Darryl J. Anderson
DC Bar Number 154567
1300 L Street NW Suite 1200
Washington, DC 20005-4178
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
danderson@odsalaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

Statement of the Case .............................................................................................. 1

Standards for Decision ............................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

I.   APWU DOES NOT MAINTAIN AN E-MAIL LIST OF ITS MEMBERSHIP FOR USE
     IN COMMUNICATING WITH THEM .......................................................... 2

     A.   APWU has only 27,000 E-Mail Addresses In Its Database For 193,000 Members
          .................................................................................................................. 2

     B.   It Is Union Policy To Use Letter Mail, Not E-Mail For Membership
          Communications ....................................................................................... 3

     C.   The Legislative Department And The Retiree Department Have Partial Lists That
          They Use For Their Particular Purposes. ................................................. 4

II.  Plaintiffs have ample alternative means of campaigning and have used these alternate
     means to widely distribute their campaign messages .......................................... 5

III. It would be damaging to the work of the e-Team and the APWU Legislative Department
     to permit national election candidates to send campaign messages to the e-Team list ...... 6

ARGUMENT ............................................................................................................ 7

I.   The Department of Labor Guidance On This Matter Confirms That the APWU May Not
     Be Compelled to Create An Email List for the Plaintiffs' Use ............................ 7

II.  Plaintiff Is Required To Show That They Would Suffer Irreparable Harm Should the
     Court Not Grant The Injunction ......................................................................... 9

     A.   Speech rights under the LMRDA are not subject to the same freedom of speech
          principles as First Amendment rights. ..................................................... 9

     B.   The exception for the irreparable harm showing that applies in certain instances
          when statutes specifically permit injunctive relief is not relevant to this case
          because Section 401(c) does not do so. ................................................... 12

III. Plaintiffs Have Failed to Show That They Have Met the Required Standards For a Court
     to Grant a Preliminary Injunction. ..................................................................... 14

A.      Plaintiff Lack of Merits..........................................................................................14

B.      Plaintiffs cannot show they will suffer irreparable harm should the injunction not
        be granted because their campaign messages are readily available to all union
        members and have been mailed to all members. ...................................................14

C.      Public policy weighs against Plaintiffs because the public policy interest in a
        robust debate is only slightly implicated and is outweighed by the public policy
        interest against the intrusion into the internal affairs of the APWU.....................15

CONCLUSION...........................................................................................................................17

## TABLE OF AUTHORITIES

**CASES**

*A.L.K. Corporation v. Columbia Pictures Industries, Inc.*, supra, 440 F.2d 761 (3d Cir. 1971)...10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1985) ...................................................................1

*Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255 (10th Cir. 1981) ......................................12

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).........................2

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C.Cir.1995)...........................2

*DeCarlo v. Salamone*, 977 F. Supp. 617 (W.D.N.Y. 1997) ..........................................................11

*Fish v. Huddell*, 51 F.2d 319 (D.C. Cir. 1931) .............................................................................15

*Guzman v. Bevona*, 90 F.3d 641, 152 L.R.R.M. (BNA) 2973 (2d Cir. 1996) ..............................11

*Haines v. Walton*, 67 F.3d 307 (9th Cir. 1995).............................................................................12

*Hodgson v. Local Union 6799, United Steelworkers of Am., AFL-CIO*, 403 U.S. 333 (1971) .....16

*Hummel v. Brennan* 469 F. Supp. 1180, 1187 (E.D. Pa. 1979).....................................................10

*Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566 (7th Cir. 1984) .....................12

*Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. N.L.R.B.*, 814 F.2d 697 (D.C. Cir. 1987) ...............................................................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 475 (1985)..............................1

*Monzillo v. Biller*, 735 F.2d 1456 (D.C. Cir. 1984).................................................................15, 16

*Morissey v. Curran*, 650 F.2d 1267 (2nd Cir.1981) ....................................................................15

*Ostrowski v. Local 1-2, Util. Workers Union of Am., AFL-CIO*, 530 F. Supp. 208, 215 (S.D.N.Y. 1980) ................................................................................................................................10, 11

*RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F.Supp.2d 70 (D.D.C.2007) ................2

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................................................7, 8

*Smith v. New York Metro Area Postal Union*, 12 CIV. 2002 PAC, 2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012)..................................................................................................................................13

*Solis v. Commc'ns Workers of Am., AFL-CIO*, 766 F. Supp. 2d 84 (D.D.C. 2011) ........................1

*Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860 (9th Cir. 1983)...............................12

*United States v. American College of Physicians*, 475 U.S. 834 (1986) ......................................13

*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998)................................................12

*\*United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102 (1982)............11, 15, 16

*Virginia Petroleum Job. Ass'n v. Federal Power Com'n*, 104 U.S.App. D.C. 106, 259 F.2d (1958) ................................................................................................................................................10

*\*Washington Teachers' Union, Local No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38 (D.D.C. 2010) .........................................................................................................................13

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .................................................................16

*Wirtz v. Local 153, Glass Bottle Blowers Assn.*, 389 U.S. 463 (1968)............................................

**STATUTES, REGULATIONS AND AGENCY GUIDANCE**

29 U.S.C.A. § 464(a) ...................................................................................................13

29 U.S.C § 481(c) ........................................................................................................1

*"Frequently Asked Questions Concerning Union Officer Elections,"
http://www.dol.gov/olms/regs/compliance/Electionsfaqgen.htm .............................7, 14

**Statement of the Case**

On August 9, 2013, Plaintiffs filed a Complaint against Defendant American Postal Workers Union ("APWU" or "Union") alleging that the APWU violated section 401(c) of the Labor Management Reporting and Disclosure Act of 1959, ("LMRDA"), 29 U.S.C § 481(c), by not providing Plaintiffs' with a list of APWU members' email addresses so that Plaintiffs campaign literature could be distributed to members via email.  Plaintiffs also filed a Motion for Preliminary Injunction asking the Court to compel the APWU to allow Plaintiffs to send their campaign literature to "all email addresses that the APWU or any of its officers or staff have for members of the APWU, or to any segment of the email addresses that Plaintiffs may elect," and to compel the APWU to inform Plaintiffs what categories or classifications of email addresses the union has that would enable plaintiffs to send specialized mailings to part of the union membership.  Plaintiffs' Motion for Preliminary Injunction.

**Standards for Decision**

Under the Federal Rules of Civil Procedure, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  In evaluating a motion for summary judgment, "all inferences to be drawn…must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 475 (1985) .  Further, "the court may not make credibility determinations or weigh the evidence."  *Solis v. Commc'ns Workers of Am., AFL-CIO*, 766 F. Supp. 2d 84, 96 (D.D.C. 2011). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable…, or is not significantly probative,…summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,  249-50 (1985).

"The standard for issuance of the "extraordinary and drastic remedy" of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F.Supp.2d 70, 72–73 (D.D.C.2007) citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The moving party must show 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction were not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  While the factors may be balanced by a strong showing in one area compensating for a weak showing in another, (*see CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995) "a movant's failure to show any irreparable harm…is grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy*, 454 F.2d at 290.

## STATEMENT OF FACTS

### I.   APWU DOES NOT MAINTAIN AN E-MAIL LIST OF ITS MEMBERSHIP FOR USE IN COMMUNICATING WITH THEM

#### A.   APWU has only 27,000 E-Mail Addresses In Its Database For 193,000 Members

The APWU has approximately 193,000 members, of whom approximately 41,000 are retiree members.  Cronk Dec. ¶¶ 5,7.  It maintains a database containing information about its members, such as their names, addresses and employee identification numbers using a software system called iMIS.  Id.  Until approximately 2008, the APWU did not make any effort to collect e-mail addresses from workers as they joined the Union.  Powell Dec. ¶¶ 8, 11, and Exhibits B through E.

