UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK DIMONDSTEIN, *et al.*,         )
            )
         Plaintiffs,      )
            )
      v.           )     No. 13-1228
            )
AMERICAN POSTAL WORKERS UNION,     )
            )
        Defendant.     )

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. . . . . . . . . . . . . . . . . . . 1

II.     THE UNION'S ARGUMENTS AGAINST ENFORCING THE STATUTE
       ACCORDING TO ITS PLAIN MEANING LACK MERIT.. . . . . . . . . . . . . . . . . . . . . . 5

      A.    Harm From Allowing Campaigning by Email.. . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Supposed Ability of Rank-and-File Candidates to Win Union-Wide Elections. . . 7

      C.    Alternate Means of Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    "Avoiding Interference in Union Affairs.". . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    ALTHOUGH VIOLATIONS OF SECTION 401(c) ALONE WARRANT THE
       ISSUANCE OF A PRELIMINARY INJUNCTION, THE REMAINING
       PRELIMINARY INJUNCTION FACTORS STRONGLY SUPPORT INJUNCTIVE
       RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Plaintiffs Established That They Will Suffer Irreparable Harm, and in Any
          Event No Showing Is Required.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    APWU and Others Will Not Be Injured by a Preliminary Injunction. . . . . . . . . 15

      C.    The Public Interest Will Be Advanced by a Preliminary Injunction.. . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## CASES

*Doyle v. Brock,*
    821 F.2d 778 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hummel v. Brennan,*
    469 F. Supp. 1180 (E.D. Pa. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*ITT Industrial v. NLRB,*
    413 F.3d 64 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*\*Masters, Mates & Pilots v. Brown*
    498 U.S. 466 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 15, 16

*Monzillo v. Biller,*
    735 F.2d 1456 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ostrowski v. Utility Workers Local 1-2,,*
    530 F. Supp. 208 (S.D.N.Y. 1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Roberts v. Sea-Land Services,*
    132 S. Ct. 1350 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Smith v. N.Y. Metro Area Postal Union,*
    2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wagner v. Federal Election Commission,*
    717 F.3d 1007 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Washington Teachers Union v. AFT,*
    751 F. Supp. 2d 38 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

## STATUTORY AND REGULATORY MATERIAL

Federal Water Pollution Control Act
    33 U.S.C. § 1319(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    33 U.S.C. § 1319(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Labor Management Reporting and Disclosure Act of 1959,
29 U.S.C. §§ 401 *et seq.*

Section 304(c), 29 U.S.C. § 464(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Section 401(c), 29 U.S.C. § 481(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Frequently Asked Questions Concerning Union Officer Elections*,
http://www.dol .gov/olms/regs/compliance/Electionsfaqgen.htm. . . . . . . . . . . . . . . . . . . 2

# I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

In their opening brief, plaintiffs argued that the language of section 401(c) of the Labor Management Reporting and Disclosure Act ("LMRDA") requiring unions to comply with reasonable requests to distribute campaign literature "by mail or otherwise" plainly comprehends electronic mail as well as postal mail.  They cited several decisions, including a Supreme Court decision, supporting their analysis by providing a mode of analyzing the statute, by showing a recognition of the need to enable candidates to make use of the lowest-cost methods of distributing their literature, and by making clear that it was not only postal mailing lists to which section 401(c) allows access in appropriate circumstances.  Plaintiffs also pointed to a Labor Department guideline for unions running their elections.

Remarkably, the union's responsive brief advances no argument about the statutory language and does not address a single one of the cases that plaintiffs cited in the "likelihood of success" portion of their opening brief.  When interpreting a statute, the Court looks first to the words chosen by Congress to determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Roberts v. Sea-Land Servs.*, 132 S. Ct. 1350, 1356 (2012). As plaintiffs' opening brief made clear, their request is encompassed by the text of section 401(c), and the union does not challenge the plain meaning of the statute. Although the union argues that, in one respect, plaintiffs' arguments go further than the Labor Department's position But it is only when the statute is ambiguous that the Court considers to the interpretation of the agency charged with its enforcement. *ITT Indus. v. NLRB*, 413 F.3d 64, 68 (D.C. Cir. 2005).

Moreover, what the union does have to say about the Secretary's views does not help its position.  The key provision in the web page to which both parties cite is question 9:

Q9. Can a union be required to distribute a candidate's campaign literature to

members via e-mail, as opposed to using their postal address?

