UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK DIMONDSTEIN, *et al.*,          )
                                     )
                Plaintiffs,          )
                                     )
        v.                           )          No. 13-1228
                                     )
AMERICAN POSTAL WORKERS UNION,       )
                                     )
                Defendant.           )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Defendant's motion for summary judgment should be denied for two reasons. First, APWU's legal analysis is faulty.  As argued in plaintiffs' memorandum in support of their motion for a preliminary injunction, and in their reply memorandum, the undisputed facts that the union's membership database has email addresses for roughly 27,000 members, that the union maintains a list of roughly 21,000 members to whom it sends a weekly email about legislative affairs, and that the union has produced lists of 5,000, 3,739, and 2,435 email addresses for the use of its Retiree Department, are alone sufficient to warrant granting plaintiffs the relief they seek under section 401(c).  Because APWU has not demonstrated that it is entitled to judgment as a matter of law,  and because plaintiffs have not been afforded an opportunity to conduct even informal discovery, this Court should deny defendant's motion for summary judgment.

Review of Plaintiffs' Response to APWU's Statement of Material Facts reveals that, in many respects, APWU seeks summary judgment based on "facts" that are not material, not supported by the evidence cited in APWU's Statement, or contradicted by APWU's own evidence or by evidence presented by plaintiffs. Plainly, the union has not satisfied its burden of demonstrating that there are no genuine issues of material fact in dispute.

Perhaps most importantly, defendant seeks summary judgment based on affidavits from witnesses whom plaintiffs have been unable to question, even informally.  At the August 13, 2013, status conference, the Court anticipated that problem by urging the parties to sit down with the union's fact witnesses to try to resolve any factual questions so that the case could be ripe for summary judgment.  Undersigned counsel Mr. Levy reported that, while the Court had been off the line, he and the union's counsel had discussed the same issue and had agreed that it was essential that plaintiffs' counsel be able to talk to defendant's staff who have knowledge of the technical facts. Union counsel did not disagree with this characterization.

But after the hearing, when plaintiff sought to talk to the relevant APWU staff, APWU counsel indicated that he was too busy preparing his papers, and said that counsel could discuss access to the staff on August 16 after the papers were due.  The papers, in fact, contained a motion for summary judgment, statement of material facts, memorandum opposing a preliminary injunction and supporting summary judgment, and four affidavits (including one filed after defendant's August 16, 2013, deadline).  Taking up the suggestion from union counsel that they resume discussions on Friday afternoon about access to the witnesses, Mr. Levy asked to talk to them.  Despite a number of requests by undersigned counsel, union counsel refused to produce his affiants even for informal questioning.  Levy Second Affidavit ¶ 4 and Exhibit X.  In effect, the union seeks summary judgment based on affidavits with no opportunity for any discovery, even informal discovery.  The attached Affidavit from Mr. Levy is submitted, in part, as a Rule 56(d) affidavit.

This Court may deny summary judgment where the non-moving party has sought but been denied **any** discovery whatsoever.  *See* Fed. R. Civ. P. 56(d)(1).  For example, in *Khan v. Parsons Global Servs.*, 428 F.3d 1079 (D.C. Cir. 2005) , the defendant removed to federal court and moved

for summary judgment just one week later.  The Court of Appeals reversed summary judgment, stating that "a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and . . . 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion." *Id.* at 1087 (citation omitted).  *See also Scarborough v. Harvey*, 493 F. Supp. 2d 1, 17 (D.D.C. 2007) (denying motion for summary judgment because "the parties have not engaged in any discovery whatsoever, and the plaintiffs' submissions amply detail the need for some development of the factual record.").  Here, as plaintiffs' reply memorandum in support of their motion for a preliminary injunction demonstrates, plaintiffs' affidavits, in addition to evidence proffered by the union's affidavits, as well as inferences that can be drawn from omissions in the affidavits as well as from the union's refusal to allow their affiants to be questioned, not only provide ample grounds for this Court to grant preliminary injunctive relief, but also raise factual issues on which further development of the record is necessary.

Consequently, plaintiffs respectfully suggest that it is not practical for the Court to address the APWU's summary judgment motion which may, in the end, have been a ploy to obtain a sur-reply brief on the motion for a preliminary injunction.  Although it would surely be desirable to conclude this case promptly, granting summary judgment to defendant in a situation where the motion was filed one week after the complaint was filed, and before any opportunity to question defendant's witnesses, where plaintiffs had to file their opposition brief on barely 72 hours' notice because the summary judgment motion was combined with an opposition to a motion for a preliminary injunction, would place too much stress on finality at the expense of fair procedure.

## CONCLUSION

For the foregoing reasons, the Court should deny defendants' motion for summary judgment.

Respectfully submitted,


 /s/ Paul Alan Levy
Paul Alan Levy (DC Bar No. 946400)
Jehan A. Patterson (DC Bar No. 1012119)

 Public Citizen Litigation Group
 1600 20th Street NW
 Washington, D.C. 20009
 (202) 588-1000 (voice)
 (202) 588-7795 (facsimile)
 plevy@citizen.org
 jpatterson@citizen.org

 Attorneys for Plaintiffs

August 19, 2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK DIMONDSTEIN, *et al.*,           )
                                      )
                    Plaintiffs,       )
                                      )
        v.                            )        No. 13-1228
                                      )
AMERICAN POSTAL WORKERS UNION,        )
                                      )
                    Defendant.        )

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS ABOUT WHICH
THERE IS NO GENUINE ISSUE AND
STATEMENT OF GENUINE ISSUES AS WELL AS
FACTUAL MATTERS ABOUT WHICH PLAINTIFFS HAVE HAD
INSUFFICIENT OPPORTUNITY FOR DISCOVERY**,

1. Plaintiffs Mark Dimondstein, Tony McKinnon and Violetta Ward are members of defendant

American Postal Workers Union, AFL-CIO (APWU) within the meaning of 29 U.S.C § 402 (o).

