UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARK DIMONDSTEIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 13-1228 |
| | ) | |
| AMERICAN POSTAL WORKERS UNION, | ) | |
| | ) | |
| Defendant. | ) | |

**THIRD AFFIDAVIT OF PAUL ALAN LEVY**

1. My name is Paul Alan Levy. I am lead counsel for plaintiffs in this action.

2. I attach as Exhibit V a decision by the Labor Department denying a complaint about an election in Mail Handlers Local 300, that is cited in the papers.

3. On July 10 and 11, 2013, when it appeared that the APWU was ignoring the letter from Mark Dimondstein seeking to send campaign literature by email to APWU members, I told Darryl Anderson, the APWU's general counsel, about this request, and requested a response. A copy of my emails is attached as Exhibit W.

4. On August 13, 2013, after the status hearing on the motion for a preliminary injunction concluded, I contacted Mr. Anderson by email to try to set up a conversation with union staff who knew the facts about the union's database of membership emails and how it was and could be used. Mr. Anderson responded that evening, that we could not discuss that matter until Friday afternoon, after the union had filed its papers. I contacted Mr. Anderson on Friday afternoon, August 16, to try to set up a conversation with some of his affiants. On Friday night, Mr. Anderson said that I could not talk to his affiants. There were several more emails about that subject but on Saturday afternoon, Mr. Anderson reconfirmed that his affiants would not be available for any questions. Copies of

emails reflecting my requests and his responses (without all of the back and forth) are attached as Exhibit X.

5. I believe that defendant's motion for summary judgment can be denied on the record as it stands, if the Court accepts plaintiffs' basic legal argument as explained in the accompanying brief; indeed, it the Court accepts that argument, summary judgment could be granted in favor of plaintiffs, if it were not for the fact that I have had insufficient time to prepare the statement of material facts and a brief supporting a motion for summary judgment.  However, given plaintiffs' need for immediate relief so that they can campaign by email before the ballots are mailed, I have not been able to devote the time needed to preparing a cross-motion for summary judgment.

6. However, an alternate ground for rejecting defendant's motion for summary judgment, without prejudice to a later filing of cross motions for summary judgment, is that the motion was filed three days ago, seven days after the complaint was filed, and that plaintiffs have not had time to conduct any inquiry into the veracity and completeness of the factual averments on which the summary judgment motion is presented.  I was prepared to contemplate addressing the merits of the summary judgment motion if I had had a chance to confer informally with the union's affiants, but without even that opportunity, plaintiffs should not be compelled to accept the affidavits at face value, especially given indications that they might be mistaken and incomplete.

7. For example the affidavit of Roger Cronk, APWU's IT director, describes the union membership "iMIS" database and says that on two occasions in 2013, he sent lists of retiree email addresses to the Retiree Department, numbering "about 5000" and "2435."  He makes no reference to having created any other email lists, but does not say that his department has not created any other email lists, nor does he say that only the IT department has the access to the database that would be

-2-

needed to create an email list.  On the other hand, Myke Reid, formerly APWU Legislative Director, refers to having added an unspecified number of email addresses from the iMIS database, apparently in 2006, and the Statement of Material Facts (¶ 22) mentions a weekly email sent by the Retiree Department to 3739 retirees.  The Statement cites "Beard Dec." for this factual proposition, apparently referring to Retiree Director Judy Beard; such an affidavit was filed this morning at about noon.  Her affidavit makes no mention of the lists of 5000 or 2435 that Cronk said he sent her. And ¶ 25 of the Statement of Material Facts cites "Powell Dec.¶ 6" for the proposition that other than the "eTeam list of approximately 21,000 member and the Retiree Department list of approximately 3,739 . . . the APWU does not maintain any e-mail list for the purpose of communicating with its members," but paragraph 6 of the affidavit of APWU Secretary-Treasurer Elizabeth Powell, says that the union does not maintain any email lists except for the list of 21,000 email addresses for the Legislative Department, with no mention of either retiree department list.  This combination of circumstances leads me to conclude that discovery into the possible existence of additional email lists, and the question of which staff have access to the membership database and to member email addresses, is needed before plaintiffs can be confident that they have complete information.  It appears that the schedule is simply too expedited to be confident that we have a full record for decision on the merits.

