**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MARK DIMONDSTEIN, *et al*,

       Plaintiff,

    v.

AMERICAN POSTAL WORKERS UNION

       Defendant.

Civil Action No. 13-1228 (CKK)

---

**MEMORANDUM OPINION**
(August 29, 2013)

Plaintiffs Mark Dimondstein, Tony McKinnon, and Violetta Ward ("Plaintiffs") have filed suit against Defendant the American Postal Workers Union ("Defendant" or "APWU"), challenging the Defendant labor union's refusal to disseminate Plaintiff's campaign literature via e-mail at Plaintiffs' expense.  Presently before the Court is Plaintiffs' [2] Motion for a Preliminary Injunction.  Upon consideration of the pleadings[1], the relevant legal authorities, and the record as a whole, the Court finds that Plaintiffs are likely to succeed on the merits of their claim.  The Court further concludes that Plaintiffs have shown a likelihood of irreparable injury in the absence of injunctive relief, that the balance of equities favors Plaintiffs, and that an injunction would be in the public interest.  Given these considerations, the Court finds that injunctive relief is warranted in this case.  Accordingly, Plaintiffs' motion is GRANTED.

---

[1] Pl.'s Mot. for Prelim. Inj., ECF No. [2] ("Pl.'s Mem."); Def.'s Opp'n. to Pl.'s Mot. for Prelim. Inj. and Def.'s Mem. of P&A in Opp'n. to Pl.'s Mot. for Prelim. Inj. and in Supp. of Def.'s Mot. for Summ. J., ECF No. [8] ("Def.'s Opp'n"); Def.'s Stmt. of Material Facts Not in Dispute, ECF No. [9] at 2-13 ("Def.'s Stmt."); Pl.'s Reply, ECF No. [14] ("Pl.'s Reply").

# I. BACKGROUND

A. Factual Background

Plaintiffs Mark Dimondstein, Tony McKinnon, and Violetta Ward are members of Defendant American Postal Workers Union, who are running for the offices of President, Industrial Relations Director, and Secretary-Treasurer, respectively, in an election this fall. Pl.'s Mem. at 1. Together, the three Plaintiffs are members of a candidate slate, which they have called "APWU Members First Team." *Id.* The ballots for this fall's APWU election will be sent out to the union membership on September 12 and 13, 2013. Def.'s Stmt. ¶ 3.

As part of their pre-election campaign efforts, Plaintiffs seek to send their campaign literature to the union membership via e-mail, at their own cost. Pl.'s Mem. at 1. Plaintiffs have already employed or plan to employ traditional methods of campaigning, such as personal interactions at postal sites around the country or postal mailings of campaign literature to union members. *Id.* However, because such forms of campaigning are expensive, with each postal mailing potentially costing candidates more than $100,000, Plaintiffs seek to use the additional, and substantially less expensive, avenue of e-mail to communicate with union voters. *Id.*

Defendant APWU has approximately 193,000 members. Def.'s Opp'n. at 2. Of these members, approximately 41,000 are retirees. *Id.* Defendant maintains a database with information about its members using a software system called iMIS. *Id.* The iMIS database contains e-mail addresses for a portion of Defendant's members, which have been collected in several ways. First, Members attending conferences, meetings, seminars, or conventions are sometimes asked for their e-mail addresses as part of the process of registration. *Id.* at 3. In addition, starting in approximately 2008, the sign-up form for Defendant union, known as an 1187 form, was changed to allow new enrollees the option of providing their e-mail addresses. *Id.* Finally, members are permitted to go to the members-only portion of the APWU webpage

and add their e-mail addresses to their member profile. Def.'s Stmt. ¶ 9. In total, the APWU iMIS database contains approximately 27,000 e-mail addresses. *Id.* ¶ 6.

While the APWU contends that it does not use the 27,000 e-mail addresses in the iMIS database to communicate with members, *id.* ¶ 8, in the past, Defendant has used this database to populate two separate lists, which *are* used for e-mail outreach. *Id.* ¶¶ 19, 23-24. First, in 2006, the APWU created the APWU e-Team, an e-mail list of members, family members, and supporters of the union. *Id.* ¶¶ 12-14. The members of this list receive weekly legislative updates from Defendant's Legislative Department that are designed to generate interest and action in support of APWU's legislative positions. *Id.* Individuals can sign up to be on the e-Team through the APWU web page or by filling out a paper form. *Id.* ¶¶ 18. In addition, as stated by Myke Reid, the former Legislative Director of the APWU, the iMIS database of member addresses has been used on at least one occasion to populate the e-Team list. *Id.*, Reid Decl. ¶ 6. Currently, the e-Team has approximately 21,000 members. *Id.* ¶ 21.

