UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK DIMONDSTEIN, *et al.*,          )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )          No. 13-1228
                                     )
AMERICAN POSTAL WORKERS UNION,       )
                                     )
            Defendant.               )

**MEMORANDUM IN SUPPORT OF
MOTION TO ENFORCE THE PRELIMINARY INJUNCTION**

On August 30, 2013, the Court issued a preliminary injunction requiring defendant APWU

to comply with a request from plaintiffs Mark Dimondstein, Tony McKinnon and Violetta Ward to

have their campaign literature distributed the members of the union for which the union has  email

addresses–according to admissions by the union in its opposition papers, the union has

approximately 27,000 email addresses that have been acquired from its members using three

methods detailed in the union's papers. APWU argued that the transmission of email to members

on union-related subjects was contrary to the union's philosophy and its culture, and that allowing

email would cause a variety of harms to which its officers and staff attested in vague and conclusory

affidavits.  The Court concluded that the proffered objections were not only meritless but, in some

cases, "disingenuous" and otherwise lacking credibility.  Consequently, the Court ruled that

plaintiffs' request was "reasonable" within the meaning of section 401(c) of the Labor-Management

Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 481(c), and ordered the union to comply

with the request, unconditionally with one exception — that defendant could provide an unsubscribe

option allowing members receiving campaign emails to opt out of the union's overall campaign

mailing list.  Notwithstanding the injunction, the union has obstructed plaintiffs' exercise of their

right to campaign by email; this Court's intervention is needed to ensure that the order is carried out.

**FACTS**

Upon learning of the issuance of the opinion, plaintiffs' counsel, Paul Alan Levy, promptly contacted the union's counsel, Darryl Anderson, to begin the process of securing implementation of the injunction, and stated that plaintiffs wanted to send their first email at the beginning of the week following Labor Day; in response, the union began the course of obstruction that has culminated in this motion for additional injunctive relief.  Because Mr. Anderson had previously said that he would be going on vacation the week following Labor Day, Mr. Levy asked Mr. Anderson to identify a lawyer in his office whom Mr. Levy could consult in obtaining compliance.  On the Friday afternoon before the Labor Day weekend, Mr. Anderson said that he would eventually identify for Mr. Levy the lawyer with whom Mr. Levy could communicate about compliance.  He made no other commitments about timing, and did not respond to Mr. Levy's request that plaintiffs be allowed to send their first campaign email immediately after Labor Day.   Levy Affidavit ¶ 2 and Exhibit 1.

On Tuesday morning, having had no response over the weekend, Mr. Levy again contacted Mr. Anderson to ask which lawyer he could talk to and when it would be possible to start sending emails.   Mr. Anderson responded that Mr. Levy should contact his partner Melinda Holmes. Furthermore, Mr. Anderson said that once the email list was compiled, the union planned to send a test email to the entire list for the alleged purpose of "eliminating bad email addresses" and inviting members to unsubscribe from all campaign mailings.  Mr. Anderson made no commitments about when the email addresses would be ready for use.  Mr. Levy promptly objected to this procedure, pointing out that when the union wanted to send emails to its members about legislative matters, it did not begin by sending an invitation to unsubscribe; rather it sent its substantive emails with an option to unsubscribe in the first few emails.  Mr. Levy indicated that plaintiffs were ready to send their first campaign email to the complete list of 27000 members, and wished to send it on

Wednesday, September 4.   Levy Affidavit ¶ 3.   Mr. Anderson did not respond to this request. Meanwhile, Mr. Levy called Ms. Holmes to try to discuss the issues with her, and also sent her a copy of his email to Mr. Anderson.   *Id.*   Ms. Holmes finally responded to Mr. Levy at 5:48 PM on September 3, simply saying that she understood that information about campaigning by email had been sent to Dimondstein (and other candidates) by email and regular mail "this afternoon," but without otherwise providing any information responsive to Mr. Levy's questions.   Levy Affidavit ¶ 5 and Exhibit 4.   The union was aware that this means of communication was calculated NOT to reach Dimondstein on a timely basis because he campaigns at workplaces around the country. Powell Second Affidavit, DEN 20-1, ¶ 10.   (Mr. Dimondstein does not have email access on his cell phone.)

