UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK DIMONDSTEIN, *et al.*,       )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )        No. 13-1228
                                   )
AMERICAN POSTAL WORKERS UNION,     )
                                   )
            Defendant.             )

**AFFIDAVIT OF LEIGHTON WOODHOUSE**

1. My name is Leighton Woodhouse. I make this affidavit with the understanding that it will be used in support of plaintiffs' request for judicial relief in this case.

2. My experience managing large email subscriber lists for the purposes of issue advocacy and social marketing began when I was Communications Director and then Political Director for Brave New Films ("BNF"). Our email list at BNF included close to one million email addresses. I was responsible for helping to manage that list, which included drafting emails and subject lines, deciding which subgroups to send particular emails to, testing different messages, templates and formats, and tracking response rates.

2. After BNF, I was the Communications Director at the National Union of Healthcare Workers. Our email list numbered in the tens of thousands, and I was solely responsible for managing all aspects of our use of the list for campaign purposes. During my tenure there, our union went through an internal officer election.

3. Today, I have my own company, Dog Park Media, and I am solely responsible for growing and deploying what is now a small list of email subscribers.

4. In my opinion, the rules, as I understand them, governing the upcoming internal election for the American Postal Workers Union seem to practically guarantee that the email communications

program that the challenger for the union's presidency must rely on to campaign to eligible voters will be entirely ineffective.

5. As anyone with professional experience managing a large email subscriber list knows, apart from the name of the organization that is attached to a given email, the single most important variable impacting a mass email's "open rate" is the subject line in an email message. (An email's "open rate" is simply the percentage of email recipients who open the email.) This is conventional wisdom in the business of electronic marketing, so much so that most commercial mass email software platforms include a function called "A/B testing," which allows a user to come up with multiple subject lines, and then test the performance of each of them against a small representative sample before deciding on which subject line to use for the list as a whole. Using A/B testing to come up with the subject line that will drive the highest open rate is a standard best practice among email marketing professionals.

6. Taking this critical variable out of the picture by forcing the challenger to use "2013 APWU National Officer Elections" as the subject line in every one of his campaign emails is, colloquially speaking, a killer. First of all, the subject line is extremely bland and highly unlikely to drive a high open rate. As a point of comparison, consider some of the email subject lines from the most famous and successful online political campaign in history, the 2012 Obama for America campaign:

- I am just so happy
- My uncle Teddy
- My place, June 14th
- Me again
- Hell yeah, I like Obamacare
- Wow
- Clutch

-2-

These subject lines were designed to come across as casual, familiar, and just vague enough to be intriguing. They avoid any mention of words like "election," because those words tend to push people away instead of inspire them to click on the email. The success of these subject lines are based on principles and practices that are completely antithetical to the impact of a subject line like "2013 APWU National Officer Elections."

7. Just as important, forcing the challenger to use the exact same subject line for different emails will dramatically depress open rates. In fact, it could cause common email services like gmail and Yahoo to send those emails to users' spam folders, because duplicate subject lines may appear to those services to be likely to have been issued by a "spambot." It's very likely that after the first mass email, many eligible voters will never see any of the follow-up emails appear in their inboxes.

8. If an email with a duplicate subject line makes it through a recipient's spam filter and does appear in his or her inbox, that recipient is very likely to delete it without opening it, based on the very reasonable assumption that he or she has been sent the same email a second or a third time. It is simply unknown in the world of email marketing to send repeated messages with the same subject line, so from the point of view of the recipient, there's every reason to assume that an email sent a second or third time with the same subject line is the same email he or she has already seen. In fact, users are likely in that case not just to delete the email without opening it, but to unsubscribe and flag the email as spam, which will guarantee that they'll never see any further campaign emails from the challenger again.

9. Even worse, if enough recipients flag the email as spam, which I would expect in this case, the services that they use, such as gmail or Yahoo, will start to block emails from that sender for all of its users. This is how email services typically work, which is why commercial mass email

-3-

vendors such as MailChimp and AWeber typically have strict rules limiting the number of times their customers can have their emails flagged by recipients as spam.  If enough recipients flag emails sent from MailChimp servers as spam, regardless of who the customer is, then email services such as gmail and Yahoo begin to mark all emails from MailChimp servers as spam for all gmail users. So even aside from the duplicate subject line rule's likely suppression of open rates, this rule could prevent the challenger's emails from even reaching recipients' inboxes at all, and that could begin to happen as early as the second email with a duplicate subject line. That occurrence would cripple the email program, possibly enough to render it entirely useless.

10.   Additionally, the $440 per email set-up charge, coupled with a charge of $.02 for every email address each time an email is sent to that email address, is way outside of the fair market standard for a list of 27,000 subscribers.  By comparison, NationBuilder, a mass email service used by many political and issue advocacy groups, charges $249 per month for a list of that size. A customer under NationBuilder's monthly subscriber plan could send as many emails as they like within that month at no additional cost per email. With APWU's vendor, if the challenger were to send just one email per week over the course of a month, the cost would be almost 16 times what he would pay under a NationBuilder account.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.  Executed on September 5, 2013.

_____
Leighton Woodhouse

-4-