2

The e-mail addresses in the iMIS database have been collected in several different ways. Members attending conferences, meetings, seminars, or conventions typically are asked to register and, in some cases, to pay a fee. In some cases, members are asked for their e-mail addresses as part of the process of registration. In addition, if the member wishes to receive a receipt for the fee or confirmation of the registration by e-mail, they provide an e-mail address. That e-mail address then becomes a part of the iMIS database. Powell Dec. ¶7.

Around 2008, the form used to sign up new members, called an 1187 form, was changed to add a place for new members to provide an e-mail address. However, it has never been mandatory to provide an e-mail address to complete the form. Many of the older forms without provision for e-mail addresses are still in use by locals in the field, and most new members are signed up in person, not by going to the Union's web page where the newer form is to be found. Powell Dec. ¶¶ 8, 11.

**B.      It Is Union Policy To Use Letter Mail, Not E-Mail For Membership Communications**

Because the APWU is a union of postal workers with a strong affinity for the U.S. Mail, it adheres to a tradition of communicating with its membership using letters instead of e-mails. Many of its members and many of its union leaders oppose the use of e-mail for sending union communications. Powell Dec. ¶7.

Even though the 1187 has been changed by adding a place for new members to put their e-mail addresses, there is no uniform or systematic effort to collect those addresses, much less to use them. At the 2010 Biennial National Convention of the APWU, the Union's highest ranking governing body, the delegates considered and rejected a resolution that would have made it mandatory to use 1187 forms with a place to record e-mail addresses. Even if the resolution had passed, which it did not, it would not have made it mandatory for e-mail addresses to be

3

collected, only possible.  As a consequence of the failure of that resolution, many forms used to sign up members still do not provide for collecting e-mail addresses.  Powell Dec. ¶¶ 8-11.

In any event, such e-mail addresses as do find their way into the iMIS database  are not used for communication with the membership.  Cronk Dec. ¶¶ 6, 10; Powell Dec. ¶6. The APWU has only limited ability to analyze or work with the data.  It cannot sort the e-mail addresses by the date the member joined the Union, nor can it determine in most cases how the e-mail address was obtained.  Cronk Dec. ¶ 18.[1]

### C.   The Legislative Department And The Retiree Department Have Partial Lists That They Use For Their Particular Purposes

After the anthrax attacks through the mail in 2001, congressional mail began to be irradiated before being delivered.  The delay and disruption caused by that process made it much more important for the APWU to be effective in making personal contact with Representatives and Senators and their staffs.  This led to the creation, in 2006, of the APWU e-Team.  The e-Team is a list of members, family members, and supporters who wish to receive weekly legislative updates designed to generate interest and action in support of APWU legislative positions.  Reid Dec. ¶¶ 5-8.  People can sign up to be on the e-Team through the APWU web page or by filling out a paper form.  In either case, the e-mail addresses collected for the e-Team do not enter the iMIS database.  Id.  The e-Team now has about 21,000 members.  Powell Dec. ¶21.

The APWU Retiree Department  also maintains a small separate e-mail list of a portion of its membership.  The APWU has a retiree membership of approximately 41,000 members. For that group, the Department has approximately 3,739 e-mail addresses.  Powell Dec. ¶6. Each

---

[1] It could, but does not, segment the e-mail addresses by local, by state and by craft.  Cronk Dec. ¶ 18.

week, the Retiree Department sends to this e-mail list a document called a "Friday Alert" that is prepared by the Alliance for Retired Americans. Although it is provided through the list kept by the APWU Retiree Department, it is not prepared by the APWU.

## II.  Plaintiffs have ample alternative means of campaigning and have used these alternate means to widely distribute their campaign messages.

Over the five month election period, Plaintiffs have had ample opportunities to campaign and to have their campaign messages and literature reach all of the APWU's members.  By Plaintiffs own admission, they have been "campaigning at entrances to workplaces spread throughout the United States," and also plan to send a mailing to all members of the APWU. Plaintiffs' Complaint ¶ 17.  The APWU has also facilitated the distribution of Plaintiffs' campaign messages.  Plaintiffs were each permitted to have a 300 word statement printed in the APWU magazine.  A copy of that magazine was then mailed, at the APWU's expense, to every member of the APWU.  The 300-word statement was also posted to the members only section of the APWU's website, also at the expense of the APWU.  Powell Dec. ¶17 and Exhibits N-P.  In addition to having their 300-word statement mailed to every member of the APWU and posted on the APWU's website, Plaintiffs' were given the opportunity to write a longer, 1,000-word statement that was also posted to the APWU's members only website.  Powell Dec. ¶ 17.