A9. Other than by mail, there is no prescribed manner in which unions must distribute campaign literature. Likewise, unions are not required to provide candidates access to all methods of distribution that may be available to the union. Generally, **if the candidate's request for an alternative method of distributing campaign literature is a reasonable one, the union is required to make the distribution.** Accordingly, **OLMS advises unions to comply with a candidate's reasonable request to distribute campaign literature to the membership through e-mail if the union uses e-mail to disseminate information to its members.**

*Frequently Asked Questions Concerning Union Officer Elections*, http://www.dol.gov/olms/regs/compliance/Electionsfaqgen.htm. (emphasis added).

The record here shows that the union **does** communicate with its members by email—by its affiants' own admission, it communicates by email about meetings and conferences, it sends a weekly email to roughly 21,000 members about legislative matters (in fact, the record shows that it is not only legislative matters), and it regularly sends email to a few thousand retiree members (who, although the union ignores the point, have the right to vote in the upcoming election, Dimondstein Second Affidavit ¶ 7 ).  The union oddly tries to distance itself from these emails by saying that it is not really the APWU, but rather its Legislative and Retiree departments, that send these emails "for their own purposes."  But that is enough.  This is not a union where, as union counsel grandly argued at the August 13 hearing, the culture is that the union uses postal mail rather than electronic mail.  The union uses postal mail or email depending on which medium is appropriate in the circumstances.  Candidates are entitled to use either means of communication as well.[1]

---

[1]The union distorts the discussion and vote on a resolution at the 2010 Convention to show membership opposition to campaigning by email, citing the affidavit of Elizabeth Powell and Exhibit A.  In fact, what Exhibit A shows is that a few locals sought to require the national union to "request email addresses on the APWU membership application" but that the Executive Board recommended that delegates vote no because "it's already provided on the form."  *Id.* 921. Two delegates spoke

The union also argues that the Secretary's views support the union's position because "a union is not required to create a system to accommodate a request for e-mail distribution." APWU Mem. 8.  But the record shows that the union **does** have a system to accommodate such requests. In 2006, when the union wanted to enable the Legislative Department to send emails to members, APWU queried its database and produced a list of all email addresses then in its possession.  Reid Affidavit ¶ 6.  When the union runs meetings and conferences, it communicates with the attendees by email as well.  APWU Statement of Material Facts ¶ 9.  On at least two occasions in 2013, when the Retiree Department wanted to send emails either to all retirees, or to a select class of retirees, the IT staff queried its database and produced lists of email addresses, one list of "about 5000" and one list of 2435.  Cronk Affidavit ¶¶ 7, 8.  Retiree Director Judy Beard indicates that her department has yet a third list of 3,739 email addresses to which it sends weekly emails.[2]  The Second Dimondstein Affidavit, filed with this brief, explains that the ability to send campaign literature by email to retirees is especially important because they cannot be reached at the workplace.  ¶ 7.[3]

---

about the importance of using email, *id.* 925-927, and one delegate argued that postal workers should use postal mail.  *Id.*  924-925.  The resolution was defeated, *id.* 928, but for all the record shows, it was because the new form already provided for email addresses, which the union promised to make available to the locals generally.  *Id.* 923.

[2]The Beard Affidavit supporting this fact was filed on Monday, Docket No. 11.

[3]The Labor Department's Statement of Reasons rejection of a member's complaint against Local 300 of the Mailhandlers Union, cited by APWU at page 9 of its brief, provides no support for its position.  First, APWU mischaracterizes the decision, because the Department did **not** say that the union did not maintain "lists of email addresses," she said that the union did not keep email addresses in its membership database, unlike this case where the APWU **does** keep email addresses in its membership database.  More important, the complaint there was not that the union had failed to comply with a reasonable request to campaign by email; the complaint was under a different part of section 401(c), which forbids discrimination in the use of lists, and was rejected because that there was no evidence that the campaign email on which the complaint rested had come from the union. A copy of the ruling is attached to the Second Levy Affidavit as Exhibit V.  Although the