Complaint ¶ 3.

**RESPONSE:**

Admitted.


2. Defendant APWU is a labor organization within the meaning of 29 U.S.C § 402 (i).

**RESPONSE:**

Admitted.


3. Plaintiffs are running as candidates for elective office in a national-officer election of the APWU

that will be conducted by referendum ballot, with the ballots to be mailed September 12 and 13,

2013. Complaint ¶ 5; Powell Dec. Exh. H.

**RESPONSE:**

Admitted.

4. Plaintiffs are seeking a preliminary injunction compelling the APWU to send Plaintiffs' campaign literature through the Internet using e-mail addresses that Plaintiffs contend comprise "lists" that must be made available to Plaintiffs under § 401 (c) of the Labor-Management Reporting and Disclosure Act of 1959.

**RESPONSE:**

Denied.  Plaintiffs do argue that most or all of the emails are on "lists" within the meaning of section 401(c), but their principal argument is that, in any event, the union has the ability to distribute the literature "by mail or otherwise" to every one of the email addresses in its possession, and hence that their request to have their campaign literature distributed to those email addresses is reasonable.

5. The APWU has approximately 193,000 members, of whom approximately 41,000 are retiree-members. Cronk Dec. ¶¶ 5, 7.

**RESPONSE:**

Admitted, and noted further that in the APWU, retirees have the right to vote for many of the national officers, including the offices for Dimondstein and Ward are running.  Second Dimondstein Affidavit ¶ 7.

6. The APWU maintains a database concerning its membership using software known as iMIS. That

database contains approximately 27,000 e-mail addresses. Cronk Dec. ¶ 5.

**RESPONSE:**

Admitted that the iMIS database has at least 27,000 email addresses, subject to the concern that plaintiffs have been given no opportunity to question Cronk about the contents of his affidavit.

7. The APWU does not know and has no way of knowing how many of the 27,000 e-mail addresses in its database are valid e-mail-addresses. Cronk Dec. ¶¶ 5, 6.

**RESPONSE:**

Admitted, subject to the concern that plaintiffs have been given no opportunity to question Cronk about the contents of his affidavit.

8. The APWU has not used the e-mail addresses in its database to send communications to the members corresponding to those 27,000 e-mail addresses. Cronk Dec. ¶¶ 6, 10.

**RESPONSE:**

Denied.  The Cronk affidavit does not make the statement asserted here to be undisputed.  In paragraph 6 of his affidavit, Cronk avers that "**to my knowledge**, we have not used [the email addresses] to send communications **to those members as a group.**" (emphasis added).  In paragraph 10 of his affidavit, Cronk avers, "To my knowledge, the APWU has not . . . sen[t] communications **to all APWU members** whose e-mail addresses are in the iMIS system."  (emphasis added). Because plaintiffs have not had any opportunity to pursue even informal questioning of Cronk, despite the fact that the union counsel previously agreed to allow such questioning and despite the

-3-

Court's having urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Cronk's affidavit to obtain summary judgment.

Moreover, even if the APWU has not sent e-mail to every one of the 27,000 email addresses, other affidavits make clear that the APWU has sent email to the vast majority of those addresses. *See* Reid Affidavit ¶ 6.


9. The e-mail addresses in the APWU database have been collected in several different ways:

   a. APWU members attending conferences, meetings and seminars are asked to register and, sometimes, pay a fee. If they wish to receive confirmation of their registration or a receipt for their feed by e-mail, they are requested to provide an e-mail address for that purpose. E-mail addresses obtained in that way our input into the database by APWU employees. Powell Dec. ¶7.

   **RESPONSE:**

   Admitted, but it is noted that nothing in this statement shows that the APWU solicits from members any expression of whether they object to having their email addresses used for any purpose other than communications about the meetings in question, or that any members have expressed any such preference.  It is further noted that this use of email belies the assertion that the APWU is a union whose culture demands communication by postal mail with a stamp rather than by email.


   b. APWU members attending meetings, conferences, seminars and conventions are asked to register and may provide their e-mail addresses at that time, but is not required that they

provide their e-mail addresses. Powell Dec. ¶7.

**RESPONSE:**

Admitted, but it is noted that nothing in this statement shows that the APWU solicits from members any expression of whether they object to having their email addresses used for any purpose other than communications about the meetings in question, or that any members have expressed any such preference.  It is further noted that this gathering of email addresses belies the assertion that the APWU is a union whose culture demands communication by postal mail with a stamp rather than by email.

c. Some APWU members are asked for e-mail addresses when they join the union and sign a Form 1187. However, that practice is inconsistent; it did not begin until approximately 2008; and some APWU locals and APWU members resist that practice. Powell Dec. ¶7.