8.  As another example, Powell states in her affidavit (¶ 7) that the union has a strong tradition of making official communications with members by U.S. Mail, and paragraph 6 says flatly "we do not use e-mails to communicate with our members" except for the e-Team messages.  But Dimondstein says in his Second Affidavit that APWU staff and officers have official union email addresses, and attaches two examples of emails he has received from Powell.  Moreover, in my

experience, email clients generally include address books, which may store email addresses that the user deliberately includes and even email addresses of frequent correspondents.  It is thus quite possible that the union  has a large collection of email addresses of members with whom its staff have corresponded by email.  Discovery may be needed to explore this additional database of email addresses, not to speak of deciding whether or not plaintiffs should argue that member email addresses in the various address books maintained by union staff should be available for candidate literature distribution.

9. Given the state of the record, however, we do not ask the Court to address that additional question in ruling on the motion for a preliminary injunction.

10.  Plaintiffs' responses to defendant's statement of material facts raises a plethora of other questions about apparent inconsistencies, incomplete or unclear averments, and beyond that uncertainty about whether the union's assertions are correct.  I need to be able to consult with plaintiffs to determine the extent to which we will want to undertake discovery to explore these various issues.   It is, I believe, not appropriate to ask plaintiffs to make this determination on three days' notice.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct. Executed on August 19, 2013.

Paul Alan Levy

UNITED STATES
DEPARTMENT OF LABOR

All DOL    OLMS    Advanced Search

SEARCH

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us | Español

Office of Labor-Management Standards                SHARE    Was this page helpful?

DOL Home > OLMS > OLMS Online FOIA Reading Room

**Compliance Assistance**

**Regulatory Library**

**News Room**

**About OLMS**

**Contact Us**

# Office of Labor-Management Standards (OLMS)

U.S. Department of Labor

Office of Labor-Management Standards
Division of Enforcement
Washington, DC 20210
(202) 693-0143 Fax: (202) 693-1343

March 15, 2012

Dear :

This Statement of Reasons is in response to your October 18, 2011 complaint filed with the Department of Labor alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) occurred in connection with the election of officers of Local 300 National Postal Mail Handlers Union, conducted on June 16, 2011, by mail ballot.

The Department of Labor conducted an investigation of your allegations. As a result of the investigation, the Department concluded that there were no violations that may have affected the outcome of the election.

You made several allegations concerning your opponent's use of union and employer resources to promote his candidacy. Specifically, you alleged that the incumbent New York City Branch President, used the local's publication to promote his candidacy, and that other union resources were used to print and distribute this material to members, including the distribution of these materials by shop stewards on the work floor of the Morgan facility. Section 401(g) of the LMRDA prohibits the use of union funds and employer monies, including its resources and property, to promote any person's candidacy. Courts consider the tone, content and timing of a publication when determining whether it constitutes campaign material. With respect to content, section 401(g) prohibits any showing of preference by a union or its officers to criticize or praise any candidate. 29 C.F.R. § 452.75.

The investigation disclosed that prior to the June 16, 2011 election, the local issued two editions of , one dated April 22, 2011, and the other dated May 3, 2011, both printed on union letterhead and reproduced with union equipment. A review of the April 22, 2011 edition showed that it concerned local negotiations with the employer to stop the involuntary transfer or excessing of members from the Morgan General Mail Facility which comprises the New York City Branch. The May 3, 2011 edition informed members that the local's negotiations were successful in stopping any member from being involuntarily transferred or excessed from the NYC Branch. This information was newsworthy to Morgan members. The tone of the two editions was informative. Although the two issues were published one and two months prior to the election, the investigation disclosed that the local published on a regular basis and distributed it in the same fashion as in the instant case. Neither issue mentioned the election, or attacked or praised any candidate for election. The two publications at issue did not constitute campaign material. Because this material did not constitute campaign material, its distribution by and shop stewards did not constitute an improper use of union or employer funds to campaign. There was no violation.

You alleged that used a union computer's data base to access members' email addresses, thereby gaining an unfair campaigning advantage over you. You provided the Department with a copy of a campaign email that you alleged was sent by to a NYC Branch member. Section 401(c) of the LMRDA mandates that unions refrain from discrimination in favor of or against any candidate with respect to the use of lists of members.