The other form of e-mail outreach used by Defendant involves communications with retired union members. The APWU Retiree Department maintains an e-mail list for roughly 3,800 of the approximately 41,000 retired members of the union. *Id.* ¶ 22. The Retiree Department sends a weekly e-mail to these members – known as the "Friday Alert" – that is prepared by the Alliance for Retired Americans, an organization separate from Defendant. *Id.* According to Defendant, this retiree list is not formally connected to the iMIS database. *Id.* Nevertheless, as with the e-Team list, the iMIS database has been used to populate the retiree e-mail list. *Id.* ¶¶ 23-24. In February 2013, the Retiree Department received approximately 5,000 e-mail addresses from iMIS and then had its contractor remove duplicate e-mail addresses. *Id.* ¶ 23. In addition, in April 2013, the APWU IT Department created a list of e-mail addresses for

2,435 APWU members who had agreed to accept an incentive for voluntary early retirement. *Id.* ¶ 24.

B. Procedural History

On July 2, 2013, Plaintiff Dimondstein sent Defendant a request to use the member e-mail addresses in the union's possession to send campaign literature for himself and the rest of his candidate slate at Plaintiffs' expense. *Id.* ¶ 47. Dimondstein also asked Defendant for information about how the e-mail addresses could be divided into separate categories of membership, as he sought to send different campaign communications to members in specific geographic or job categories. Pl.'s Mem. at 2.

On July 15, 2013, Anthony Turner, the Chairperson for Defendant's Election Committee responded to Plaintiff Dimondstein's letter stating that "it is not the policy of the APWU to provide the e-mail address of members." Def.'s Stmt., Decl. of Elizabeth Powell, Exhibit T (Letter from Anthony Turner to Mark Dimondstein). Subsequently, on July 19, 2013, Plaintiff Dimondstein sent an appeal to the APWU's Election Appeals Committee. Pl.'s Mem. at 2. Through its general counsel, Defendant in a July 19, 2013 e-mail informed Plaintiffs' counsel that Defendant was unwilling to comply with Plaintiffs' request. *Id.*, Affidavit of Paul Alan Levy, Exhibit J (E-mail exchange between Paul Alan Levy and Darryl Anderson).

On August 9, 2013, Plaintiffs filed suit in this Court against Defendant alleging that the APWU violated section 401(c) of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 481(c), by refusing Plaintiffs' request to distribute campaign literature, at Plaintiffs' expense, via e-mail to APWU members. Plaintiffs simultaneously sought a preliminary injunction compelling the union to send Plaintiffs' campaign literature, at Plaintiffs' expense, to union members by e-mail prior to this fall's union election. As noted, the ballots in this fall's election will be mailed on September 12 and 13, 2013. Def.'s Stmt. ¶ 3.

On August 13, 2013, the Court held an on-the-record conference call with counsel for both parties. During this call, Plaintiffs' counsel stated that Plaintiffs were willing to pay any and all costs associated with e-mail distribution of their candidate communications, including expenses due to a third party contractor chosen by Defendant to coordinate the mailing. Transcript of Aug. 13, 2013 Conference Call at 19:9-16. In addition, Defendant's counsel, although noting his reluctance to discuss technical issues, stated his belief that compiling a list of e-mail addresses from the iMIS database would not prove particularly time-consuming. *Id.* at 6:17-20. The parties' counsel further indicated that because of the fast-approaching date for sending out ballots, a decision as to Plaintiff's [2] Motion for a Preliminary Injunction would be required by the beginning of September 2013. *Id.* at 6:20-25, 25:4-6.

## II. LEGAL STANDARD

A temporary restraining order or preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction would be in the public interest. *Id.* at 20.

Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that a stronger showing on one factor could make up for a weaker showing on another. *See Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360–61 (D.C. Cir. 1999). Recently, the continued viability of that approach has been called into some doubt, as the United States Court of Appeals for the District of Columbia Circuit has suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary

injunction. *See Sherley v. Sebelius,* 644 F.3d 388, 392–93 (D.C. Cir. 2011); *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1292 (D.C. Cir. 2009). However, because Plaintiffs here have shown a clear likelihood of success on the merits and have satisfied the other requirements for a preliminary injunction, the Court need not resolve this issue.

## III. DISCUSSION

A. Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits of their claim that section 401(c) of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 481(c), requires Defendant to comply with their request to distribute their campaign literature via e-mail. The Court agrees, concluding that Plaintiffs' request is reasonable under the circumstances, and that Defendant's reasons for opposing this request, although understandable, do not affect the reasonableness of the request. Accordingly, Plaintiffs are likely to succeed on the merits of their claim under section 401(c).

Title IV of the Labor Management Reporting and Disclosure Act , 29 U.S.C. §§ 481–483, regulates the procedures that labor unions must follow when conducting elections. Its purpose is to ensure "free and democratic" union elections. *Wirtz v. Hotel, Motel & Club Emp. Union, Local 6,* 391 U.S. 492, 496 (1968). Section 401(c) of the LMRDA provides, in relevant part, that:

> Every national or international labor organization . . . shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, *to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization . . . .*

29 U.S.C. §481(c) (emphasis added). Relying on this provision, Plaintiffs request an order from this Court requiring Defendant to send out their candidate communications for the upcoming election, at Plaintiffs' expense, to the e-mail lists of members maintained by Defendant.