In fact, on the afternoon of September 3, the APWU's election committee issued "supplemental rules" governing the use of emails for disseminating campaign literature, and sent those rules as an attachment to an email to all candidates.   (A copy of the email and the attachment is attached as Exhibit 4).   The rules contained a number of significant restrictions, including designation of an exclusive vendor that charges unreasonably high prices to send emails to APWU's membership, requirement of payment through a written financial instrument that must be delivered by hand to an office in the Washington, DC area, a requirement that candidates provide twenty-four hours advance notice prior to any email, a requirement that requests for emailing be made by telephone only to a specific vendor employee and only between the hours of 9 AM and 5 PM Monday through Friday, and most relevant to this motion, a rule that every email from every candidate contain the same subject line: "2013 APWU National Officer Elections."   As explained below, each of these requirements is legally objectionable, but the most significant problem is the subject-line requirement, which is not only flatly contrary to a Labor Department rule that prohibits

union regulation but is also extremely likely to make email campaigning ineffective.  And by the time plaintiffs actually had the rules in hand, it was after 5 PM on Tuesday, too late to make a request for an emailing on Wednesday.

That evening, Mr. Levy communicated his objections to the supplemental rules to Ms. Holmes.  Levy Affidavit ¶ 6 and Exhibit 5.  Ms. Holmes responded that the governance of campaign email is at  the discretion of the union's election committee, concluding, "If your clients have questions or requests, particularly ones that might be of general interest to all candidates, they should direct them in writing to the Committee (see the email address provided in the directions)." *Id.*  Mr Levy asked Ms. Holmes to discuss the issues, and indicated that absent a change in position on the subject line issue, plaintiffs would seek further relief from the Court.  *Id.* At this writing, the parties have not been able to resolve their differences.

## I.     PLAINTIFFS' REQUEST TO SEND CAMPAIGN LITERATURE BY EMAIL WITH A SUBJECT LINE OF THEIR OWN CHOOSING WAS REASONABLE, AND THE UNION'S EFFORT TO DICTATE THE CONTENT OF THE SUBJECT LINE VIOLATES THE PRELIMINARY INJUNCTION.

As the Court ruled in its memorandum granting a preliminary injunction, quoting the Supreme Court's decision in *Masters Mates and Pilots v. Brown,* Section 401(c) literature distribution requirements "are specifically designed to offset the 'inherent advantage over potential rank and file challengers' possessed by incumbent union leadership."   Docket Entry Number 24 ("DEN 24") at 18-19.  Desperate to perpetuate the "structural disadvantages" of rank-and-file candidates, *id.* at 19, APWU's incumbents have once more tried to fashion election rules that would deprive plaintiffs of the opportunity to level the playing field, this time attempting to circumvent the preliminary injunction by imposing restrictions on emailing that they could have raised in opposition to a preliminary injunction, but did not.  Moreover, instead of being willing to discuss the legal

-4-

issues to avoid the need for this motion, the union wishes to subject plaintiffs to even further delay by demanding that the **clients** seek relief in writing from the APWU election committee.  But  a union's statutory duty under section 401(c) of the LMRDA "to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy" simply does not turn on whatever rules or restrictions a union may try to impose, but on the reasonableness of the request itself.

Moreover, in determining whether the Union has obeyed the union's unconditional order that the union comply with plaintiffs' request to send campaign literature by email, the Court may consider the interpretive guidelines issued by the United States Department of Labor, the agency charged with enforcing Title IV of the LMRDA, in adjudging the reasonableness of a request. See DEN 24, Aug. 29, 2013, Mem. Op. at 7 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The union's insistence on telling every candidate the subject line they must place in their emails is flatly contrary to the following rule:

> **Contents of literature**.
>
> The Act does not and unions may not regulate the contents of campaign literature which candidates may wish to have distributed by the union. This is left to the discretion of each candidate. The labor organization may not require that it be permitted to read a copy of the literature before it is sent out, nor may it censor the statements of the candidates in any way . . .
>
> 29 C.F.R. § 452.70.

The title of an expressive work is an especially significant part of an author's expression, to which courts are, consequently, especially deferential.  *Rogers v. Grimaldi*, 875 F.2d 994 (2d. Cir. 1989).

Moreover, as shown by the attached affidavits of Glenn Simpson and Leighton Woodhouse, both experts in the use of email for campaigning in a variety of contexts, a requirement that each and every email sent by any candidate contain precisely the same subject line is highly likely to render

all email by every candidate ineffective, and that is particularly true of the subject line imposed by the union's fiat, for several reasons.