Beyond the avenues of communication provided by the APWU at no cost to the Plaintiffs, the Plaintiffs have created their own means of communicating their campaign messages to members nationwide.  Plaintiffs maintain their own campaign website, their own Facebook pages, their own e-mail accounts and their own Twitter accounts.  Powell Dec. Exhibits J-M.  Their message is also available through the 21st Century Postal Worker web page. The 21st Century Postal Worker site is maintained by APWU members who are critical of the

incumbent officers of the APWU that has been accessed more than 1.9 million times. Powell Dec. ¶ 18.

The electoral successes of non-incumbent candidates throughout the political history of the APWU demonstrates that candidates have consistently been able to effectively communicate their campaign messages without the assistance of e-mail. Incumbent full-time elected officers of the APWU National Executive Board have been defeated in past APWU elections, including incumbent presidents and executive vice presidents. Powell Dec. ¶ 25. These outsider victories show that non-incumbent candidates do not need access to APWU members' email addresses in order to successfully overcome any electoral advantage that may come with incumbency.

Plaintiffs have been campaigning in person at workplaces nationwide, their campaign statements have been mailed to every single APWU member, and through modern technology their messages are readily available to all members of the union, both through the APWU's website and through Plaintiffs' own web sites and social media presence. Through these many channels, Plaintiffs have been actively campaigning for the duration of the APWU's election period and have widely distributed their campaign message.

**III.   It would be damaging to the work of the e-Team and the APWU Legislative Department to permit national election candidates to send campaign messages to the e-Team list.**

The e-Team list was created to facilitate prompt timely contacts with members of Congress on legislative issues. Reid Dec. ¶ 4. Communicating with members over e-mail to encourage them to call their legislators is more effective than asking members to write their legislators, because mail sent to Congress must go through security screenings. Reid Dec. ¶ 3. These screenings delay the delivery of the mail and when the APWU is asking members to contact their legislators regarding upcoming votes on postal issues, such delays would render

6

APWU members' letters to Congress ineffectively late.  The e-Team list is therefore a critical part of the Legislative Department's lobbying efforts.

Using the e-Team list to send e-mails unrelated to legislative news updates and requests for action on the part of APWU members would result in e-Team list recipients receiving more frequent e-mail contact from the APWU.  This increased contact would risk annoying recipients, who may then decide to unsubscribe from the list in order to stop receiving the messages.  Of course, having less people on the list that the APWU is asking to contact Congress would hurt the efficacy of the e-Team list.

**ARGUMENT**

Defendant's Motion for Summary Judgment should be granted because there are no material facts in dispute and Defendant is entitled to judgment as a matter of law.  Further, the Department of Labor has issued advice on the issue before the Court, and their interpretation of Section 401(c) supports the position of the APWU.  Should the Court decline to grant summary judgment in favor of the APWU, the APWU respectfully requests that the Court deny Plaintiffs' Motion for a Preliminary Injunction on the ground that the Plaintiffs have failed to demonstrate the necessary elements for an injunction to be granted.

I.    **The Department of Labor Guidance On This Matter Confirms That the APWU May Not Be Compelled to Create An Email List for the Plaintiffs' Use.**

The Court should grant the APWU's Motion for Summary judgment because the APWU is entitled to judgment as a matter of law.  The Department of Labor has previously given advice on the very issue of whether a union is obligated to provide election candidates with the e-mail addresses of its members.  "Frequently Asked Questions Concerning Union Officer Elections," http://www.dol.gov/olms/regs/compliance/Electionsfaqgen.htm.  When an agency issues

7

guidance or an opinion on a statute under its purview, the agency's interpretation is entitled to respect by the Courts to the extent that it is persuasive. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