In the 21st century, the union's "list" of members is an electronic database. As the union's own evidence demonstrates, when APWU wants to communicate with particular sets of members about legislation, or about retiree issues, or about meetings and conferences, it uses electronic means to query that database—in the words of the statute, that list— to funnel the appropriate names into a mail-merge with the text that it wants to send to those members. Requests from candidates who want to have their campaign literature sent to those lists should also be accommodated, both as a matter of law and fact.[4]

Moreover, it is apparent that the union has "a system" for sending out mass emails to lists of members, because, in fact, it does such mass mailings. The attached affidavit of Glenn Simpson, ¶ 5, shows that it is apparent that the union uses a system provided by a well-known mass email provider called Salsa, with which Simpson is familiar because Public Citizen also uses that system. Simpson shows, ¶ 11, that it is a simple database operation either to extract email addresses and deliver them to an email provider, or to slice and dice the list to send targeted emails to particular categories of members within the list. Moreover, the union admits, Cronk Affidavit ¶ 18, that it can divide the list by many categories. Indeed, if it were a matter of "culling out" certain email addresses

---

Department of Labor cannot issue Statements of Reasons for denying members' election complaints that are so inconsistent with each other as to be irrational, *see Doyle v. Brock,* 821 F.2d 778, 786 (D.C. Cir. 1988), it is doubtful that such statements have any impact on judicial constructions of the statute.

[4]Indeed, every APWU officer and staff member has an email address and, presumably, an address book sitting on the union system that includes the email addresses of members with whom the employee or officer corresponds. Dimondstein Second Affidavit ¶ 9. For example, contrary to her affidavit, Elizabeth Powell uses her union email address to communicate with APWU members. *Id.* and Exhibit M. At the preliminary injunction stage, without the opportunity for discovery, plaintiffs cannot seek injunctive relief about the use of the email addresses in staff and officer address books. That issue may have to be resolved on a permanent injunction basis, if plaintiffs decide to pursue the issue.

as was discussed at the August 13 hearing—for example, to prevent campaign literature from being emailed to members who expressed a desire not to receive such communications—it would be simple to compare the list of members who expressed that preference to the overall list for that purpose.  In any event, as discussed below at pages 7-8, there is no evidence that any member expressed a preference to have their emails not used for any purpose.  Similarly, it would be a simple database operation to eliminate individuals who signed up for the e-Team but indicated in one of the mandatory fields on the signup form that they were not APWU members.

In short, the systems exist.  Moreover, even if they did not, the cases cited in plaintiffs' opening brief show that, if the union's own staff is unable to accommodate a reasonable request, the union may be **compelled** to provide the mailing list to a mailing house.  At the August 13 hearing, union counsel agreed that, if e-mailings must be done, the union prefers to have them done by an outside entity.  That is, therefore, what plaintiffs ask the Court to order.

## II.   THE UNION'S ARGUMENTS AGAINST ENFORCING THE STATUTE ACCORDING TO ITS PLAIN MEANING LACK MERIT.

Instead of discussing the statute, the APWU makes a variety of arguments, many couched as relating to irreparable injury or the public interest, about why the Postal Workers should not be compelled to allow campaign mailings by email.  None of their arguments has merit.

### A.  Harm From Allowing Campaigning by Email

APWU argues that allowing candidates to campaign by email could harm the union, but its arguments are exceptionally vague.  Although Powell avers in very conclusory fashion that "many" APWU members have any antipathy to receiving information by email, there is no showing that a majority feel this way or, indeed, that such feelings are more prevalent among postal workers than

among members of unions generally.  The APWU, after all, regularly sends information that way to members who have chosen to give the union their email addresses.  Moreover, receiving emails containing campaign literature would not implicate the APWU Legislative Department, or cause members to unsubscribe from the e-Team list, because the campaign literature would not come **from** the Legislative Department or be labeled e-Team emails.  Moreover, although the union makes much of the fact that it does not **force** members to provide their email addresses, and cannot be required to obtain email addresses, those arguments are a red herring—plaintiffs have only asked to have their campaign materials distributed to the email addresses the union already has.  It is possible that some members do not want to receive union-related information by email, but that is unlikely to be true of those members who have **voluntarily** provided their email addresses to the union.  And if Powell is right about the union's culture, then plaintiffs will pay politically at the polls for sending email. APWU incumbents are free to argue on the campaign trail that using email is inappropriate, but it is irrelevant to the legal issue before the Court.