**RESPONSE:**

Admitted, but it is noted that nothing in this statement shows that the APWU solicits from members any expression of whether they object to having their email addresses used for whatever purposes the union may choose, including the rental or sale of email addresses to raise revenue or to provide support for allied causes, or that any members have expressed any such preference.  It is further noted that this gathering of email addresses belies the assertion that the APWU is a union whose culture demands communication by postal mail with a stamp rather than by email.   It is further noted that it is incredible that the union would ask members for their email addresses and not intend ever to use them to communicate with members.

d. Members are permitted to go to the members-only portion of the APWU webpage to see their member profile data. If they choose to do so, they may add an e-mail address to their member profile. But that is not required. Cronk Dec. ¶¶ 12, 14.

**RESPONSE:**

Admitted, despite the fact that plaintiffs have not been permitted to question Cronk, even informally, because this fact has been verified by plaintiffs' personal experience.  It is noted that nothing in this statement shows that the APWU solicits from members any expression of whether they object to having their email addresses used for whatever purposes the union may choose, including the use of email addresses to raise revenue or to provide support for allied causes, or that any members have expressed any such preference.   It is further noted that this gathering of email addresses belies the assertion that the APWU is a union whose culture demands communication by postal mail with a stamp rather than by email.

10. Many APWU members have been members of the APWU since before e-mail existed. The median age of APWU members is. See Powell Dec.

**RESPONSE:**

The first sentence is admitted.  The second sentence is denied because it is incomplete.

11. The APWU Legislative Department has a program it calls "e-Alert." That program is used to send e-mails about current legislative issues to its list of subscribers. Individuals who go to the APWU web page, both APWU members and members of the public, are offered an opportunity to sign up to receive e-Alert e-mails from the APWU. That list of subscribers is not maintained in iMIS.

Cronk Dec. ¶ 9.

**RESPONSE:**

The first three sentences are admitted based on plaintiffs' personal experience; plaintiffs note further that their own investigation shows that APWU uses a common system called Salsa to obtain email addresses. *See* Simpson Affidavit ¶ 4. The last sentence is denied because plaintiffs do not have the knowledge to form a belief as to its truth. Moreover, defendant's unwillingness to allow plaintiffs to question either Cronk or Reid, even informally, prevented plaintiffs from exploring how the e-Team database is maintained and any relationships to other union databases. Because union counsel previously agreed to allow such questioning and because the Court urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Cronk's affidavit to obtain summary judgment.

12. The e-Team was created because lobbying is time-sensitive. Since the terrorist attack on the post office using anthrax in 2001, mail directed to Congress is diverted to a site away from Congress where it is irradiated before being delivered. This delay in the delivery of mail has increased the importance of timely personal visits and phone calls from APWU members. Reid Dec. ¶ 3.

**RESPONSE:**

The reasons why the e-Team were created are irrelevant to this litigation, hence no response to this paragraph is required. Subject to that objection, to the extent that any response is required, these facts show the need to contact Congress by email or telephone rather than by mailing letters, but it does not show an increased need to email members about the issues. It is noted, however, that it **is** relevant that the union uses email to communicate with members when it considers that email is a

good way to communicate.

13. Because of the delay in mail to Congress, APWU decided to create an e-mail list to facilitate prompt timely contacts with members of Congress on legislative issues. The program was announced on March 20, 2006. Reid Dec. ¶4, Exhibit A.

**RESPONSE:**

It is admitted that the program was announced on March 20, 2006.  The reasons why the e-Team were created are irrelevant to this litigation, hence no response to the first sentence is required. Subject to that objection, to the extent that any response is required, the delay in mail to Congress shows the need to contact Congress by email or telephone rather than by mailing letters, but it does not show an increased need to email members about the issues.  It is noted, however, that it **is** relevant that the union uses email to communicate with members when it considers that email is a good way to communicate.

14. The purpose of e-Team News Updates, which are sent once per week, is to generate interest and action by APWU members to support the APWU legislative program. An example of this would be calling on e-Team members to support or defeat particular legislation affecting the Postal Service. Reid Dec. ¶8 and Exh. B.

**RESPONSE:**

Admitted.

15. The position of the Postal Service is dire. The future of the Postal Service is hanging in the

balance. It is very important that APWU members be informed so they are in a position to take action to influence the outcome of postal legislation. Reid Dec. ¶ 9.

**RESPONSE:**

These statements are irrelevant to the litigation, hence no response to this paragraph is required. Subject to that objection, to the extent that any response is required, this paragraph is admitted. It is noted, however, that it **is** relevant that the union uses email to communicate with members when it considers the reason for communicating by email to be "very important."  It is further noted that, under section 401(c) of the LMRDA, it is "very important" that the union comply with reasonable requests by candidates for union office who seek an inexpensive and prompt way of having their campaign literature distributed to the union membership that allows candidates to respond quickly to developments in the campaign.

16. It is difficult but not impossible for APWU lobbying efforts to have an effect on postal legislation. In 2012, APWU lobbying efforts did have a positive effect on the content of a bill that passed the United States Senate. Reid Dec. ¶ 10.

**RESPONSE:**

These statements are irrelevant to the litigation, hence no response to this paragraph is required. Subject to that objection, to the extent that any response is required, this paragraph is admitted.

17. If candidates for union offices were permitted to have access to the e-Team list for making political mailings that would result in people receiving messages about internal union politics when they have no interest in receiving them. The impact of opening up the legislative alert system to other

uses could be detrimental to the APWU's legislative program at the most critical time in the Union's history. Reid Dec. ¶11.