The investigation disclosed that the local's database of its membership does not include members' email addresses. The investigation further disclosed that the message you provided appears to be a forwarded text message, not an email, and that the only email address and phone number on the message are yours. The gist of this communication was a solicitation of the reader's vote in the upcoming election, with a signature of "Willi," spelled differently than the way in which spells his first name. Given that the local does not maintain a list of members' email addresses and the evidence you supplied does not support your allegation, there is no basis to conclude that the local discriminated against you in the use of lists of members. There was no violation.

You alleged that the local included in its tally 50 ballots that were not returned in secret ballot envelopes, and that observers could see how those members voted. Section 402(b) of the LMRDA requires that local union elections covered by the statute be held by secret ballot. Section 3(k) of the LMRDA defines "secret ballot" to mean, in relevant part, "the expression by ballot, voting machine, or otherwise . . . of a choice with respect to any election . . . which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed."

The investigation disclosed that ballot opening procedures employed by the American Arbitration Association (AAA), the election company hired by the union to conduct the election, prevented anyone from seeing the identity of a voter and the member's vote

Exhibit V

when a ballot was returned without a secret ballot envelope. The AAA's equipment opened the outer and secret ballot envelopes very quickly. The machine opened outer envelopes, from which AAA staff then removed the secret ballot envelopes and ballots that were not in secret ballot envelopes, which were immediately stacked face down. The secret ballot envelopes were then opened by a machine and the ballots were stacked face down. All ballots were then inserted into a tally machine.

The investigation disclosed that for the entire local election there were 56 ballots counted that were not returned in a secret ballot envelope. Two observers who were present at the tally stated that they did not see any ballot returned without it being in a secret ballot envelope. They also said that the tally process, including the opening of the outer and secret ballot envelopes and the stacking of the ballots, moved so rapidly that it would be impossible to identify the voter with how he or she voted if the ballot was not returned in a secret ballot envelope. There was no violation.

You alleged ballots that included multiple markings or employee signatures were nevertheless included in the tally for NYC Branch President, in violation of the secret ballot requirement of section 401(b) of the LMRDA. The Department examined the ballots for identifying markings, and recounted the NYC Branch ballots. One ballot contained the written initials while another ballot was signed "" It is unclear whether these ballots were included in the AAA tally. However, even if they had been included, the violation would not have affected the outcome of the election because the margin of victory for the office of NYC Branch President was 44 votes. There was no violation that may have affected the outcome of the election. 29 C.F.R. § 136(b).

You alleged that stewards told members they would know how members voted, which intimidated some members. The three members you identified as being intimidated by a steward did not substantiate your allegation. Two of them voted, and stated that no steward told them anything about knowing how they would vote. Your third witness chose not to vote because she did not care for any of the candidates. There was no violation.

You alleged that stewards told members to return their voted ballots to the stewards, thereby vitiating the secrecy of the ballot. One member stated that a steward, whom he could not identify, asked him to bring his voted ballot to the steward, but the member told the steward he had already mailed in his ballot. Although stewards should not have asked members for their ballots, there was no ballot secrecy violation of the LMRDA because no member actually gave his or her ballot to a steward. There was no violation.

You alleged that members who transferred from the NYC Branch were nevertheless permitted to vote for NYC Branch President. Section 401(e) of the LMRDA, provides in relevant part that every member in good standing shall be eligible to vote. Only members in good standing of the NYC Branch were eligible to vote for NYC Branch President. Article VI, section 1G, Local 300 Constitution. You named two members who were transferred out of the NYC Branch whom you allege improperly voted.

The investigation disclosed that one of those members did not vote and the other member did vote. With respect to the member that voted, the investigation disclosed that she was transferred out of the local on June 4 which was after ballots were mailed. The local was not notified of this transfer until after the conclusion of the election. It was not unreasonable to count her ballot considering the timing involved. The investigation further disclosed that twenty-seven NYC Branch members voluntarily transferred from the NYC Branch in April 2011, well in advance of the June 16, 2011, election. None of those members was eligible to vote for NYC Branch President. The investigation disclosed, however, that four of those transferees voted in the election of the NYC Branch President. These members were ineligible to vote in that election. In addition, the Department's investigation disclosed that fourteen other members who were not current in their dues payment were nevertheless permitted to vote in the election. In sum, the ballots of eighteen members who were ineligible to vote were included in the tally. Nevertheless, there was no violation that may have affected the outcome of the election because the margin of victory for office of NYC Branch President was 44 votes.