Whether section 401(c) requires unions to send out candidate communications via e-mail is a question of first impression. In spite of the rise of e-mail over the course of the past two decades, no court has thus far addressed the issue of whether the statutory phrase "mail or otherwise" should be read to encompass e-mail communications with union members. Recognizing the lack of precedent in this area and the lack of guidance from the text itself, in an effort to guide the Court's interpretation of this provision both parties point to a website maintained by the Office of Labor-Management Standards of the Department of Labor which provides answers to Frequently Asked Questions (FAQs) Concerning Union Officer Elections. *See* U.S. Department of Labor, Office of Labor-Management Standards (OLMS), Frequently Asked Questions (FAQs) Concerning Union Officer Elections, http://www.dol.gov/olms/regs/compliance/Electionsfaqgen.htm (last visited Aug. 29, 2013) [hereinafter "OLMS Union Officer Elections FAQ"]. Although the Court notes some skepticism about an FAQ website last updated more than six years ago, nevertheless, given the helpfulness of this document as well as the scarcity of other materials on the question raised by the parties, the Court adheres to the well-settled proposition that "the rulings, interpretations, and opinions of [the Administrator of a statute], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See also Herman v. Local 305*, 214 F.3d 475, 480 (4th Cir. 2000) (noting that the Secretary of Labor has the "statutory duty to administer those provisions of the LMRDA pertaining to the

enforcement of §481"). When an agency issues guidance or an opinion on a statute under its purview, the agency's interpretation is entitled to respect by the courts to the extent that it is persuasive. *Skidmore*, 323 U.S. at 140. The persuasive power of agency guidance "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *See Vance v. Ball State University*, 133 S.Ct. 2434, 2443 n.4 (quoting *Skidmore*, 323 U.S. at 140). As here, where a Court is called on to decide a question of first impression and the agency provides detailed answers that neither party has identified as inconsistent with other pronouncements, such materials prove particularly helpful.

Here, the Department of Labor materials describing the application of section 401(c) to e-mail, although not binding, provide aid in interpreting the statute and resolving the parties' dispute. In response to the question "Can a union be required to distribute a candidate's campaign literature to members via e-mail, as opposed to using their postal address?" the website states,

> Other than by mail, there is no prescribed manner in which unions must distribute campaign literature. Likewise, unions are not required to provide candidates access to all methods of distribution that may be available to the union. Generally, if the candidate's request for an alternative method of distributing campaign literature is a reasonable one, the union is required to make the distribution. Accordingly, OLMS advises unions to comply with a candidate's reasonable request to distribute campaign literature to the membership through e-mail if the union uses e-mail to disseminate information to its members.

OLMS Union Officer Elections FAQ. Both parties cite to this statement as support for their position, apparently recognizing its persuasive weight. Indeed, this agency language does help clarify the parties' dispute. As an initial matter, the Department of Labor materials help resolve the question of whether section 401(c) can *ever* be read to encompass requests to send candidate communications via e-mail. Plaintiffs contend that the term "mail" in the statutory clause

"distribute by mail or otherwise" should be read to include e-mail. Pls. Mem. at 5. In the alternative, they argue that "or otherwise" should be read to include communication via e-mail. *Id.* The Court need not resolve which of these textual arguments is correct, but notes that the Department of Labor guidance clearly views the statute as potentially applying to e-mail requests. According to the agency charged with administering the statute, there is no categorical bar on a candidate requesting e-mail distribution pursuant to section 401(c).

The Department of Labor materials also focus directly on the more pertinent question here – when is a union *required* to comply with a request to distribute candidate communications via e-mail. In support of its argument that section 401(c) does not require it to acquiesce to Plaintiffs' request here, Defendant relies heavily on the statement that "unions are not required to provide candidates access to all methods of distribution that may be available to the union." OLMS Union Officer Elections FAQ. However, as Plaintiffs point out, the agency materials go on to state that "if the candidate's request for an alternative method of distributing campaign literature is a *reasonable* one, the union is *required* to make the distribution. Accordingly, OLMS advises unions to comply with a candidate's *reasonable* request to distribute campaign literature to the membership through e-mail if the union uses e-mail to disseminate information to its members." *Id.* (emphasis added).

Read as a whole, this guidance makes clear that while that there is no *per se* rule requiring unions to distribute via e-mail, a union must still abide by reasonable candidate requests to use alternative forms of distribution (such as e-mail) if the union uses these alternative forms to disseminate information to its members. Accordingly, pursuant to Department of Labor guidance, where a union itself uses e-mail to disseminate information to its

members, the touchstone of the statutory inquiry remains the reasonableness of the candidate's request.