First, the selection of subject lines for emails is an art that has important effects on the likelihood that the recipient will open and read the email, and hence on the effectiveness of the sender's communication. Each candidate should have the freedom to deploy his or her creativity to devise subject lines that are most likely to induce recipients to open the emails and hence read the content. If a subject line is sufficiently nondescript, many recipients will not choose to open the email in the first place. Plaintiffs' experts deem the union's selected line to be particularly problematic in that regard. Simpson Affidavit ¶ 6; Woodhouse Affidavit ¶ 6.

Second, a rule that requires repetition of the same subject line in a series of mass emails sent during a short period of time is likely to discourage members who receive an email from opening subsequent emails. Some recipients who read one of the emails with that subject line may think any subsequent email with that subject line contains the same information, so the rates of opening the email will very likely diminish with each subsequent email that has the repeated subject line. Simpson Affidavit ¶ 7, Woodhouse Affidavit ¶ 8.

Third, the union's requirement that the same line be repeated several times in a relatively short time period could cause email services such as Gmail, whose use of sophisticated algorithms to protect their users from spam is one of the features that makes them particularly attractive in the marketplace, to decide after the first time that subsequent emails are spam and not even deliver one or more of the subsequent emails. Simpson Affidavit ¶ 8; Woodhouse Affidavit ¶ 7.

Fourth, the subject line at issue — "2013 APWU National Officer Elections" — has several elements that could make spam filters particularly likely to intercept the emails: for example, starting with numbers, including an acronym, and capitalizing the other words. The subject line imposed by

the union runs up too many red flags.  Simpson Affidavit ¶ 9.

In opposing a preliminary injunction, APWU argued that its interests would be harmed unless recipients of campaign emails had the opportunity to unsubscribe.  The Court accommodated that concern by requiring that campaign emails allow opt-outs. The preliminary injunction requiring compliance with plaintiffs' request was otherwise unconditional. If the union believed that its interests also required a uniform subject line, it could have sought that condition as well.  Now, with the mailing of the ballots imminent, the Court should enforce its injunction as written, by ordering the union to allow plaintiffs to send their emails without the uniform subject-line requirement, both because the union's subject line rule is likely for so many reasons to cause plaintiffs' emailed campaign literature to be ineffective, and because the law forbids unions from dictating the contents of campaign literature.[1]

## II.     APWU'S OTHER CAMPAIGN EMAIL RULES IMPROPERLY DENY PLAINTIFFS THE OPPORTUNITY TO EXERCISE THEIR RIGHTS UNDER SECTION 401(c).

There are several other respects in which the union's new election rules unduly restrict plaintiffs' right to have their campaign literature distributed by email.  Plaintiffs would not have asked for injunctive relief on these issues if the union had not also imposed the subject line requirement, but the law strongly supports their objections to other limitations imposed by the union to obstruct the Court's injunction.

First, the price charged by Kelly Press, APWU's selected vendor, is exorbitant – $440 for set-up of each email, plus two cents per email address per email; because the total email database

---

[1]Because the initial emailing has been so far delayed, plaintiffs will also want to send additional email after the ballots are mailed, around the time that the postal-mailed ballots are likely to be received, and perhaps shortly thereafter.  Plaintiff's proposed order reflects this additional clarification of the Court's order.

contains 26,882 addresses, the up-front cost for the first e-mail will be $440 + $537.64 = $977.64.[2]

In an Exhibit attached to the motion for a preliminary injunction, plaintiffs showed that, for an email

list of 21,000 addresses, plaintiffs could obtain the ability to send an unlimited number of emails to

those addresses for the charge of $150 per month, DEN 2-5, page 12 of 15 – that same exhibit shows

that the charge for a database of 27000 addresses would be $240 per month. *Id.* The Simpson

affidavit submitted with this motion shows that Public Citizen's emailing vendor similarly imposes

a flat charge per month based on the number of emails in Public Citizen's database, rather than by

email address per mass email, but that if he were to divide the monthly fee that Public Citizen pay

its vendor by an average amount of emailed addresses in a month, the charge would be roughly

one-tenth of what the union's vendor demands. Simpson Second Affidavit ¶ 10. Public Citizen's

vendor is, as Simpson noted in his first affidavit in this case, the same vendor that APWU uses for

managing its legislative update email list. *Id.*; DEN 14-2 ¶ 5. Surely the union should not be

allowed to impose a greater cost for emailing campaign literature than it pays for sending its own

mass emails through the device of selecting a different vendor that imposes excess charges.