The DOL advises that "other than by mail, there is no prescribed manner in which unions must distribute campaign literature." *Id.* DOL further advises that a union need only acquiesce to a candidate's request to distribute his or her campaign literature via e-mail *if* the union itself uses e-mail to provide information to its members (emphasis added). *Id.*[2] Also, the advice clearly states that a union is not required to create a system to accommodate a candidate's request for e-mail distribution of campaign materials if such a system does not already exist, nor is a union required to keep a complete and up-to-date list of member e-mails. *Id.*

As a general rule, the APWU does not use e-mail to communicate with its members. As a postal union, the APWU is of course a strong supporter of the U.S. mail system and believes that the U.S mail system is the best way to disseminate information to all of its members. The only exception to mail being the preferred method of the APWU to communicate with members is the APWU e-Alerts. Those e-Alerts are sent by the APWU's Legislative Department and are sent to members of the APWU and other APWU supporters. e-mail is the preferred mode of communication for the Legislative Department because it is often sending information that requires immediate action, frequently asking recipients to contact their Representative or Senator as soon as possible regarding an upcoming legislative vote. Beyond that small list maintained by the Legislative Department, the APWU does not maintain a list of members' email addresses and per the DOL advice, should not be required to maintain one. Furthermore, requiring that the

---

[2] On this point, Plaintiffs' Complaint misstates the advice given by DOL. In Paragraph 16, Plaintiff claims that the DOL "advises unions that to the extent that they have email addresses for union members, they must comply with reasonable requests to distribute campaign literature by email." Plaintiffs' Complaint ¶ 16

APWU allow campaign literature to be sent to its e-Alert list would undermine the purpose for

which the e-Alert system was created.  The purpose of the list is to generate interest and action

by APWU members in support of the APWU's legislative program.  Declaration of Myke Reid.

Using the list to distribute campaign literature may encourage recipients to unsubscribe from the

list due to the additional emails or perhaps simply stop reading the e-mails they receive.  Either

reaction to additional e-mails from the APWU would obviously damage the APWU's ability to

quickly spur its members into calling their legislators and urging them to either support or

oppose postal legislation.

Patricia Fox, Chief of Enforcement for the Office of Labor-Management Standards

dismissed a complaint alleging that a candidate was given unfair access to members' email

addresses.

http://www.dol.gov/olms/regs/compliance/foia/2012/ECD/SOR/mar/NPMHU_LU300_03-15-

12.htm.  In explaining her decision to dismiss the complaint, Ms. Cox noted that the complainant

failed to prove that the union had discriminated against him in the use of its lists of members

because the union did not maintain a list of members' email addresses.  Similarly, the APWU

does not maintain a list of its members' email addresses and therefore should not be required to

either create a list of addresses for the purposes of campaigning, nor should it be required to

provide Plaintiffs with the email addresses used by its Legislative Department for E-alerts.

**II.     Plaintiff Is Required To Show That They Would Suffer Irreparable Harm
Should the Court Not Grant The Injunction.**

**A.     Speech rights under the LMRDA are not subject to the same freedom
of speech principles as First Amendment rights.**

Plaintiffs assert that they should not be required to show that they would suffer an

irreparable injury if the injunction is not granted because Plaintiffs claim relates to their rights

under the LMRDA.  Plaintiffs' Motion for Preliminary Injunction, 10.  In support of this

argument, Plaintiffs cite *Hummel v. Brennan* 469 F. Supp. 1180, 1187 (E.D. Pa. 1979).  The

*Hummel* Court does not mention freedom of speech or LMRDA rights in its evaluation of

whether or not to grant a preliminary injunction.  In fact, the Court evaluates the motion under

the standard established for that circuit, based on factors including "the possibility that adequate

or other corrective relief will be available at a later date," and whether the showing is based upon

actual injury of a serious nature and is not merely theoretical.  *Hummel v. Brennan*, 469 F. Supp.