Moreover, there is no evidence that, when the union elicits email addresses, it provides any assurances that members' email addresses will not be uses for particular intra-union purposes or, indeed, for communication about other subjects.  The Simpson affidavit shows these facts clearly, ¶¶ 4-8; his affidavit shows, as well, that members who want to "learn more" about the e-Team are pointed to a statement that the resulting email list will be used to send "legislative news, action alerts, and **other relevant information**."  (emphasis added).  *Id.* ¶ 7 and Exhibit P.  Information about candidates running for office within the union and their views about the union is surely "relevant information" in which union members may be interested, and the union has offered no evidence to the contrary other than a self-serving and conclusory statement by an incumbent who is

running for re-election.

Indeed, when APWU created its e-Team email list, it included on the list every member email address that it had.  Reid Affidavit ¶ 6.  Reid makes a point of the fact that he insisted on including an "unsubscribe" button on the early e-Team emails, *id.*, but he does not say that any members took advantage of that option.  Moreover, if some members unsubscribed, they would therefore not be getting campaign literature sent to the e-Team list.

Plaintiffs also argue, however, that they should be allowed to send campaign literature to every email address in the union-member database.  Had the union shown that some members had unsubscribed, and if the Court decides that those who unsubscribed from the e-Team should be excluded from the list of those who receive campaign literature by email—a point that plaintiffs do not concede legally or factually—it should be a simple database operation to remove them from the overall list.

**B.  Supposed Ability of Rank-and-File Candidates to Win Union-Wide Elections**

APWU argues that the fact that incumbent candidates have been defeated in selected national elections between 1980 and 2001 shows that there is no need to allow rank-and-file candidates to campaign by email.  This argument not only is unresponsive to plaintiffs' legal position, but also overstates the facts.

When plaintiffs argued that the "one-party state" character of most unions, in which the channels of communication are largely in the hands of the incumbents, provides an important reason for the robust enforcement of section 401(c)'s provisions regarding the distribution of campaign literature within unions, the point was less about the APWU in particular— although incumbents **do** control the methods of mass communication to the membership in this union as well—than about

unions and especially national unions in general.  This point is a reason to construe the **statute** to comprehend a modern form of mail—electronic mail—as well as postal mail.  In *Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991), for example, there was evidence in the record about the state of democracy in that union, but the Supreme Court did not discuss that evidence in making the point about the impact of mailings before the official nominations on the ability of insurgents to havew a fair chance to run in elections.   Similarly, here, even if APWU could show that it experienced a succession of successful rank-and-file candidacies, that showing would not meet plaintiffs' argument about the meaning of the statute.

Moreover, the election results to which affiant Elizabeth Powell points do not aid the union here, for several reasons  First, there have been contested elections for national office in each of the triennial contests since 2001, that is, during the age of robust Internet and email communications, but no incumbent has been defeated in those elections.  Second Dimondstein Affidavit ¶ 2.  Second, as discussed in more detail in plaintiffs' response to paragraph 46 of APWU's Statement of Material Fact, as well as in the Second Dimondstein Affidavit at ¶¶ 3-6, no rank-and-file candidate has upset an incumbent national officer in a union-wide election since 1980, and even in 1980 there were special circumstances not present here.  In that regard, most of the successful candidacies against incumbents were not in union-wide elections but in elections for Director  of relatively small crafts within the union (Motor Vehicle Services, Special Delivery Messenger, and Maintenance); under Article 9 Section 8 of the APWU Constitution, only members of the division vote for division director positions, and the membership of these small craft units is more cohesive and much, much smaller, so that it is much less expensive to use postal mail and other methods to communicate with them.  Second Dimondstein Affidavit ¶ 3.  In 2001, Cliff Guffey was not running against an

incumbent for the position of executive vice-president, and he was not a rank-and-file candidate—he was director of the division that contained the vast majority of APWU members. *Id.* ¶ 4. The 1980 election was contested by a slate led by Moe Biller, the head of the very large New York local which was far and away the largest local in the country, and also had a significant national reputation; he was joined by candidates who headed the large Cleveland and Pittsburgh locals. *Id.* ¶ 5. But equally important as the ability of these local leaders to deliver huge voting blocks of members who already knew them well, the Biller slate was the first in the history of the union to use the right to invoke section 401(c) to do a direct mailing to the entire membership, and the incumbents did not do such a mailing themselves. *Id.* ¶ 6. Plaintiffs' APWU Members First Slate wants to be the first to use 21st Century methods of communication to aid their candidacy. Section 401(c) of the LMRDA enables them to do so.[5]