**RESPONSE:**

Denied.  The cited affidavit provided no basis for the affiant's speculation that members of the union who are on the e-Team mailing list and hence would receive campaign mailings if the preliminary injunction is granted might "have no interest in receiving them."  Moreover, plaintiffs have not suggested "opening up the legislative alert system to other uses"; rather, they have asked that email addresses available for official union uses through, among other things, the e-Team database, be furnished to an independent emailing service and sent out in plaintiffs' name, without any explanation that the email came from the e-Team database.  Consequently, there is no basis for the contention that members might "blame" the legislative department for their having received campaign literature.  Nor does the affiant provide any explanation about how sending campaign literature by email to the same email addresses to which legislative alerts are emailed "could be detrimental to the APWU's legislative program."  The affiant has shown no basis for expressing an opinion on that issue.  Finally, because plaintiffs have not been allowed to question Reid, even informally, even though union counsel previously agreed to allow such questioning and even though the Court urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Reid's affidavit to obtain summary judgment.


18. There are several sources of members for the APWU e-Team. It was begun by creating sign up options on the APWU web page. APWU officers also began speaking at all available APWU conferences and meetings asking people to sign up for the e-Team. Officers distributed sign-up forms

at union conferences, meetings and conventions. These activities have been ongoing since the beginning of the e-Team. Reid Dec. ¶5.

**RESPONSE:**

Admitted.  However, it is noted that nothing in this statement shows that the APWU solicits from members any expression of whether they object to having their email addresses used for whatever purposes the union may choose, including the use of email addresses to raise revenue from other organizations, Simpson Affidavit ¶ 9, or to provide support for allied causes, or that any members have expressed any such preference.  It is further noted that this use of email belies the assertion that the APWU is a union whose culture demands communication by postal mail with a stamp rather than by email.

19. The APWU also, on a one-time basis, added e-mail addresses to the e-Team system from the iMIS system. A prominent "unsubscribe" button was displayed on the messages sent during the period shortly after that transfer of addresses from iMIS to make it easy for non-consenting participants to withdraw from the e-Team. Reid Dec. ¶6

**RESPONSE:**

The first sentence is admitted.  The second sentence is denied, because under the best evidence rule, the actual messages sent are the best evidence of their contents, and there is no showing that those messages are unavailable.  Moreover, it is noted that there is no indication that anybody unsubscribed and, if any, how many. Finally, because plaintiffs have not been allowed to question Reid, even informally, and because union counsel previously agreed to allow questioning and because the Court urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Reid's

affidavit to obtain summary judgment.

20. The e-mail list for the e-Team is maintained as a separate database that is not a part of the APWU iMIS system. That database is used to generate e-mail messages called News Updates. Reid Dec. ¶7 and Exh. B.

**RESPONSE:**

The fact that the database is part of a different system than the iMIS system is not relevant to the issues in this case, hence no reply is required.  To the extent that any response is required, the statement is denied because plaintiffs lack knowledge sufficient to formulate a response.  Because plaintiffs have not been allowed to question Reid, even informally, even though because the union's counsel previously agreed to allow questioning and even though the Court urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Reid's affidavit to obtain summary judgment.

21. The e-Team has about 21,000 members. Powell Dec. ¶6.

**RESPONSE:**

Admitted.

22. The APWU Retiree Department sends out weekly "Friday Alerts" which are prepared by the Alliance for Retired Americans. These Friday Alerts are sent by e-mail to approximately 3,739 people. Of the 41,000 members of the Retiree Department, the Department has only the e-mail addresses it uses to send. Beard Dec. ¶¶ 2, 3.

**RESPONSE:** The first two sentences are admitted provisionally, even though the affidavit from Retiree Department Director Judy Beard was filed only today and even though the union's counsel previously agreed to allow questioning and even though the Court urged the parties to talk to each others' experts has been filed. The rest is a sentence fragment, and therefore there is nothing to admit or deny.

23. The Retiree Department e-mail list is not maintained as part of iMIS. On two occasions, the Retiree Department asked for and received retiree e-mail addresses from the iMIS system. On the first occasion, in February 2013, the Department was given all the e-mail addresses for retiree members in the iMIS system. At that time, there were about 5,000 e-mail addresses associated with the approximately 41,000 retiree members. Cronk Dec. ¶7.

**RESPONSE:**

The first sentence, about whether the Retiree email list is part of a different system than the iMIS system is not relevant to the issues in this case, hence no reply is required. To the extent that any response is required, the statement is denied because plaintiffs lack knowledge sufficient to formulate a response. Moreover, because plaintiffs have not been allowed to question Reid, even informally, even though because the union's counsel previously agreed to allow questioning and even though the Court urged the parties to talk to each others' experts, plaintiffs object to defendant's reliance on Reid's affidavit to obtain summary judgment. The remaining sentences are admitted, noting that the statement being admitted does not say that such requests occurred **only** two times.

24. The second occasion was in April. At that time, the APWU IT Department created a list of 2,435 APWU members who had agreed to accept an incentive for voluntary early retirement. Those 2,435 employees for whom the APWU had e-mail addresses were all there were with associated e-mail addresses out of a total of approximately 22,000 APWU members who took voluntary early retirement. Cronk Dec. ¶8.

**RESPONSE:**

Admitted.