You alleged that numerous members did not receive a ballot or even a duplicate ballot. You failed to identify any member who did not receive a ballot, but provided the names of three members whom you allege either did not receive a duplicate ballot or whose ballot was not counted despite having mailed that ballot a week after he received it in the mail.

Section 401(e) of the LMRDA requires locals to, among other things, mail to each of its members at his or her last known home address a notice of the election at least fifteen days prior to the election. Where, as here, the ballot serves also as the election notice, the fifteen-day prior notice applies. 29 C.F.R. § 452.102.

The investigation disclosed that ballots were mailed to all members at their last known home address on May 16, 2011, with a return date of June 16, 2011. The voted ballots were returned by business reply mail to a post office box maintained by the AAA, who controlled the key to the post office box. Of the 5,488 ballots mailed to eligible members, only 48 were returned as undeliverable, eight of which were re-mailed. The number of ballots returned as undeliverable was only .7%, showing that the local's list of its members' addresses was updated and accurate. The local fulfilled its obligation under the LMRDA, adhering to time constraints imposed under section 401(e) and mailing the ballots to members at their last known home addresses. The local also had a procedure for members to request a duplicate ballot in the event they did not receive a ballot or spoiled or lost their ballot.

With respect to the local's duplicate ballot request procedure, the election committee and the AAA coordinated the issuance of such ballots. Notice of the duplicate ballot system was posted at postal facilities shortly after the mailing of the ballot. Members were advised that if they had not received a ballot by May 23, 2011, they were to contact the election judges, who then provided that information to AAA. In turn, the AAA then mailed a duplicate ballot to the requestor. The AAA maintained a list of the names of members who requested a duplicate ballot. A review of the election records disclosed 153 requests for a duplicate ballot. The investigation disclosed that none of the three members you identified made any request for a duplicate ballot; further, the election record showed that they did not vote in the election. The local provided a reasonable duplicate ballot request procedure whose invocation required merely the request for such a ballot. Since the record shows that none of these three members made any request for a duplicate ballot, there was no violation.

You alleged that management campaigned for while members of the local filled out surveys at the Morgan facility. Specifically, you alleged that a Senior Manager of Distribution Operations (MDO) told the membership at the Morgan facility that they should vote for on May 4 and May 5, 2011, prior to the mailing of the ballots. As explained above, the LMRDA prohibits employers from promoting any member's candidacy.

The investigation disclosed that management hired a company to conduct quarterly surveys in an effort to improve relations with employees and for operations purposes. The surveys were not provided to all Morgan members, but only to those who were

randomly selected. The MDO addressed those completing the survey, advising that "excessing" would not occur and thanked for handling the issue. She also told the attendees that although she did not always agree with she applauded his effort on the excessing issue. This did not constitute campaigning as there was no reference to the election and her statement was neutral, in that she acknowledged past issues of contention with but recognized his contribution on this issue, one of vital interest to the membership. There was no violation.

For the reasons set forth above, your administrative complaint to the Department is dismissed, and I have closed the file in this matter.

Sincerely,


Patricia Fox
Chief, Division of Enforcement

cc: Mr. John F. Hegarty, National President
National Postal Mail Handlers
1101 Connecticut Avenue, NW, Suite 500
Washington, DC 20036

Mr. Paul Hogrogian, President
Mail Handlers Local 300
111 John Street, Suite 710
New York, New York 10038


Christopher B. Wilkinson, Associate Solicitor
Civil Rights and Labor-Management Division

**Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  Plug-ins Used by DOL**

U.S. Department of Labor | Frances Perkins Building, 200 Constitution Ave., NW, Washington, DC 20210
www.dol.gov | Telephone: 1-866-4-USA-DOL (1-866-487-2365) | TTY | Contact Us

## Paul Alan Levy

| | |
|---|---|
| **From:** | Darryl Anderson <danderson@odsalaw.com> |
| **Sent:** | Thursday, July 11, 2013 10:09 PM |
| **To:** | Paul Alan Levy |
| **Subject:** | RE: Sorry to be a noodge, but |

I understand your need to inquire.  I just (less than an hour ago) finished a two-day mediation settling a suit growing out of the contracting out of 33 driver jobs in Tacoma, WA.  We won it in arbitration but had to sue to enforce and then mediate with the AUSA to get compliance.