This reasonableness analysis governs Plaintiffs' request here because Defendant uses e-mail to disseminate information to its members. Although Defendant repeatedly claims that it does not use e-mail to communicate with its members, Def.'s Opp'n. at 3, 8, 14, the Court finds these contentions disingenuous. Various other statements in the record, many of which are actually made by Defendant, belie the assertion that Defendant does not disseminate information to its members via e-mail. Defendant makes much of the fact that it does not use the approximately 27,000 member e-mail addresses contained in the iMIS database to communicate with members. Def.'s Stmt. ¶ 8. Yet the mere fact that Defendant does not send mass e-mails to all of the 27,000 e-mail addresses in its database does not show the absence of e-mail communication with members. Defendant has previously used its database of e-mail addresses to populate its two e-mail lists, managed by the Legislative and Retiree Departments. *Id.* ¶¶ 19, 23-24. Both of these lists, which have been drawn from Defendant's database of e-mail records, are frequently used to disseminate information to members. Indeed, members of the Retiree and Legislative lists receive e-mails on a *weekly* basis. *Id.* ¶¶ 14, 22. Similarly, members who sign up for meetings and conferences with Defendant receive communications, such as receipts, via e-mail. *Id.* at ¶ 9. In light of this evidence, Defendant can hardly claim that it does not use e-mail to disseminate information to its members. Consequently, having made the decision to communicate with members via e-mail, under the Department of Labor guidance materials cited by both parties, Defendant must honor a reasonable request by Plaintiffs for e-mail distribution of candidate communications.

"Reasonableness does not have a bright line definition. What is reasonable varies with the circumstances." *Reich v. Local 30, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 6 F.3d 978, 979 (3d Cir. 1993). Here, the Court must decide whether Plaintiffs' request is reasonable under the circumstances. Although there is limited case law on what constitutes a "reasonable request" pursuant to section 401(c), what precedent exists carries great weight and provides substantial direction here. In *International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991), the Supreme Court considered a similar factual scenario, albeit in a case that predates the Internet Age. In *Brown*, the plaintiff sought a preliminary injunction requiring the defendant union to mail out his campaign materials in advance of an upcoming union election. The union refused, arguing that the distribution request conflicted with an internal union rule against candidate mailings prior to nominating conventions. Rejecting this union rule as the basis for denying the candidate plaintiff's request, the Court held that such internal union policies, even if reasonable, should not factor into assessing the reasonableness of the candidate's request. "The language of the statute plainly requires unions to comply with 'all reasonable requests' and just as plainly does *not* require union members to comply with 'all reasonable rules' when making such requests." *Id.* at 475 (emphasis in original). In conducting the reasonableness analysis under section 401(c), the Court emphasized, the focus should be on the reasonableness of the candidate's request. "Section 401(c) simply prescribes a straightforward test: Is the candidate's distribution request reasonable?" *Id.* at 478.

In setting out the focus of the section 401(c) inquiry, the Court also described factors relevant to determining the reasonableness of a candidate request under the provision. Rejecting the respondent union's arguments that the request was unreasonable, the Court held, "there is no

11

basis for contending that the request was not 'reasonable' within the meaning of section 401(c). No question is raised about respondent's responsibility for the cost of the mailing or about any administrative problem in complying with his request." *Id.* at 475. The Court further stated that a candidate's distribution request could be unreasonable if "for example, [it] caused administrative or financial hardship to the Union or . . . discriminated against any other candidate." *Id.* at 478. Accordingly, the salient factors the *Brown* Court identified as relevant to the reasonableness inquiry include (1) any financial hardship suffered by the union, (2) any administrative burden imposed on the union, and (3) any discrimination against other candidates.[2]

None of these circumstances exist here. First, Defendant has not pointed to any financial hardship it would suffer from complying with Plaintiffs' request. As an initial matter, the statute at issue requires candidates to pay the costs of distribution. *See* 29 U.S.C. §481(c) (requiring unions to "to distribute [campaign literature] by mail or otherwise at the candidate's expense"). Defendant has not identified any additional costs above and beyond those fees Plaintiffs have already agreed to pay. As already noted, in the Court's August 13, 2013 conference with the parties, Plaintiffs' counsel expressly agreed to assume any and all financial costs Defendant might sustain from complying with Plaintiffs' request, including payment to a third-party contractor who would oversee the mailing. *See* Transcript of Aug. 13, 2013 Conference Call at

---

[2] The *Brown* Court did not state whether these were the *only* factors that could render a request unreasonable, and presumably did not intend to impose such a limit. Nevertheless, this Court reads *Brown* as identifying the key factors that would most likely make a request unreasonable. Furthermore, because, as discussed *infra,* all of Defendant's reasons here for opposing Plaintiffs' request represent the sort of reasons rejected by the *Brown* Court as the basis for denying a section 401(c) distribution request, this Court need not resolve whether the reasonableness factors discussed by the *Brown* Court are exclusive.