A number of district courts have refused to allow unions to increase needlessly the cost of

disseminating campaign literature. In *Mims v. Teamsters Local 728*, 821 F.2d 1568 (11th Cir. 1987),

the district court had required a union to allow members to minimize the cost of doing a postal

mailing of campaign literature to the membership by using a mailing house that could perform

mailing tasks more cheaply than the union's own secretarial staff. *Id.* at 1568-1569; No. C-86-454A

---

[2]The set-up charge for future emails can be limited if candidates decide, when they send their first email, exactly when and to whom all subsequent emails will be sent. Levy Affidavit, Exhibit 5. Although plaintiffs are taking advantage of this option to limit expense, it is strategically undesirable to have to make those decisions even before the first emailing, because in an online advocacy campaign, it is important to calibrate subsequent email blasts according to political developments, including recipient reactions to the first emails. Simpson Second Affidavit ¶ 12.

(N.D. Ga. Mar. 3, 1986) (copy on record as DEN 2-5, pages 9-10). The Eleventh Circuit held that establishment of this right created a common benefit to the union membership justifying an award of attorney fees under the doctrine of *Hall v. Cole*, 412 U.S. 1 (1973). 821 F.2d at 1571. Similarly, *Department of Labor v. Teamsters Local 783*, 1982 WL 2095 (W.D. Ky. July 27, 1982), held that a union violated a candidate's rights under 401(c) by overcharging for the mailing of union literature, which had the effect of deterring the candidate from sending out as much literature as he would have preferred.

Second, the requirement that all payments for emailing service be made by postal money order or by certified check, delivered to Kelly Press at its office in suburban Maryland, is commercially unreasonable and imposes an additional delay in the transmission of emailed campaign literature. The requirement also discriminates in favor of the incumbent officers, who maintain their offices in Washington, DC, and against plaintiff rank-and-file candidates who do not reside here.

Moreover, the requirement that requests be made by telephone to a specific individual, and only between the hours of 9 AM and 5 PM, and twenty-four hours in advance, is also unreasonable, in light of the fact that the union's own vendor for its e-Team alerts allows mass emails to be created and sent with a few clicks of a mouse on an online system at any hour of the day or night. Simpson Second Affidavit ¶¶ 10-11.

It is apparent that this union cannot be trusted to manage the sending of campaign literature by email through a vendor that it selects. Instead, the Court should issue the attached proposed order that requires the union to provide to a vendor selected by plaintiffs its database of email addresses with accompanying classifications by members' locals, state organizations, crafts, and geographic divisions, as well as whether the members are retirees or Postal Support Employees. Plaintiffs will agree to preserve the database's security, including a commitment not to use the email addresses for

any reason other than allowing plaintiffs to have no more than five emails sent to any one email address, between now and the end of the election. Other than the additional requirement that an unsubscribe option be provided with each email, the union should be forbidden from demanding any other limitations on the content of the emails, or from requiring the inclusion of any other content. Finally, the union should be required to furnish the database no later than the close of business on Monday, September 9.

## III.    DEFENDANT'S FAILURE TO COMPLY TIMELY WITH THE COURT'S ORDER CONTINUES TO EXPOSE PLAINTIFFS TO IRREPARABLE INJURY, FURTHER TIPS THE BALANCE OF EQUITIES IN PLAINTIFFS' FAVOR, AND IS CONTRARY TO THE PUBLIC INTEREST.

In its August 29th memorandum opinion, the Court found that plaintiffs would be irreparably harmed if a preliminary injunction did not issue, that the balance of equities leaned in plaintiffs' favor because APWU would suffer no financial injury or administrative burden by complying with plaintiffs' request, and that the public interest favored vindication of plaintiffs' section 401(c) rights. See Mem. Op. at 20-23, DEN 24. APWU's continued delay and imposition of requirements that fetter plaintiffs' exercise of their statutory rights are both contrary to law and undermine this Court's order, and the same equitable balance weighs in favor of enforcing the injunction by issuing the further order requested in this motion.

## CONCLUSION

Plaintiffs' emergency motion to enforce the preliminary injunction should be granted.

Respectfully submitted,

 /s/ Paul Alan Levy
Paul Alan Levy (DC Bar No. 946400)
Jehan A. Patterson (DC Bar 1012119)

Public Citizen Litigation Group
1600 20th Street NW

            Washington, D.C. 20009
            (202) 588-1000 (voice)
            (202) 588-7795 (facsimile)
            plevy@citizen.org
            jpatterson@citizen.org

            Attorneys for Plaintiffs

September 5, 2013