1180, 1187 (E.D. Pa. 1979) *citing  A.L.K. Corporation v. Columbia Pictures Industries, Inc*.,

supra, 440 F.2d 761, 764 (3d Cir. 1971) *and Virginia Petroleum Job. Ass'n v. Federal Power*

*Com'n*, 104 U.S.App. D.C. 106, 110, 259 F.2d 921, 925 (1958).  The Court does state that a party

may be excepted from exhausting internal union remedies by a showing of irreparable harm

related to the exercise of his rights under the LMRDA, but whether or not Plaintiffs' must

exhaust their internal union remedies is not the issue in the case at hand. *Hummel*, 469 F. Supp.

at 1185-1186.  *Hummel* provides no basis for the Court to decide that Plaintiffs are excused from

the irreparable injury showing in order for his preliminary injunction to be granted.

The other case Plaintiffs cite deals with freedom of speech rights implicated by Title I of

the LMRDA.  *Ostrowski v. Local 1-2, Util. Workers Union of Am., AFL-CIO*, 530 F. Supp. 208,

215 (S.D.N.Y. 1980).  In *Ostrowski*, the plaintiff was removed as shop steward after speaking up

about work place safety issues.  The Court found that the union's actions against the plaintiff had

a chilling effect on members speech rights.  The Court pointed to the ample evidence the plaintiff

provided on the chilling effect of the union's actions,  evidence that members feared to hold

further meetings on the subject of workplace safety and that as a result of plaintiff's removal

information on the subject of workplace safety was no longer available to other concerned

10

members.   *Ostrowski* 530 F. Supp. at 216.  While that Court does hold that actions that have a

"chilling effect" on LMRDA rights constitute irreparable injury,  the decision of the APWU not

to provide the Plaintiff with email addresses does not rise to the level of a "chilling effect" on

speech rights.  The APWU is not attempting to censor Plaintiff's campaign message or prevent

him from distributing his campaign message to members.  To the contrary, the APWU has

mailed Plaintiff's campaign statement to every member of the APWU, as it does for all

candidates.  Additionally, the APWU has posted Plaintiffs' campaign statements on its website.

Plaintiff has not demonstrated a chilling effect on his speech rights under the LMRDA.

Furthermore, the Supreme Court has noted that while some rights under the LMRDA are

indeed modeled after the Bill of Rights, "there is no indication that Congress intended the scope

of [rights under the LMRDA][ to be identical to the scope of the First Amendment." *United*

*Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 111 (1982).  Indeed, the

LMRDA clearly states that union rules limiting speech rights are valid so long as they are

reasonable. *Id.*  There is no basis for subjecting the APWU's communications practices to strict

scrutiny as Plaintiffs' appear to suggest.  When evaluating union policies regarding members'

speech rights, "First Amendment principles may be helpful, although they are not controlling."

*Sadlowski*, 457 U.S. 102, 111 (1982).  Courts have found that actions like placing members

under surveillance after criticizing union officials, removing members from leadership position

for speaking out on controversial union issues, and disciplining members for libelous speech

about union officials have a "chilling effect" on members' speech rights in violation of the

LMRDA.  *See Guzman v. Bevona*, 90 F.3d 641, 152 L.R.R.M. (BNA) 2973 (2d Cir. 1996);

*Ostrowski* 530 F. Supp. at 216; *DeCarlo v. Salamone*, 977 F. Supp. 617 (W.D.N.Y. 1997).  On

the other hand, when a union shut down a public electronic bulletin board, the 9th Circuit Court

11

of Appeals held that the action did not violate the freedom of speech rights of the union's

members, noting that the union showed that it provides members with a variety of other means of

communication. *Haines v. Walton*, 67 F.3d 307 (9th Cir. 1995).

> **B.** **The exception for the irreparable harm showing that applies in certain instances when statutes specifically permit injunctive relief is not relevant to this case because Section 401(c) does not do so.**

Plaintiffs also contend that that they are not required to show an irreparable injury

because of "the general rule that irreparable injury may be presumed from a statutory violation."