### C. Alternate Means of Communication

APWU argues that plaintiffs will not suffer irreparable injury because they have other means of communicating their campaign messages. Plaintiffs address irreparable injury from a legal perspective in the last section of this brief, but the fact that plaintiffs are not waiting for a victory in this case to begin their campaign is legally irrelevant to their right under section 401(c) to campaign using the union's list of email addresses, for two reasons. First, APWU's argument is factually overstated, a matter addressed below. More important, as argued in our opening brief and not disputed by APWU, section 401(c) protects the right to have campaign literature distributed multiple

---

[5]APWU implies that Dimondstein's former employment by the national union would have given him access to the membership at large. Powell Affidavit ¶ 28. But  Dimondstein worked as an outside organizer with minimal contact with APWU members. His task was to bring new units of workers employed in the private-sector postal industry into the APWU. Second  Dimondstein Affidavit ¶ 9.

times and to different segments of the union. APWU deserves credit for putting "battle pages" of 300-word candidate statements in the back of its postal-mailed magazine, although the front of the magazine is plastered with columns by and photographs of the incumbents, and for providing a section of its web site for candidates to post 1000 word statements. Still, the fact that the union thus enables distribution by mail and Web does not vitiate a candidate's right to send multiple emails as well. At this point, with less than a month until the ballots are mailed on September 12 or 13, 2013, time is of the essence.[6]

Moreover, the distribution through alternate means of communication is overstated. APWU gives no data about the number of visits to the part of its web site where candidate statements appear, although such data would ordinarily be in its grasp, Simpson Affidavit ¶ 13, and although APWU points to the 1987487 hits to the home page of the 21cpw.org web site, it is not true that the web site "supports Dimondstein"—it is a membership discussion site where all sides can speak, Dimondstein Affidavit ¶ 11 and Exhibit N. Moreover, that large number of hits may well reflect visits since the site began; WHOIS records indicate that the domain name for that web site was registered thirteen years ago, Simpson Affidavit Exhibit R, and the Internet Archive indicates that as of April 15, 2013, the first time the Archived web site makes any reference to the 2013 APWU election, the site had already had more than 1935546 hits. *id.* ¶ 12 and Exhibit S. The 50,000 hits in between could have included several different visits from the same viewer. The section of the site relating to the 2013 election has had only 28586 visitors, Second Dimondstein Affidavit Exhibit N (again, this could include multiple views by the same person)—but the electorate is nearly 200,000. Moreover, perusal

---

[6]These dates, which are two or three days earlier than the date for mailing ballots that both parties assumed to be correct at the August 13 hearing, appear in Exhibit H to the Powell Affidavit.

of the discussion on that page reveals that a few voices appear scores of times. http://www.21cpw.com/election.html.  Similarly, the fact that candidates can have their own web sites and Facebook pages, and can do their best to collect a handful of email addresses, is no substitute for access to the 27,000 member email addresses that APWU has collected using union resources.

###    D.   "Avoiding Interference in Union Affairs."

Finally, APWU argues that the Court should give it the benefit of every doubt about the meaning of the statute and its application in this case by arguing that the legislative history of the LMRDA reflects a desire to avoid unnecessary interference in union affairs.  In fact, in 1959, Congress was divided between some legislators who wanted to avoid such intervention and others who concluded that the history of corruption and tyranny revealed by the McClellan Committee's investigation required extensive intervention in union affairs.  The LMRDA as enacted reflects that tension.  In some respects, the statute requires exhaustion of intra-union remedies and deference to union rules so long as they are "reasonable,"[7] but other parts of the statute lay down detailed and precise commands about union members' rights to which unions are required to defer.  In *Masters, Mates & Pilots v. Brown*, the Supreme Court identified section 401(c) as a statutory provision that overrides the policy of "avoiding unnecessary interference in union affairs." 498 U.S. 466, 478

---

[7]*Monzillo v. Biller*, 735 F.2d 1456 (D.C. Cir. 1984), was such a case, in which the issue was the proper construction of the APWU's Constitution; the union's newly elected officials had decided how the constitution applied to the decision to buy a new building for the union, the D.C. Circuit was unwilling to allow members to invoke the general fiduciary duty of union officers to override that decision.  In any event, *Monzillo* is invoked to argue a non-issue—whether the APWU is required to collect email addresses from new members.  Plaintiffs do not argue that the law so requires, and in any event the transcript of the convention attached to the Powell affidavit belies her characterization of the convention's action.