25. Other than the e-Team list of approximately 21,000 e-Team members and the Retiree Department list of approximately 3,739 out of 41,000 Retiree Department members, the APWU does not maintain any e-mail list for the purpose of communicating with its members. Powell Dec. ¶6.

**RESPONSE:**

Denied.   The affiant does not show that she has knowledge about whether any other APWU department or staff member has any list of emails for the purpose of communicating with APWU members.  Indeed, it is incredible that there is not a single union staff member who uses email at work and who maintains an address book on the email account that he or she uses at work with APWU member email addresses, acquired in the course of his or her official duties, in it.


26. Because we are a union of postal workers, we have a strong tradition within our union of sending official communications to each other by U.S. Mail. Many of our members and many of our union leaders oppose the use of e-mail for sending union communications to our members. Powell Dec. ¶ 7.

-14-

**RESPONSE:**

The first sentence is denied because the union's own affidavits show that the union maintains a database of email addresses and dips into that database to obtain email lists whenever sending emails suits the union's fancy. It is also denied because Dimondstein's second affidavit, ¶ 9 shows that APWU officers and staff members have official union email addresses which they use to communicate with members; Powell herself uses her union email address to communicate with members. *Id.* and Exhibit M. Each officer and staff member is therefore likely to have an address book, embedded within his or her email client, that includes many email addresses of APWU members. Levy Third Affidavit ¶ 8. Plaintiffs will need discovery to learn more about this issue. Whether some members or officers are personally opposed to the use of email is not relevant to the issues in this case, hence no response to the second sentence is required. To the extent that a response is required, plaintiffs acknowledge that **some** members and **some** officers are opposed; whether "many" are opposed, plaintiffs do not yet know. Moreover, it is incredible that the union would regularly solicit email addresses from members, and store those email addresses in a database, if it intended to make no use of those email addresses. The union's other affidavits show that the union regularly sends bulk emails to lists of email addresses.

27. Until a few years ago, the APWU did not seek to collect e-mail addresses from new members who join the union. Membership in the APWU is ordinarily obtained by filling out a form called an "1187" that also authorizes automatic payroll deduction of dues. That form did not provide a place for collection of e-mail addresses. A few years ago, union leadership changed the form to add a place for e-mail addresses to be provided. This sparked a protest that led to a floor debate and vote at the

2010 Biennial National Convention. Powell Dec. ¶8.

**RESPONSE:**

Everything except the final sentence of this paragraph is admitted.  The final sentence is denied because the transcript of the convention debate, Exhibit A to the Powell Affidavit, contradicts Powell's description.  In fact, the resolution under consideration would have required the union to use a form that "requested" email addresses, and the executive board recommended defeat of the resolution because the union was already doing what the resolution sought.

28. APWU convention delegates, usually numbering around 2,000 people, are selected to represent their locals and attend Biennial Conventions from every state and territory in the United States. The Biennial National Convention is the highest ranking governing body of the APWU. Powell Dec. ¶9.

**RESPONSE:**

Admitted.

29. On August 26, 2010, at the APWU 20th Biennial Convention the delegates defeated a resolution that would have required the addition of a place for e-mail addresses on the Form 1187 used to sign up new members. After debate for and against the resolution, the resolution was defeated by a voice vote of the delegates. Powell Dec. ¶ 10, and Exhibit A.

**RESPONSE:**

Admitted, but it is noted that Exhibit A shows that the executive board recommended defeat of the resolution because the union was already doing what the resolution sought.

30. At this time, some of the 1187 forms used to sign up new members include a place for e-mail addresses and some do not. The form available on the internet does provide a place, but most members are signed up in person at new employee orientation using whatever form of the 1187 the local chooses to use. Powell Dec. ¶11; see Exhibits B through E.

**RESPONSE:**

Admitted.


31. The 1187 form, in its newer version, provides a place for e-mail information, but the provision of that information is voluntary and is not a condition on membership. It would be contrary to the will of the membership as expressed at the 2010 Biennial Convention to require prospective members to provide e-mail addresses. Some APWU locals continue to use the older form that does not make provision for e-mail addresses. Powell Dec. ¶12.

**RESPONSE:**

The first sentence is admitted, but it is noted that nothing on the form advises applicants for members that completion of the "email address" section on the form is voluntary.   The second sentence is denied because the transcript of the convention debate, Exhibit A to the Powell Affidavit belies Powell's opinion that the will of the membership as expressed at the 2010 convention opposed collecting email addressed from members.  In fact, the resolution under consideration would have required the union to use a form that "requested" email addresses, and the executive board recommended defeat of the resolution because the union was already doing what the resolution sought.  The assertion that some APWU locals do not collect email addresses  is not relevant to the issues in this case, hence no response to the last sentence is required.   To the extent that a response

-17-

is required, the sentence is admitted.

32. The three plaintiffs in this case all were present at the 2010 Biennial Convention. Ms. Ward and Mr. KcKinnon were delegates, and Mr. Dimondstein was present and campaigning for election to the position of Organization Director.

**RESPONSE:**

Admitted that Ward and McKinnon were delegates.  The clause about Dimondstein is denied as misleading insofar as it implies that he was present for the debate and vote described in previous paragraphs.  Dimondstein was campaigning outside the convention room; although there was a visitors section that he visited occasionally, he does not recall being present for this discussion. Dimondstein Second Affidavit ¶ 10.