I have not read your letter closely, nor have I had a chance to talk to the Union about it.  I expect to be able to read the letter tomorrow.  If I must do research to determine how right you may be, I will not be able to turn to that until next week.  We learned yesterday that Issa is having hearings on his bill to kill the Postal Service next week and the APWU will be providing testimony, which I will draft starting tomorrow; then, over the weekend, I will get economist and client clearances and redraft.  The hearing is Wednesday, so written testimony is due Monday.

I will respond to you in substance as soon as I can do so responsibly.

Darryl

**From:** Paul Alan Levy [mailto:plevy@citizen.org]
**Sent:** Thursday, July 11, 2013 5:38 PM
**To:** Darryl Anderson
**Subject:** Sorry to be a noodge, but

I am hoping to figure out whether the union is planning to allow distribution of Dimondstein's campaign literature by email, as he has requested

Paul Alan Levy
Public Citizen Litigation Group
1600 - 20th Street, NW
Washington, D.C. 20009
(202) 588-1000
http://www.citizen.org/Page.aspx?pid=396

**From:** Paul Alan Levy
**Sent:** Wednesday, July 10, 2013 6:20 PM
**To:** danderson@odsalaw.com
**Subject:** Response to your letter

The attached letter is coming to you in the mail, but I wanted to share it with you immediately.  I do hope that your client decides that it need not enforce its claimed trademark rights in the way that you have suggested.

In addition, Dimondstein has sent a demand of his own to the Election Committee, to be permitted to send campaign literature to the union membership using any list of email addresses that the APWU may have.  I mention this to you just in case it has not yet come to your attention even though it was sent over a week ago.  Although we can give the union a few days to set up the systems for candidates to send out literature using this sort of address, I want to make

EXHIBIT W

sure that the union is moving to comply with its Section 401(c) obligation to comply with "all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature." If the union's position is going to be that Dimondstein's request is not reasonable, we need to know that, and understand the basis for that position, so that we can take appropriate action.

Paul Alan Levy
Public Citizen Litigation Group
1600 - 20th Street, NW
Washington, D.C. 20009
(202) 588-1000
http://www.citizen.org/Page.aspx?pid=396

## Paul Alan Levy

| | |
|---|---|
| **From:** | Darryl Anderson <danderson@odsalaw.com> |
| **Sent:** | Tuesday, August 13, 2013 9:00 PM |
| **To:** | Paul Alan Levy |
| **Subject:** | RE: responses to three questions and a factual correction. |

After we have a better idea of what might be at issue and what information we need, I will see who we need and what questions they may need to answer.  We can address this question on Friday afternoon.

**From:** Paul Alan Levy [mailto:plevy@citizen.org]
**Sent:** Tuesday, August 13, 2013 8:47 PM
**To:** Darryl Anderson
**Subject:** RE: responses to three questions and a factual correction.

Thank you.  On service, we had somebody coming down from Baltimore to effect personal service on one of your people, personally.  I will try very hard to call him off.

On technical facts and experts, will your experts be available for conversation over the weekend?

**From:** Darryl Anderson [mailto:danderson@odsalaw.com]
**Sent:** Tuesday, August 13, 2013 8:03 PM
**To:** Paul Alan Levy
**Subject:** responses to three questions and a factual correction.

1. On service, go ahead and mail it.  I will have them sign or I will accept service.

2. Yes on splitting the cost of the transcript.

3. As to how people sign up, I am still trying to master the facts.  Given the tight time constraints the judge placed us under, I will make every effort to let you know as much as I know then in our papers filed Friday at noon.

I have learned that ballots will be mailed on September 12 and 13, not on September 15 as I had thought.

**From:** Paul Alan Levy [mailto:plevy@citizen.org]
**Sent:** Tuesday, August 13, 2013 1:59 PM
**To:** Darryl Anderson
**Subject:** Tthee questions for you

If we are moving into SJ land, we definitely need to deal with service.  If we mail return receipt requested, will we get the card back with a signature?

Second, it seems to me that the transcript would be useful for both of us.  Shall we split the cost up front?