19:9-16.  Accordingly, Defendant can hardly claim that any financial burden of compliance with Plaintiffs' request renders the request unreasonable.

Similarly, Defendant has offered little evidence of any administrative burden imposed by Plaintiffs' request for a list of members as well as sub-lists containing categories of members. Defendant need not create a new database of e-mail addresses in order to comply with Plaintiffs' request.  To be sure, and as as the Department of Labor materials recognize, a union is plainly "not required to create e-mail records that it does not presently have to accommodate a candidate's request."  OLMS Union Officer Elections FAQ.  Certainly a request by a candidate to create a new e-mail database where there is none *could* create an administrative burden on a union.  On these grounds, a union (and a court) could reject the request as unreasonable under section 401(c).  However, that is not the case here, where the database already exists, and has been previously used to compile lists used by Defendant for disseminating information to union members.  Indeed, any claim of an administrative burden in compiling a list of e-mail addresses from the iMIS database is undercut by the fact that Defendant has previously used this database to populate e-mail lists.  As previously noted, both the Retiree and e-Team list were at one point populated by using the iMIS database.  Def.'s Stmt. ¶ 19, 23-24.

Admittedly, Defendant does state that "[t]he APWU has only limited ability to analyze or work with the data.  It cannot sort the e-mail addresses by the date the member joined the Union, nor can it determine in most cases how the e-mail address was obtained."  Def.'s Opp'n. at 4. Yet Plaintiffs are not asking for the Union to undertake this administrative burden.  At most, Plaintiffs are requesting the opportunity to use the e-mail addresses Defendant has in its database, and for the opportunity to have this list separated out according to available categories, such as geography and job description.  Indeed, Defendant notes that such a request would be

possible, stating that "[i]t could, but does not, segment the e-mail addresses by local, by state, and by craft." *Id.* at 4 n. 1; Def.'s Stmt., Cronk Decl. ¶ 18 ("We can segment the addresses by local, by state organization, by craft, and by geographic location."). Moreover, Defendant's counsel admitted in the August 13, 2013 conference with the Court that compiling a list of e-mails from the database would not present an administrative burden. *See* Transcript of Aug. 13, 2013 Conference Call at 6:17-20 ("I think that it is possible electronically to cull from our database a list of e-mail addresses. I mean, I think that it can be done; I don't think that it is extremely time consuming.").

Plaintiffs do not bring themselves outside the scope of section 401(c) by requesting distribution to lists containing only portions of the union membership. Although section 401(c) does not specify whether a request to distribute materials to part of a union's membership renders a request unreasonable, the regulations interpreting the statute make clear that such a request is not *per se* unreasonable. Instead, such a request must be honored if practicable, an issue seemingly incorporated in the notion of an administrative burden. *See* 29 C.F.R. §452.68 ("Although section 401(c) specifies distribution to 'all members in good standing,' a labor organization must also honor requests for distribution of literature to only a portion of the membership if such distribution is practicable."). Here, Defendant and its counsel have readily admitted that such a request for partial distribution is practicable, noting the lack of an administrative burden in complying.

Moreover, even if Defendant does encounter any unforeseen administrative hurdles in culling a list of member e-mail addresses from the database or dividing the list into categories, Plaintiffs' counsel expressly agreed that Plaintiffs would assume the expenses incurred by Defendant in compiling a list of e-mails from the iMIS database. *See* Transcript of Aug. 13,

2013 Conference Call at 19:9-16.  Taken together, these facts mitigate any concerns regarding Defendant's administrative burden in complying with Plaintiffs' request here.

As an additional note, while the administrative burden of repeated requests to send e-mail communications might render a future request unreasonable, there is no evidence in the record that Plaintiffs' request – as currently stated – will reach this threshold.  The mere possibility that some future request by Plaintiffs might be unreasonable does not render Plaintiffs' current request to send e-mail communications prior to the upcoming election unreasonable.  Nevertheless, should Plaintiffs ultimately engage in repeated requests for e-mail communication such that they begin to impose an administrative burden on Defendant that cannot be lessened by passing financial costs onto Plaintiffs, these requests could ultimately be unreasonable, and are not covered by this preliminary injunction.  *See* OLMS Union Officer Elections FAQ ("Q14: Is there a limit on how often a candidate can send out campaign material via e-mail versus regular mail?  A14: A request to distribute campaign material using either e-mail or regular mail is the same: the union must comply with all reasonable requests and the candidate must bear the cost.")

Finally, there is no argument that Plaintiffs' request is unreasonable because it would result in discrimination against other candidates.  Although Plaintiffs are the ones seeking this injunction, this injunction would also require the union to honor reasonable requests by all candidates to have their candidate communications distributed via e-mail. Indeed, if Defendant failed to honor these requests by other candidates, it would find itself in violation of a different portion of section 401(c), which requires that "whenever such labor organization or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate . . . similar distribution at the request of any other bona fide candidate shall be made by the labor organization . . . ."  29 U.S.C. §481(c).