Plaintiffs Motion for Preliminary Injunction, 11.  Plaintiffs argue that this rule should apply

because Section 401(c) authorizes pre-election suits.  However, "the grant of jurisdiction to

ensure compliance with a statute hardly suggests an absolute duty to do so under all

circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an

injunction for every violation of law."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313

(1982).  "Plaintiffs must show that Congress intended to intervene and guide or control the

exercise of the courts' discretion." *United States v. Microsoft Corp.*, 147 F.3d 935, 943 (D.C.

Cir. 1998) (internal quotations omitted).   Furthermore, many of the cases that Plaintiffs cite to

support their position involve statutes that specifically provide for injunctive relief, unlike

Section 401(c).  *E.g.*, *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th

Cir. 1984); *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983);

*Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 258 (10th Cir. 1981).

Plaintiff argues that this exception to the required irreparable injury showing should

apply to 401(c) because the statute permits pre-election suits that "must necessarily be decided in

a preliminary injunction context."  Plaintiffs' Motion for Preliminary Injunction, 11.  To support

this proposition, Plaintiff relies on the legislative history of the LMRDA.  However, one should

12

not conclude based on the legislative history that Congress intended that all pre-election suits be decided by preliminary injunction when the statute itself does not specifically provide for such relief.  *See Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. N.L.R.B.*, 814 F.2d 697, 708 (D.C. Cir. 1987) ("Legal principles may not be gleaned *solely* from legislative history that has no statutory reference point.") (emphasis in original); *United States v. American College of Physicians*, 475 U.S. 834, 846 (1986). (" [D]espite the [Committee] Reports' seeming endorsement of a *per se* rule, we are hesitant to rely on that inconclusive legislative history either to supply a provision *not* enacted by Congress").

Additionally, in a recent case involving an APWU local union election, the Court evaluated a motion for a preliminary injunction under Section 401(c) using the standards of irreparable harm and a likelihood of success on the merits, declining to do without the irreparable harm requirement as Plaintiff suggests.  *Smith v. New York Metro Area Postal Union*, 12 CIV. 2002 PAC, 2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012).  In this jurisdiction, this Court has used a four factor test as its standard for issuing a preliminary injunction in an LMRDA case. *Washington Teachers' Union, Local No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38, 49 (D.D.C. 2010).  In *Washington Teachers' Union*, the Court ruled on a motion for a preliminary injunction Under §464 of the LMRDA, which actually specifically provides for injunctive relief in 29 U.S.C.A. § 464(a), the Court still evaluated whether to issue an injunction by examining whether the moving party showed: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunctive relief were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Washington Teachers' Union, Local No. 6* 751 F. Supp. 2d at 49 (D.D.C. 2010).

### III.   Plaintiffs Have Failed to Show That They Have Met the Required Standards For a Court to Grant a Preliminary Injunction.

#### A.  Plaintiffs Arguments Lack Merit.

As we showed above, the Plaintiffs' have no likelihood of success on the merits. The Department of Labor has already issued advice on the issue of if and when a union is required to allow candidates to distribute their campaign literature via email addresses that the union has in its possession.  Again, the DOL's interpretation of Section 401(c) advises that "there is no prescribed manner in which unions must distribute campaign literature" and "unions are not required to provide candidates access to all methods of distribution that may be available to the union."  "Frequently Asked Questions (FAQs) Concerning Union Officer Elections."  DOL advises that unions are only required to allow candidates to distribute their literature through email addresses the union has if those email addresses are how the union communicates with its members.  As the APWU does not use email addresses as a means of communication with its members, Plaintiffs have no right to compel the APWU to create an e-mail list so that Plaintiffs may communicate with the APWU's members.

#### B.   Plaintiffs cannot show they will suffer irreparable harm should the injunction not be granted because their campaign messages are readily available to all union members and have been mailed to all members.