(1991).  Under section 401(c), unions must defer to members' choices about how to campaign, so long as their requests are reasonable; courts do not defer to unions' choices about what rules to adopt about internal communications.

### III.   ALTHOUGH VIOLATIONS OF SECTION 401(c) ALONE WARRANT THE ISSUANCE OF A PRELIMINARY INJUNCTION, THE REMAINING PRELIMINARY INJUNCTION FACTORS STRONGLY SUPPORT INJUNCTIVE RELIEF.

#### A.   Plaintiffs Established That They Will Suffer Irreparable Harm, and in Any Event No Showing Is Required.

As their opening papers demonstrated, at 8-12, plaintiffs need not demonstrate a specific showing of irreparable injury to obtain preliminary injunctive relief, because, under applicable case law, a violation of their free speech rights under section 401(c) caused by APWU's refusal to comply with their reasonable request to distribute their campaign literature by email is itself presumed to be an irreparable injury. The union's attempts to distinguish *Hummel v. Brennan*, 469 F. Supp. 1180 (E.D. Pa. 1979), and *Ostrowski v. Utility Workers Local 1-2,*, 530 F. Supp. 208 (S.D.N.Y. 1980) are unpersuasive. Contrary to APWU's assertion that the court did not even consider plaintiffs' LMRDA rights in its analysis of whether injunctive relief was proper, the court found that the deprivation of voting rights of the union membership under the LMRDA would cause "irreparable injury … to the plaintiffs." *Hummel*, 469 F. Supp. at 1187 (granting motion for preliminary injunction).  *Hummel*  was a lawsuit over whether union dues had been increased in violation of the LMRDA – if any case was appropriate for an argument that there was no irreparable injury *Hummel* would be it, because increased dues could always be refunded.  But the mere violation of statutory voting rights was enough to support a preliminary injunction.  Similarly, although the union accurately cites *Ostrowski*'s holding that "a 'chilling effect' on the exercise of freedom of speech or

other LMRDA rights constitutes irreparable injury," 530 F. Supp. at 216, the relevance of the chilling effect in that case was to show that there had been a violation of LMRDA free speech rights; such a violation was enough to warrant a finding of irreparable injury. Here, the LMRDA right violated was the right to have campaign literature distributed. The violation is sufficient to find irreparable injury.

Further, as plaintiffs explained in their opening papers, a showing of irreparable injury is not necessary when a statute by its terms necessarily requires injunctive relief to remedy a violation of that statute. Plaintiffs' Mem. 8-9, 11. APWU's reliance on *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), to argue that section 401(c)'s provision for pre-election suits does not permit this Court to infer that injunctive relief is mandated for violations is misplaced. In *Weinberger*, the Court found that an injunction was not the only means of ensuring compliance with the Federal Water Pollution Control Act ("FWPCA") because the statute also allowed for the assessment of fines and criminal penalties for violations. *Id.* at 313 (citing 33 U.S.C. §§ 1319(c) and (d)). Unlike the FWPCA, Section 401(c) provides only that plaintiffs may enforce their rights in a pre-election suit; it does not authorize an award of damages or any other monetary relief for violations. 29 U.S.C. § 481(c). The legislative history, as outlined in plaintiffs' opening papers, supports the necessary inference from the text of section 401(c) that injunctive relief is the only means by which candidates may enforce their rights to distribute their campaign literature prior to an election. Plaintiffs' Mem. 11. Unable to circumvent the plain meaning of section 401(c), APWU resorts to discounting the legislative history. *But see Wagner v. Fed. Election Comm'n*, 717 F.3d 1007, 1012-13 (D.C. Cir. 2013) (relying on legislative history to confirm interpretation of plain text of statute).