33. The APWU 21st Biennial Convention in August 2012 again considered the use of electronic communication in APWU national officer elections. The Convention amended Article 11, Section 3.(c) of the APWU Constitution and Bylaws by adding a provision for 1,000-word statements from candidates for national office to be posted on the APWU web page during national officer elections. Powell Dec. ¶ 14, Exhibit F at page 32 of the Constitution and Bylaws (last page of Exhibit F).

**RESPONSE:**

Admitted, but this vote did not express any view of the membership about the propriety of allowing candidates to have literature sent to the union's email addresses.

34. The three plaintiffs in this case were present at the 21st Biennial Convention in August 2012, Ms.

Ward and Mr. McKinnon as delegates and Mr. Dimondstein as a visitor. Powell Dec. ¶ 14.

**RESPONSE:**

It is admitted that Ward and McKinnon were delegates. The Powell Declaration does not support the assertion that Dimondstein was present as a visitor; however, it is admitted that Dimondstein was at the Convention as a guest, similar to the facts stated in response to paragraph 32.

35. Articles 11 and 12 of the APWU Constitution and Bylaws establish the basic procedures and timetables for the nomination and referendum election of National Officers. Powell Dec. ¶ 15, Exhibits F and G.

**RESPONSE:**

Admitted.

36. Under Articles 11 and 12 of the APWU Constitution and Bylaws, the Union's triennial National Officer election campaigns are five months long, from the time election rules are announced until the ballots are mailed to the members and then returned to be counted by an independent ballot association. A list of "Important Election Dates" is provided to any member who asks for a nominating petition. Powell Dec. ¶ 16, Exhibit H.

**RESPONSE:**

Admitted.

37. In addition to "campaigning at the entrances to workplaces" and sending "postal mail" as plaintiffs describe their campaigns, the plaintiffs are campaigning by:

1. Having a 300-word statement by each candidate printed in the American Postal Worker Magazine which has been mailed to every member of the APWU at union expense and also made available to members on the members only section of the APWU web page.

**RESPONSE:**

Admitted.

2. Having an additional 1,000-word statement by each candidate presently posted on the members-only section of the APWU web page at no cost to the candidates.

**RESPONSE:**

Admitted.

3. Having the support of a dissident web page about APWU matters called the "21st Century Postal Worker," a web page that has been visited nearly two million times.

**RESPONSE:**

Denied.  The web page takes no position on plaintiffs' candidacy; it is a discussion forum in which all sides are represented.  Dimondstein Second Affidavit ¶ 11; *see generally* www.21cpw.com/. Moreover, the statement that the page has been visited nearly two million times is misleading insofar as it implies that many visitors have seen the alleged endorsement of plaintiffs' candidacy.  There have been less than 50,000 visits to the web site since the site first started having a page about the 2013 election, Simpson Affidavit ¶ 12.  The page about the 2013 election, in turn, has had roughly 20,000 visits, and ever fewer since May 16, which is the first time plaintiffs' candidacy was mentioned.  Dimondstein Affidavit ¶ 13 and Exhibit N.

4. Having their own team and individual campaign web pages linked to the 21st Century Postal Worker web page.

**RESPONSE:**

Admitted that plaintiffs' web pages are linked **from** the 21st Century Postal Worker web page on elections, although it is noted that the incumbents also have their campaign web sites linked from the 21st Century Postal Worker web page.  Dimondstein Second Affidavit ¶ 12 and  Exhibit N.


5. Maintaining their own campaign Facebook pages.

**RESPONSE:**

Admitted.


6. Maintaining e-mail accounts, and

**RESPONSE:**

Admitted.


7. Maintaining twitter accounts

Powell  Dec. ¶ 17.

**RESPONSE:**

Denied.  Dimondstein does not have a Twitter account and so far as he knows, neither does Ward.   Dimondstein believes that McKinnon maintains a Twitter account. Dimondstein Second Affidavit ¶ 14.

-21-

38. The 21st Century Postal Worker web page is a web page maintained by APWU members who are critical of the incumbent officers of the Union. That web page shows that it has been accessed more than 1.9 million times. It shows a link to the "APWU 2013 National Election." When one follows that link, the first web page listed on the next page is a link to the Plaintiffs' team campaign web page. Powell Dec. ¶ 18.

**RESPONSE:**

Respecting the first sentence, it is admitted that the 21st Century Postal Worker web page is maintained by an APWU member and that, at the present time, it appears that the operator of the site may be critical of the incumbents; but the site is a discussion forum in which the points of view expressed are those of whichever members choose that forum in which to express their opinions. Pro-incumbent views are well-represented in the discussion.  The second sentence is denied as misleading insofar as it implies that 1.9 million visitors have seen the alleged endorsement of plaintiffs' candidacy.  There have been less than 50,000 visits to the web site since the site first posted a page about the 2013 election, Simpson Affidavit ¶¶ 9, 12; compare Exhibits S, T and U. The page about the 2013 election, in turn, has had roughly 20,000 visits, and even fewer since May 16 which is the first time plaintiffs' candidacy was mentioned. Dimondstein Second Affidavit ¶ 13. The third sentence is admitted. The fourth sentence is denied.  Powell has not attached the page that appears "[w]hen one follows that link", but that page is attached to Dimondstein's second affidavit (as Exhibit N), and that exhibit contradicts the cited part of Powell's affidavit.  In fact, the first web page listed on the APWU 2013 National Election page is the web page through which members may make comments.  The second web page listed on the APWU 2013 National Election page is the web page entitled "APWU 2013 National Election Candidate Web Sites" and on that page, in fact,

incumbent candidate Cliff Guffey's web page is listed before the web page for plaintiff Dimondstein; similarly, for each office, the incumbent's page is listed first. Dimondstein Second Affidavit Exhibit N.