Third, how do we develop the technical facts?  Seems to me we need to see the signup form for the two email addresses (is there anything besides this page http://afl.salsalabs.com/o/4047/p/salsa/web/common/public/signup?signup_page_KEY=48?), and we need to have some sense of what your technical expert(s) have to say  before we know if we have any questions.  We should think about conferring technically as soon as possible after that

EXHIBIT X

Paul Alan Levy
Public Citizen Litigation Group
1600 - 20th Street, NW
Washington, D.C. 20009
(202) 588-1000
http://www.citizen.org/Page.aspx?pid=396

**Paul Alan Levy**

| | |
|---|---|
| **From:** | Darryl Anderson <danderson@odsalaw.com> |
| **Sent:** | Saturday, August 17, 2013 1:24 PM |
| **To:** | Paul Alan Levy |
| **Subject:** | RE: Questions for your affiants |

Paul, I think you should just go ahead and file your papers on Monday.  That process should focus any factual question closely enough so that we can deal with it.

**From:** Paul Alan Levy [plevy@citizen.org]
**Sent:** Saturday, August 17, 2013 11:59 AM
**To:** Darryl Anderson
**Cc:** Jehan Patterson
**Subject:** RE: Questions for your affiants

Darryl, I want to ask your affiants, and I want to ask them orally so that I can follow up with more questions if that is appropriate.  Will they be available or not?

I have great deal of work still to do, and I have to figure out how to schedule the next 54 hours before my papers are due.   At this point,, we may be running out of time to schedule a conversation for today for which I can prepare adequately, so please let me know when they would be available today OR tomorrow.

Seems to me you have a choice – you can make them available for questioning or we can risk having to postpone the court's ruling on your motion for summary judgment, depending on how the court views the legal issues in the case, until after the preliminary injunction matter is resolved.

**From:** Darryl Anderson [mailto:danderson@odsalaw.com]
**Sent:** Saturday, August 17, 2013 10:23 AM
**To:** Paul Alan Levy
**Subject:** Re: Questions for your affiants

What are your questions?

**From:** Paul Alan Levy [mailto:plevy@citizen.org]
**Sent:** Saturday, August 17, 2013 05:54 AM
**To:** Darryl Anderson
**Cc:** Jehan Patterson <jpatterson@citizen.org>
**Subject:** RE: Questions for your affiants

Darryl, we do have technical questions, as well as questions about some apparent contradictions among your affidavits and indeed your other  papers.

My mass emailing expert will be in the office for some period of time this afternoon.  Can we talk to your affiants then? (no need for Powell)

**From:** Darryl Anderson [mailto:danderson@odsalaw.com]
**Sent:** Friday, August 16, 2013 11:44 PM
**To:** Paul Alan Levy
**Subject:** RE: Questions for your affiants

1

Paul, we talked about possibly talking to our IT person if there were a technical problem that might be resolved that way.  If there is such an issue, please let me know.

I am willing to provide a Word version if I can find out how to do that without revealing all the earlier drafts of the document.

BTW, I recommend Dragon Naturally Speaking.  It is not too expensive and it can save a lot of time.  Also advanced forms of adobe acrobat permit you to convert pdf documents into docs you can cut and paste.

**From:** Paul Alan Levy [plevy@citizen.org]
**Sent:** Friday, August 16, 2013 1:16 PM
**To:** Darryl Anderson
**Subject:** RE: Questions for your affiants

Well, I want to be able to ask THEM. That is what we discussed while the judge had us on hold, and that is, as I recall, what Judge Kollar-Kotelly suggested when she came back to the call.

Also, given the very short time I have to respond to your statement of material facts, I wonder whether you would be up for sending the statement in Word or Word Perfect format so that I can create a response without having to retype every graf

Paul Alan Levy
Public Citizen Litigation Group
1600 - 20th Street, NW
Washington, D.C. 20009
(202) 588-1000
http://www.citizen.org/Page.aspx?pid=396

**From:** Darryl Anderson [mailto:danderson@odsalaw.com]
**Sent:** Friday, August 16, 2013 1:03 PM
**To:** Paul Alan Levy
**Subject:** Re: Questions for your affiants

Let me know what you need to know.

**From:** Paul Alan Levy [mailto:plevy@citizen.org]
**Sent:** Friday, August 16, 2013 11:55 AM
**To:** Darryl Anderson
**Subject:** Questions for your affiants

Is there a time tomorrow when I can talk to some of your affiants on the telephone, hopefully with one of MY IT people on the phone as well (and I assume you would be on the phone), to ask a few questions about their affidavits?

Paul Alan Levy
Public Citizen Litigation Group
1600 - 20th Street, NW
Washington, D.C. 20009
(202) 588-1000
http://www.citizen.org/Page.aspx?pid=396