Rather than relating to the factors identified by the *Brown* Court as relevant to the reasonableness inquiry, the reasons offered by Defendant for opposing Plaintiffs' request represent the sort of union policies and rules that the *Brown* Court rejected as the basis for denying a request under section 401(c). Defendant's reasons for refusing Plaintiffs' distribution request can be seen as internal union rules and policies, which, under *Brown*, should not be the focus of the reasonableness inquiry under section 401(c), even if themselves reasonable.

First, Defendant argues that it should not be forced to comply with Plaintiffs' request because as a union of postal workers, it has "a strong affinity for the U.S. Mail" and "[m]any of its members and many of its union leaders oppose the use of e-mail for sending union communications." Def.'s Opp'n. at 3. While the Court understands and appreciates Defendant's ideological reasons for refusing to distribute Plaintiffs' materials via e-mail, *Brown* makes clear that such internal union policies should not be the focus of the section 401(c) reasonableness inquiry. As the Court there noted, "[t]he text, structure, and purpose of Title IV of the LMDRA all support the conclusion that our inquiry should focus primarily on the reasonableness of the candidate's request rather than on the reasonableness of the Union's rule . . . ." *Brown*, 498 U.S. at 475. Here, Defendant's unwillingness to send candidate communications amounts to a de facto rule akin to the rule in *Brown*. Indeed, just as the union in *Brown* refused to send candidate materials prior to the nominating convention, here Defendant seeks to prohibit candidate communications via e-mail prior to an election. Accordingly, in keeping with the Supreme Court's decision in *Brown*, this Court must focus its attention *not* on the reasonableness of a rule by a postal worker union to prohibit candidate communications through e-mail, but rather on the reasonableness of a request by a union candidate to use an e-mail list of union membership for

pre-election communications. Consequently, this reason does not justify denying Plaintiffs' request.[3]

The same can be said of Defendant's argument that allowing candidate e-mails to be sent via the e-Team list would be damaging to the work of the APWU Legislative Department. Defendant argues that allowing Plaintiffs to send their candidate communications to those union members on the e-Team list would cause members to unsubscribe from the list and undermine its efficacy as a tool for legislative action. As an initial matter, this argument does not affect Plaintiffs' use of the larger database, and only applies to the smaller e-Team list. Consequently, it only applies to a portion of Plaintiffs' request. In considering this argument, the Court finds that it falls closer to the internal rules rejected by the Court in *Brown* than the sort of administrative burden that could render the request unreasonable. Here, the union has a rule against providing access to its legislative e-mail list for non-legislative matters. The union would prefer not to use this list for candidate e-mails. Under *Brown*, however, the reasonableness of this internal policy is irrelevant, and the union must point to some administrative or financial burden imposed by the request in order to render it unreasonable.

Furthermore, even taking Defendant's arguments about allowing Plaintiffs' to use the e-Team list at face value, this preliminary injunction shows sensitivity to Defendant's concerns regarding the e-Team list. Plaintiffs are merely asking that their e-mails be sent to the addresses

---

[3] As an additional matter, the Court expresses some skepticism about Defendant's repeated assertion that its membership is vigorously opposed to e-mail communication. As discussed, *supra*, the use of e-mail by APWU's Legislative and Retiree Departments reveals that the union is amenable to using e-mail when such communication would prove useful. Indeed, Defendant admits that e-mail is the "preferred method" for communicating in such scenarios. Def.'s Opp'n. at 8. Such an admission appears to conflict with Defendant's other statements regarding a general opposition to e-mail. Nevertheless, the truth of Defendant's claim does not affect the Court's analysis here, as such internal policies do not determine the reasonableness of a candidate's request.

on the list, not that their candidate e-mails be couched within APWU legislative alert e-mails. Defendant is surely entitled to insist that these candidate e-mails be distinguished from e-mails sent for the purpose of e-Team's Legislative action proposals. Furthermore, Defendant could (as it has done in the past) give e-mail recipients the option of unsubscribing from candidate e-mails without at the same time removing them from the APWU's e-Team list. Def.'s Opp'n, Decl. of Myke Reid ¶ 6. In this way, Plaintiffs' rights under section 401(c) can be accommodated without undermining the efficacy of Defendant's legislative action list.

Defendant's argument that Plaintiffs already have alternative means of campaigning at their disposal similarly does not affect the result here. "[I]n union elections, as in political elections, it is fair to assume that more, rather than less, freedom in the exchange of views will contribute to the democratic process." *Brown*, 498 U.S. at 477. Here Plaintiffs seek to provide union voters with additional information through e-mail. The fact that they may have other available avenues for reaching voters does not affect the reasonableness of their request for distribution via e-mail.