Plaintiffs claim that they will suffer irreparable harm if the injunction is not granted because the APWU "is preventing them from communicating, inexpensively and effectively, with a significant segment of the union electorate."  Plaintiffs' Complaint ¶ 18.  The APWU has done no such thing.  To the contrary, the APWU has facilitated the mailing of Plaintiffs' campaign literature to every APWU member.  Furthermore, the APWU published a 300-word statement by Plaintiffs in the APWU Magazine, which has been mailed to every member of the

APWU at union expense.  The APWU also has posted a 1,000-word statement by each candidate on the members-only section of the APWU web page also at the APWU's expense.  Plaintiffs' maintain their own campaign, webpages, Facebook pages and Twitter accounts.  Declaration of Elizabeth Powell.  Based on the broad distribution of Plaintiffs' campaign literature and statements, Plaintiffs have failed to demonstrate that the APWU's decision to not provide them with email addresses of members has prevented them from communicating with the union electorate.

> **C.**   **Public policy weighs against Plaintiffs because the public policy interest in a robust debate is only slightly implicated and is outweighed by the public policy interest against intrusion into the internal affairs of the APWU**

There is of course a strong public policy interest in preserving and promoting a robust debate during union elections and Congress intended to protect this debate with the LMRDA. *United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 112 (1982).  When weighing this policy interest, the Court should keep in mind that Plaintiffs' campaign is by no means being silenced by the APWU's decision not to permit them to distribute their campaign literature to members' via email.  As mentioned above, Plaintiffs' campaign literature and statements have been widely distributed to all APWU members at no cost to the Plaintiffs and are readily accessible to all members through the APWU's website.

Additionally, the public policy interest in protecting the robust debate in union elections is outweighed in this case by the longstanding judicial principle of avoiding interfering in internal union affairs  *Fish v. Huddell*, 51 F.2d 319, 320 (D.C. Cir. 1931).  It is well established that the LMRDA "does not give courts a license to interfere broadly in internal union affairs." *Monzillo v. Biller*, 735 F.2d 1456, 1464 (D.C. Cir. 1984) citing *Morissey v. Curran*, 650 F.2d 1267, 1273 (2nd Cir.1981).  The Supreme Court has noted that the legislative history of the

LMRDA evidences a desire to avoid "departing needlessly from the longstanding congressional policy against unnecessary governmental interference with internal union affairs." *Hodgson v. Local Union 6799, United Steelworkers of Am., AFL-CIO*, 403 U.S. 333, 338 (1971) citing *Wirtz v. Local 153, Glass Bottle Blowers Assn.*, 389 U.S. 463, 470-471 (1968).

In *Monzillo*, a group of union members objected to an action by the union's executive board committing the union to purchasing a new building.  The District Court enjoined the Union from purchasing a new headquarters building.  Shortly thereafter, union representatives and the unions national convention passed a resolution which interpreted the union's constitution as giving the executive board the authority to "make decisions and engage in transactions that the National Executive Board deems necessary in the best interests of the Union."  *Monzillo* , 735 F.2d at 1459.  Though the case had become moot on appeal, the reviewing court did note that the district court should have considered the importance of a democratically agreed upon resolution by a union's own members when evaluating that union's actions.

Taking guidance from *Monzillo*, the Court should give great weight to the decision made by APWU members at the 2010 APWU National Convention.  A resolution was considered that would have required the collection of email addresses from all new members.  Declaration of Elizabeth Powell.  The delegates at the convention, selected by their locals to represent them, defeated the resolution declining to require the collection of email addresses on forms for new members.  *Id*.  The APWU respectfully requests that the Court give substantial weight to the fact that implicit in the APWU delegates' vote to decline to collect email addresses from new members is a preference that communications between the APWU and all of its members occur via the U.S. mail, consistent with APWU practices and in support of the industry which employs its members.

**CONCLUSION**

For the foregoing reasons, the APWU respectfully requests that the Court grant its Motion for Summary Judgment.  Should the Court decline to do so, the APWU respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunction.


Dated August 16, 2013                    Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

By: /s/ Darryl J. Anderson
Darryl J. Anderson
DC Bar Number 154567
1300 L Street NW Suite 1200
Washington, DC 20005-4178
Telephone: (202) 898-1707
Facsimile: (202) 682-9276
danderson@odsalaw.com

17