Similarly, APWU misreads two recent district court decisions, both of which it contends

-13-

unequivocally require plaintiffs to prove irreparable injury to obtain injunctive relief. To the contrary, the court in *Smith v. N.Y. Metro Area Postal Union*, 2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012), found that plaintiffs failed to demonstrate a likelihood of success on the merits, and, therefore, did not reach the issue whether plaintiffs had demonstrated irreparable harm. *Id.* at *2 (finding that challenged publication "is not 'campaign literature' for purposes of [section 401(c)]"). Moreover, there is no indication that plaintiffs argued that irreparable injury need not be shown in a section 401(c) case, hence the case cannot stand for the proposition that it must be shown. Similarly, in *Washington Teachers Union v. AFT*, 751 F. Supp. 2d 38 (D.D.C. 2010), a case litigated by the firm that represents APWU in this case, the plaintiffs expressly argued that they would suffer irreparable injury if an injunction did not issue, *id.* at 56, and review of plaintiffs briefs on PACER shows that they did not point to the law that irreparable injury need not be shown when the statute provides for injunctive relief. In any event, *WTU* was a suit under the LMRDA's trusteeship provisions which, like the statute at issue in *Weinberger*, authorizes injunctions among other forms of appropriate relief. LMRDA section 304(c), 29 U.S.C. § 464(a). Thus, this Court, which heard that case, had no occasion to decide whether a violation of section 401(c) alone dispensed with the need to prove irreparable injury.

In any event, plaintiffs are likely to suffer irreparable injury should an injunction not issue, because monetary damages cannot make plaintiffs whole for their loss of an election to union office. Plaintiffs Mem. 8-9. APWU does not respond to this point. Indeed, APWU does not explain to the Court what remedy it would consider appropriate after a judgment for plaintiffs on the merits. In fact, the statute prescribes only one remedy—compelling the union to comply with its duty to distribute. To be sure, the statute does not use the word "injunction," but the remedy authorized, and

-14-

the only remedy ever awarded in section 401(c) cases, other than attorney fees under the common benefit doctrine, is a mandatory injunction.    The unavailability of other remedies literally makes plaintiffs' injury "irreparable" after the fact.

**B.    APWU and Others Will Not Be Injured by a Preliminary Injunction.**

In their opening papers, plaintiffs explained why the issuance of a preliminary injunction will not substantially injure APWU, noting that plaintiffs would bear the costs of distributing their campaign literature by email. Plaintiffs' Mem. 11. More significantly, plaintiffs explained why deciding this issue prior to the election would spare both APWU and its membership from a costlier, time-consuming post-election lawsuit. Id. APWU does not raise any objections to these arguments. Instead, it asserts that plaintiffs' use of its email lists will cause harm to APWU's culture and offense to its members, but as explained in Section II.A above, these allegations are vague, unsubstantiated, and wholly meritless. Accordingly, the Court should find that no substantial injury to APWU or other interested parties will occur by issuing a preliminary injunction.

**C.    The Public Interest Will Be Advanced by a Preliminary Injunction.**

Plaintiffs argued in their opening brief that the public interest in vindicating principles of union democracy will be furthered by issuance of a preliminary injunction. Plaintiffs' Mem 12. APWU does not disagree that this is a significant public interest, but instead argues that there is an even stronger public interest in avoiding judicial interference in internal union affairs.  APWU Mem. 15.  This interest, although legitimate, has no place within the context of a candidate's exercise of his section 401(c) rights. As the Supreme Court recognized in *Masters, Mates & Pilots*, Congress expressed a clear policy preference in section 401(c) for ensuring "free and democratic union elections … [by] offset[ting] the 'inherent advantage over potential rank and file challengers'

-15-

possessed by incumbent union leadership." 498 U.S. at 476; *see also id.* at 478 (observing that "expressions of respect for internal union rules are notably absent in § 401(c)."). Because the public interest in the fair conduct of union elections, as articulated by Congress, is paramount, the Court should reject APWU's argument that judicial deference to union rules in other contexts warrants a finding in its favor on this factor.

## CONCLUSION

The Court should grant plaintiffs' motion for a preliminary injunction.

Respectfully submitted,


  /s/ Paul Alan Levy
Paul Alan Levy (DC Bar No. 946400)
Jehan A. Patterson (DC Bar 1012119)

  Public Citizen Litigation Group
  1600 20th Street NW
  Washington, D.C. 20009
  (202) 588-1000 (voice)
  (202) 588-7795 (facsimile)
  plevy@citizen.org
  jpatterson@citizen.org

  Attorneys for Plaintiffs

August 19, 2013