39. A copy of the plaintiffs' team web page is Powell Dec. Exhibit J.

**RESPONSE:**

Admitted that Exhibit J is the home page of the web site of plaintiffs' slate.

40. The plaintiffs also maintain individual campaign web pages. Copies of their web pages are Exhibits K, L and M to the Powell Declaration.

**RESPONSE:**

Admitted that there is a web page within the APWU Members First web site devoted to the candidacy of each of the plaintiffs.

41. Under Article 11 of the APWU Constitution and Bylaws, Section 3(c), the National Union publishes candidate statements for all candidates for national office at no cost to the candidates. Every candidate may provide a 300-word statement for publication in the July-August edition of the American Postal Worker magazine, which is the official publication of the APWU. By this means, the National Union mails the candidates' 300-word statements to every member of the Union during the campaign period and also posts them on-line in the members-only section of the APWU web page at no cost to the candidates. Powell Dec. ¶20.

**RESPONSE:**

Admitted, although it is noted that they appeared in black and white in the back of an issue of the magazine whose first 31 pages featured columns by plaintiffs' incumbent opponents, including full-color photographs of those incumbents.   Dimondstein First Affidavit ¶ 2 and Exhibit C.  It is noted that the union has provided no evidence indicating how many times the online campaign statements have been accessed; the union would likely have that information.  Simpson Affidavit ¶ 13.

42. The 300-word statements of each of the plaintiffs in this case have been published in the July-August issue of the American Postal Worker. Copies of those statements are Exhibits N (Dimondstein), O (McKinnon), and P (Ward) to the Powell Declaration.

**RESPONSE:**

Admitted.

43. Mr. Dimondstein's 300-word statement (Exhibit N) that has been distributed by mail to every APWU member at no cost to Mr. Dimondstein, and which also is posted on the APWU web page at no cost to Mr. Dimondstein, includes the following passage:

> For more information please visit our website:
>
> www.apwumebersfirst.org or contact me directly at
>
> votemarkd@yahoo.com

This reference to Mr. Dimondstein's campaign web page and yahoo account also is included in Mr. Dimondstein's 1,000-word candidate statement that is posted on the members only section of the APWU web page. Powell Dec. ¶22.

**RESPONSE:**

Admitted, although it is noted that the cited address for plaintiffs' web site contains a typographical error that does not appear in Exhibit N; it is actually www.apwumembersfirst.org.  It is noted that the union has provided no evidence indicating how many times the campaign statements have been accessed; the union would likely have that information.  Simpson Affidavit ¶ 13.

44. Although Mr. KcKinnon and Ms. Ward submitted 300-word statements and 1,000 word statements that have been published and distributed by the National Union, and both of them maintain individual campaign web pages linked to the 21st Century Postal Worker web page, neither Mr. McKinnon nor Ms. Ward included a reference to their campaign web page in their union-published statements. Powell Dec. ¶22.

**RESPONSE:**

Admitted.

45. The 1,000-word candidate statements of the three plaintiffs that are posted on the APWU web page are Exhibits M (Dimondstein), N (McKinnon), and O (Ward) to the Powell Declaration.

**RESPONSE:**

Admitted.

46. The political history of the APWU provides many examples of how effectively the APWU democratic processes work. Examples include the following instances involving full-time elected offices at APWU headquarters in Washington, DC. Officers in bold-faced type were elected to offices that are, ex officio, a part of the 13-member APWU National Executive Board, which is the

highest ranking governing body of the Union between Biennial Conventions:

In APWU 1980 election,

o Moe Biller defeated an incumbent **President**, Emmett Andrews.

o John Richards defeated an incumbent **Director of Industrial Relations**, Forest Newman.

o Bill Burrus (later to be elected President) won the office of **Executive Vice President** running as an outsider on a team with Biller and Richards.

o Sam Anderson defeated incumbent Mike Benner for the office of **Special Delivery Messenger Craft Director**.

In APWU 1983 election,

o George McKeithen defeated incumbent Sam Anderson for **Special Delivery Messenger Craft Director**.

In APWU 1992 Election,

o Jim Lingberg defeated an incumbent, Tom Freeman, for the position of **Maintenance Craft Director**.

In APWU 1998 election,

o Bob Pritchard defeated an incumbent **Motor Vehicle Services Director**, Don Ross.

o Joe Williams defeated an incumbent **Motor Vehicle Services Assistant Director**, Teddie Days.

In APWU 2001 election,

o Bill Burrus, the long-time Executive Vice President and heir apparent to Moe Biller was elected **President**; however

o Cliff Guffey, running as an insurgent candidate, defeated Bill Burrus's chosen running mate for the office of **Executive Vice President**, Steve Albanese.

-26-

o Steve Raymer defeated an incumbent **Maintenance Craft Director**, Jim Lingberg. Lingberg was on the Burrus team.

o Sue Carney defeated an incumbent **Director of Human Relations**, Sidney Brooks. Brooks was on the Burrus team.

Powell Dec. ¶25.