In a similar vein, Defendant argues that because non-incumbent candidates have won APWU elections in the past, Plaintiffs do not need access to e-mail distribution in order to successfully overcome any electoral advantage associated with incumbency. As an initial matter, the weight of this evidence is disputed, as Plaintiffs point out various reasons to question Defendant's assertions about the relative success of non-incumbent candidates. Pl.'s Reply at 7-9. Furthermore, evidence of non-incumbent success is irrelevant to the reasonableness analysis under section 401(c). In *Brown*, the Court noted the special concern underlying section 401(c) and the rest of Title IV of the LMRDA. "The statutory guarantees [in Title IV of the LMRDA] are specifically designed to offset the 'inherent advantage over potential rank and file

challengers' possessed by incumbent union leadership." *Brown*, 498 U.S. at 476 (quoting *Wirtz v. Glass Bottle Blowers*, 389 U.S. 463, 474 (1968)). Here, the statutory requirement that unions comply with all reasonable requests for distribution does not hinge on whether incumbents have had previous success. Rather, concerned with the advantages incumbents typically enjoy in union contests, Congress guaranteed candidates an "unqualified" right. *Id.* at 476. By adopting this provision, Congress has already made a decision that non-incumbents suffer from structural disadvantages. It is not for this Court to revise this judgment in this specific context, based merely on disputed evidence concerning the success of non-incumbents in previous APWU elections.

Accordingly, because Plaintiffs' request for distribution of their campaign literature via e-mail is reasonable, and because Defendant uses e-mail to disseminate information to its members, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim under the LMRDA. As the Supreme Court has made clear, section 401(c) provides union candidates an extremely broad right. "Unlike the member's right to run for union office, which is created by §401(e) and made expressly subject to the 'reasonable qualifications uniformly imposed' by the Union, and unlike the member's speech and voting rights, which are governed by sections of the LMRDA such as §§ 101(a)(1) and 101(a)(2), 29 U.S.C. §§ 411(a)(1) and 411(a)(2), and are made 'subject to reasonable rules' in the union constitution, the § 401(c) right is unqualified. . . . Congress gave this right pertaining to campaign literature a *special status* that it did not confer upon other rights it granted to union members." *Id.* at 475-76 (emphasis added). Given the facts here, this broad right entitles Plaintiffs to have their campaign literature sent via e-mail to Defendant's members.

B. Irreparable Injury

Plaintiffs argue that Defendant's refusal to comply with their request to e-mail candidate communications to members exposes them to irreparable injury. The Court agrees. In order to establish irreparable harm, a plaintiff must show that its injury is "great, actual, and imminent." *Hi–Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F.Supp.2d 1, 11 (D.D.C. 2008). The plaintiff must also "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).

Here, Plaintiffs have shown a likelihood of irreparable injury in the absence of an injunction. As discussed, *supra*, Plaintiffs will have their statutory right to communicate with members of the union curtailed in the absence of a preliminary injunction, preventing them from communicating inexpensively and effectively with a significant segment of the union's electorate. Such limitations on their right to communicate with union members will no doubt limit their ability to run their campaigns in a manner they view as effective. Defendant points to other forms of communication available to Plaintiffs, such as the mailing of Plaintiffs' campaign letter, candidate statements in the APWU magazine and on the APWU website, as well as Plaintiffs' own campaign webpages, Facebook pages, and Twitter accounts. Def's Opp'n. at 15. Nevertheless, denial of Plaintiffs' request here would deprive them of an inexpensive and affirmative way to contact a vast section of the union's voters. Aside from the candidate letter sent to APWU members, the other forms of communication are passive, requiring voters to affirmatively seek out information about candidates. By contrast, e-mail communication would provide an inexpensive way for Plaintiffs to reach out to voters, offering an active and arguably more useful form of campaigning. E-mail also offers the opportunity to reach voters who cannot be reached by other means, such as in-person campaigning. *See, e.g.,* Pl.'s Reply, Second Affidavit of Mark Dimondstein at ¶ 7 (noting that retiree members of the union cannot be

reached by campaigning at postal workplaces). As the Secretary of Labor's Interpretive Guidelines for the conduct of union elections note, "Each candidate may choose his own ways of campaigning for election according to his own ingenuity and resources. For example, some candidates . . . may want to appeal directly to the membership or parts thereof in an effort to influence particular constituencies." 29 C.F.R. § 452.68. Accordingly, depriving Plaintiffs' of their statutory right to communicate with voters via e-mail could drastically affect their ability to run an effective campaign.

Plaintiffs have no adequate remedy at law for the injury to their ability to run an effective campaign, as the LMDRA does not provide for recovery of damages for violations of section 401(c). The only other remedy available to Plaintiffs for violation of their rights under section 401(c) is a post-election complaint under section 402 of the LMRDA seeking an order overturning the election. As other judges of this court have noted, "[t]he machinery set forth in Section 402 which provides for the filing of a complaint with the Secretary of Labor, who after investigation and finding of probable cause may sue to set aside the election, is cumbersome, doubtful, and calls for delay. It is not an adequate remedy for the wrongs which plaintiff is presently suffering." *Yablonski v. United Mine Workers of America*, 305 F.Supp. 868, 871-72 (D.D.C. 1969).