**RESPONSE:**

Denied as misleading.  The election results are accurate, but they do not, as stated in the summary, show how democratic the APWU is, because with the exception of the 1980 election, only one rank-and-file candidate defeated an incumbent in a union-wide election, and even in 1980 there were special circumstances not present here.

Since the 1980 election, the great majority of the successful candidacies against incumbents described above were not in the union-wide elections but in the elections for Director of relatively small crafts within the union (Motor Vehicle Services, Special Delivery Messenger, and Maintenance) whose membership is more cohesive and much, much smaller, so that it is much less expensive to use postal mail and other methods to communicate with them.  Dimondstein Second Affidavit ¶ 3.  For these offices, only the members in the specified crafts vote.  In 2001, two incumbents were defeated by a slate on which Cliff Guffey, the current president, was running, but Cliff Guffey did not defeat an incumbent – the office of vice-president, for which he ran, did not have an incumbent.  Moreover, when he ran, Guffey already held a national office – the elected director of the Clerk Division, which is far and away the largest of the craft divisions within the APWU, having the vast majority of the APWU's members.  *Id.* ¶ 4.  He was not a rank-and-file candidate.  *Id.*  Of the three candidates identified from this election, only Sue Carney was a rank-and-

-27-

file candidate who won a union-wide election against an incumbent.  The 1980 election was contested by a slate led by Moe Biller, who was already the head of the very large New York local, and joined by candidates on the Cleveland and Pittsburgh locals.  *Id.* ¶ 5.  Biller was also nationally known as the leader of a 1970 postal worker strike in New York that ultimately spread nationwide and was responsible for the formation of the APWU.  *Id.* –.  But equally important as the ability of these important local leaders to deliver huge voting blocks of members who already knew them well, the Biller slate was the first in the history of the union to invoke section 401(c) to do a direct mailing to the entire membership, and the incumbents did not do such a mailing themselves.  *Id.*  ¶ 6. Plaintiffs' APWU Members First Slate wants to be the first to use 21st Century methods of communication to aid their candidacy.  *Id.*

47. Mr. Dimondstein wrote a letter dated July 2, 2013, requesting access to e-mail addresses of APWU members to use in his campaign. Mr. Dimondstein's letter was answered by Election Committee Chair Anthony Turner in a certified letter mailed to Mr. Dimondstein's home in Greensborough, NC on July 15, 2013. That letter was received in Greensborough, and delivery was attempted at Mr. Dimondstein's house on July 17, 2013. If Mr. Dimondstein had accepted that certified letter from APWU headquarters, he would have been informed on July 17, 2013, that his request had been denied. Powell Dec. ¶27, Exhibit T.

**RESPONSE:**

It is denied that Dimondstein asked for access to email addresses; he requested that he be allowed to have his campaign literature distributed to the email addresses.  Verified Complaint, Exhibit A. The dates are admitted, although it is noted that Dimondstein lives in Greensboro, North Carolina,

not Greensborough.  It is denied that Dimondstein had any knowledge that the union had responded to his initial request to be allowed to send email to the union's lists of email addresses. For almost the entire month of July, Dimondstein was traveling away from home, campaigning in APWU workplaces throughout the United States.  Dimondstein Second Affidavit ¶ 7.  On July 11, because no response to Dimondstein's July 2 letter had yet been received, his attorney, Mr. Levy, sent a courtesy copy of the request to APWU's counsel, Mr. Anderson.  Levy Second Affidavit ¶ 3 and Exhibit W.  Apparently, the union sent its denial to Dimondstein without sharing that denial with his counsel.  Dimondstein appealed the denial, which he portrayed as a denial by non-response, on July 19; Verified Complaint Exhibit B; Mr. Levy sent a courtesy copy to Mr. Anderson.  Levy First Affidavit ¶ 2 and Exhibit J.

48. Mr. Dimondstein is a veteran APWU staff member whose identity, ideas and proposals are very well known to APWU members. He was appointed as a full-time union organizer for the APWU in 1995. He spent at least 15 years travelling all over the country as a full-time APWU organizer. He has run for national union office unsuccessfully three previous times, in 1992 (Southern Regional Coordinator), 1998 (Director of Organization), and 2010 (Director of Organization). His 300-word campaign statement has been mailed to every APWU member and posted on the APWU web page, and his 1,000 word statement is posted on the APWU web page. Powell Dec. ¶ 28.

**RESPONSE:**

It is admitted that Dimondstein was employed as an organizer, but denied that he was so employed for fifteen years; he was appointed in 2000.  It is also admitted that he has previously run for the offices stated, but denied that his "identity, ideas and proposals are very well known to APWU

members." Powell does not explain how she has first-hand knowledge of what APWU members know about Dimondstein. To the extent that the paragraph is intended to imply that his employment brought him into contact with many APWU members, it is noted that Dimondstein's job was to try to organize employees in the private sector of the postal industry, and that, consequently, he was mainly in contact with workers who did not belong to the APWU. Dimondstein Second Affidavit ¶ 9. The final sentence, which repeated facts that appear in paragraphs 37, 41, 42, and 43 of this Statement of Material Facts, is admitted.

Respectfully submitted,

/s/ Paul Alan Levy
Paul Alan Levy (DC Bar No. 946400)
Jehan A. Patterson (DC Bar 1012119)

Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009
(202) 588-1000 (voice)
(202) 588-7795 (facsimile)
plevy@citizen.org
jpatterson@citizen.org

Attorneys for Plaintiffs

August 19, 2013

-30-