Indeed, showing the extent to which a violation of section 401(c) results in an irreparable injury, courts uniformly, and often without any significant discussion, grant preliminary injunctions in cases challenging failure to honor requests to distribute candidate communications. *See, e.g., Brown v. Lowen*, Civ. No. HAR-88-1994 (D.Md. July 26, 1988), *aff'd sub nom, Int'l Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991) (granting preliminary injunction without any discussion of irreparable injury); *Mims v. Teamsters Local No. 728,* 821

F.2d 1568, 1569 n.5 (11th Cir. 1987) (noting that the district court concluded "that [plaintiff] and the Local 728 membership would suffer irreparable harm if injunctive relief were withheld"). *See also Guzman v. Local 32B-32J, Service Employees Intern. Union*, 1995 WL 562187 at *3 (S.D.N.Y. Sept. 21, 1995), *appeal dismissed as moot*, 72 F.3d 260 (2d Cir. 1995) (finding, without discussion, potential irreparable harm to candidate for union's failure to provide equal access to distribution); *Johnson v. Local 1199, Hosp. & Health Care Employees Union*, 1986 WL 166 at *4 (S.D.N.Y. Jan. 31, 1986) ("As for the requisite element of irreparable harm, it follows necessarily from the facts that the union elections will take place in March 1986, and that campaign literature, if it is to be effective at all, must be mailed to the membership in February.")

Consequently, given the harm to Plaintiffs' ability to campaign effectively in the absence of a preliminary injunction, the Court concludes that Plaintiffs have satisfied the irreparable harm requirement.

C.  Balance of Equities and Public Interest

Finally, a plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in its favor, and that an injunction would be in the public interest. *Winter*, 555 U.S. at 20.  The balance of equities in this case favors Plaintiffs, as there is no significant possibility of injury to Defendant from the grant of a preliminary injunction.  Despite its protestations, the AWPU *does* use e-mail to communicate with its members, casting doubt on its claims of ideological injury.  Def.'s Stmt. ¶¶ 19, 23-24.  In addition, as discussed, *supra*, Defendant can comply with Plaintiffs' request without compromising the effectiveness of its legislative action e-mail list.  Furthermore, there is no financial cost to the union of complying with Plaintiffs' request, as Plaintiffs' have agreed to assume all costs associated with the mailing.  Transcript of Aug. 13, 2013 Conference Call at 19:9-16.  Moreover, as Plaintiffs point out, a preliminary

injunction would spare both APWU and its membership a lengthy and costly post-election lawsuit seeking to overturn the election under section 402. Pl.'s Reply at 15.

Furthermore, an injunction would serve the public interest by vindicating principles of union democracy. "[T]he public interest in fair union elections as expressed in the [LMRDA] is clearly on the side of injunctive relief." *Yablonski*, 305 F.Supp. at 872. *See also United Steelworkers of America v. Sadlowski*, 457 U.S. 102, 113 (1982) (noting the "interest in fostering vigorous debate during [union] election campaigns"). Although they recognize this important public interest, Defendants argue that the simultaneous interference with internal union affairs from an injunction would be contrary to the public interest. However, while this argument may carry weight with other provisions of the LMRDA, it is unpersuasive in the context of section 401(c). As the Supreme Court noted in *Brown*, section 401(c) represents a clear intent to interfere with union affairs in order to uphold principles of union democracy. *See Brown*, 498 U.S. at 478 ("The policy of avoiding unnecessary intervention into internal union affairs is reflected in several provisions of the LMRDA . . . These expressions of respect for internal union rules are notably absent in 401(c)."). *See also Wirtz*, 391 U.S. at 496 ("congressional concern to avoid unnecessary intervention was balanced against the policy expressed in the [LMRDA] to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles."). Accordingly, both the balance of equities and the public interest favor injunctive relief for Plaintiffs here.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs are entitled to a preliminary injunction requiring Defendant to distribute, at Plaintiffs' expense, their candidate communications to the full list of member e-mail addresses stored by Defendant, as well as sub-parts of this list practically accessible by Defendant, prior to the mailing of ballots in the

upcoming election.  Plaintiffs have shown a likelihood of success on the merits of their claim that such action is required by section 401(c) of the Labor Management Reporting and Disclosure Act.  Similarly, Plaintiffs have shown that a likelihood of irreparable harm should the injunction not issue, that the balance of equities tips in their favor, and that the public interest favors injunctive relief.  Accordingly, Plaintiffs' [2] Motion for a Preliminary Injunction is GRANTED.  An appropriate Order accompanies this Memorandum Opinion.


Dated: August 29, 2013


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge