## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MARK DIMONDSTEIN, et al.                )
                                                    )
                    Plaintiffs,               )
                                                    )
          v.                                      )          Case No. 1:13-cv-1228 (CKK)
                                                    )
AMERICAN POSTAL WORKERS UNION,  )
AFL-CIO                                        )
                                                    )
                    Defendant.               )
_____ )

## DEFENDANT'S MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

Defendant American Postal Workers Union, AFL-CIO ("APWU" or "Union") asks the

Court to dismiss the plaintiffs' First Amended Complaint.  The plaintiffs' Amended Complaint

sets out two claims, the first of which is non-justiciable because it is moot, the second of which

fails to state a claim under this Circuit's LMRDA jurisprudence and presents anissue that is

within the Secretary of Labor's exclusive jurisdiction to address.  In support of this motion, the

APWU submits a Memorandum of Points and Authorities detailing its position, the Declaration

of Hannah Lively, and a proposed order.

Dated:  October 7, 2013                    Respectfully submitted,

                                                    O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                                    By:*/s/ Melinda K. Holmes*

                                                    Darryl J. Anderson
                                                    Melinda K. Holmes
                                                    1300 L Street N.W., Suite 1200
                                                    Washington, DC 20005-4178
                                                    Telephone: (202) 898-1707
                                                    mholmes@odsalaw.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| MARK DIMONDSTEIN, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:13-cv-1228 (CKK) |
| | ) |
| AMERICAN POSTAL WORKERS UNION, | ) |
| AFL-CIO | ) |
| | ) |
| Defendant. | ) |

_____

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

The Court should dismiss the plaintiffs' First Amended Complaint.  All of the purposes for which the plaintiffs brought their lawsuit have been accomplished, and there is nothing left that the Court can or should adjudicate.  The plaintiffs' claims, including their new free speech claim, are all based on enforcement of the Labor Management Reporting and Disclosure Act within the 2013 APWU National Officer Election.  The Election ended today.  The right to email members campaign literature or use the APWU's name in the plaintiffs' campaign organization title simply has no purchase now that the Election is over and the plaintiffs have already been granted the relief they seek in their complaint.  The email issues the plaintiffs bring to court again are moot; the issues they might want to litigate for and about emails in the future are not ripe; facts and claims of Union liability they allege or are required to allege are not sufficiently pled; and the remaining disputes are ones about election conduct that can and should be investigated and prosecuted, if appropriate, only by the Secretary of Labor.  Accordingly, the Court should dismiss all of the plaintiffs' claims in their First Amended Complaint.

I.        **General Standard for Motions to Dismiss**

Plaintiffs must satisfy the Article III prerequisites for bringing suit in federal court, and justiciability doctrines ensure the basic constitutional requirement that disputes involve "'an actual controversy ... extant at all stages of review, [and] not merely at the time the complaint is filed.'" Monzillo v. Biller, 735 F.2d 1456, 1459 (D.C. Cir. 1984) (quoting Steffel v. Thompson, 415 U.S. 452, 459, n.10 (1974)). The doctrines of mootness and ripeness, in particular, "assure[] that 'federal courts are presented with disputes they are capable of resolving,' U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980), and not mere opportunities to engage in spirited sophistry." Id. Allegations that do not meet these requirements should be dismissed for lack of subject matter jurisdiction in accordance with Federal Rule of Civil Procedure 12(b)(1). Freedom Watch, Inc. v. Obama, 859 F.Supp.2d 169, 172-73 (D.D.C. 2012)("If a case is moot, it must be dismissed for lack of subject-matter jurisdiction under Rule 12 (b)(1).").

On a Rule 12(b)(6) motion challenging whether a plaintiff has stated a claim, the court must "liberally construe[] the complaint in a light favor[able] to the plaintiff.'" Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (citation omitted); In re United Mine Workers of Am. Employee Benefit Plans Litig., 854 F.Supp. 914, 915 (D.D.C.1994). If the facts presented in the complaint do not allow a court to infer more than the "mere possibility of misconduct," the claims should be dismissed. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). But the court is not required to accept the legal conclusions of the non-moving party. See Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997). On a motion to dismiss, the court can look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C.Cir.1992); Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005)

2

(a court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."); Alliance for Democracy v. FEC, 362 F.Supp.2d 138, 142 (D.D.C. 2005).

## II.   Statement of Facts

### A.  Earlier Proceedings in the Case

This matter began when the plaintiffs filed a complaint on August 9, 2013, claiming that the APWU was violating Section 401(c) of the LMRDA by refusing to grant the plaintiffs' request to distribute campaign literature about their candidacies by email in the 2013 APWU National Officer Election.  ([1] Cmplt.at ¶17.)The plaintiffs moved for a preliminary injunction at the same time, asking the Court to "compel defendant American Postal Workers Union to allow [Plaintiffs] to send their campaign literature, at their own expense, to all email addresses that the APWU or any of its officers or staff have for members of the APWU, or to any segment of the email addresses that plaintiffs may elect, and further [compel] defendant to inform plaintiffs what categories or classifications of email addresses the union has, that would enable plaintiffs to send specialized mailings to part of the union membership."  ([2] Mot. for Prelim. Inj.)  The plaintiffs also sought a declaratory judgment from the Court that the APWU is required "to make available to candidates for the mailing of campaign literature all member email addresses that it or its officers or employees have, in their capacity as such, accumulated, so long as the candidates pay the costs of the mailings."  ([1] Cmplt. at¶18(C).)

On August 13, 2013, the Court held a telephone conference with the parties' counsel. (08/13/13 Tr.)The APWU opposed the plaintiffs' preliminary injunction motion, but on August 29[th]the Court entered a preliminary injunction granting the plaintiffs the relief they had sought. ([24] Mem. Op. at 1.)  The Court ordered the APWU to arrange for distribution via e-mail of the

3

plaintiffs' campaign literature to the APWU's databases of member e-mail addresses by September 12th, the date the Election ballots were scheduled to be mailed to the membership. ([24] Mem. Op. at 23-24; [9-1] Powell Dec. at ¶16, Ex. H.)  Preparing the email list and sending the actual campaign emails were to be done at the expense of the plaintiffs.  ([24] Mem. Op. at 5 (*citing* 08/13/13 Tr. at 19:9-16).)

The APWU had complied fully with the Court's order by September 3rd, but the plaintiffs nonetheless filed an "Emergency Motion to Enforce Preliminary Injunction" on September 5th, claiming that the APWU had not acted expeditiously enough in following the Court's order. ([26-1] Mem. Supp. Em. Mot. Enf. Prelim. Inj. at 10.) The plaintiffs raised new issues in their motion, including their objection to parts of the email Election Rules issued to comply with the preliminary injunction.  ([26-1] Mem. Supp. Em. Mot. Enf. Prelim. Inj. at 3.) Specifically, the plaintiffs claimed that the $400 for setting up an email charged by the vendor identified by the APWU to administer the emails, Kelly Press, was too expensive.  ([26-1] Mem. Supp. Em. Mot. Enf. Prelim. Inj. at 7-8.) The plaintiffs asked the Court to issue an order requiring the Union to allow the plaintiffs to select their own third-party vendor to distribute their campaign literature via e-mail. ([26-1] Mem. Supp. Em. Mot. Enf. Prelim. Inj. at 9.)  Additionally, the plaintiffs objected to the part of the email Election Rule requiring that all candidates' campaign emails contain a pre-determined subject line.  ([26-1] Mem. Supp. Em. Mot. Enf. Prelim. Inj. at 3-4.) In their proposed order, the plaintiffs sought to have the Court order the APWU to allow the plaintiffs to distribute their campaign literature via e-mail "without any limitation" beyond the inclusion of an unsubscribe option and to order the APWU to provide its database of member email addresses to a third party vendor chosen by the plaintiffs.  ([26-5] Prop. Order at ¶1.)

That evening, before the APWU had an opportunity to respond, the Court issued an Order directing the APWU to adhere to the August 29, 2013preliminary injunction and further ordering that the APWU not send out a test e-mail prior to the first candidate email being sent.  ([27] 09/05/13Orderat 1-2.)  The next day, the parties participated in a second and third telephone conference with the Court.  (09/06/13(A.M.) Tr.; 09/06/13(P.M.) Tr.)  The APWU moved for reconsideration of the Court's Order from the evening before, representing that it had no present intention of sending a test email, and that it had complied as expeditiously as possible with the preliminary injunction.  (09/06/13(A.M.) Tr. at 6:4-10, 6:22-25, 7:1-4.)  Over the course of those calls, the APWU also agreed to rescind the subject line rule without prejudice to its legal position on whether it was required by the LMRDA to do so.  (09/06/13(P.M.)Tr. at 3:18-20.)  The Court and the parties further agreed that all other issues raised in the Motion to Enforce the Preliminary Injunction were resolved.  (09/06/13(P.M.) Tr. at 7-8.)  As set forth in Court's September 6, 2013 Minute Order:

> Based on two on-the-record conference calls with the parties on September 6, 2013, and the Court's September 5, 2013 Order, Plaintiff's Motion to Enforce Preliminary Injunction has been resolved. As to the two issues left unresolved by this Court's September 5, 2013 [27] Order, first, the parties have agreed that for purposes of this fall's APWU national-officer election, candidates will determine the subject line of their own campaign e-mails, rather than having a uniform subject line set by the APWU Election Committee. Defendant reserves all rights with respect to this issue, and this order, as it pertains to this issue, has no binding effect as to future elections. The Court will consider this issue de novo in any future briefing the parties choose to submit. Second, the parties shall use Kelly Press, the e-mail distribution vendor designated by Defendant, as the third-party e-mail distribution vendor responsible for sending candidate e-mails for this election…While Plaintiff indicated in its motion that other vendors may offer more reasonable rates, they failed to offer an alternative proposal until today. Therefore, in the interests of sending candidate e-mails as expeditiously as possible, the Court orders that Defendant shall continue to use Kelly Press for this election.

The Court also granted the APWU's motion for reconsideration, noting that "[t]he Court also adds that the conference calls with parties provided the Court with information that Defendant and its counsel did act expeditiously in complying with this Court's August 29, 2013 [23] Order Granting Plaintiff's Motion for a Preliminary Injunction. When the Court questioned whether Defendant and its counsel were acting expeditiously in its September 5, 2013 [27] Order, this assessment was based on Plaintiff's [26] Motion to Enforce Preliminary Injunction and the e-mails attached as exhibits. Having spoken with Defendant's counsel on-the-record, the Court now recognizes that in response to this Court's Order Defendant expeditiously provided its e-mail database to Kelly Press, the vendor it has relied on in the past to distribute candidate communications..." (09/06/13 Minute Order.)

On September 11, 2013, the plaintiffs filed a FirstAmended Complaint.[1] The plaintiffs' Amended Complaint sets out two causes of action.  The first cause of action again concerns emailing campaign literature in the 2013 Election.  ([28] Am. Cmplt. at 10-11.)  As relief, the plaintiffs repeat their demand that the Court (1) enjoin the APWU to distribute the plaintiffs' campaign literature at the plaintiffs' expense to the APWU's database of email addresses; (2) require the APWU to inform the plaintiffs of the categories by which its email lists may be broken down; and (3) declare that under Section 401(c), the APWU must make available its list of member email addresses to candidates for the purposes of distributing campaign literature. ([28] Am. Cmplt. at ¶41(A-C).) The plaintiffs' second cause of action is new and asks the Court to declare that the use of the Union's name or initials in the plaintiff's campaign

---

[1]      The plaintiffs appear to have added an individual to the group of plaintiffs bringing this litigation (Debbie Szeredy) without motion or explanation.  The APWU reserves the right to challenge Ms. Szeredy's addition if and when appropriate.

organization/slate name does not violate the APWU's trademark or any Union rules, and is protected by the First Amendment of the United States Constitution and Section 101(a)(2) of the LMRDA. ([28] Am. Cmplt. at ¶41(D).)  This second cause of action also asks the Court to enjoin the APWU from taking any action against the plaintiffs for their use of the Union's name and initials in the name of their campaign organization, "APWU Members First Team."([28] Am. Cmplt. at ¶41(E).)

### B.  2013 APWU National Officer Election and the Election Rules

APWU national officer elections are held every three years, and each election is administered by an election committee convened for that particular election in accordance withArticle 12 of the APWU National Constitution and Bylaws.  ([9-1] Powell Dec. at ¶15, Ex. G (Art. 12, §§ 1, 7).) A six-member 2013 National Election Committee ("NEC") has been administering the 2013 Election, and met between January 29and February 1, 2013, to adopt "Rules and Regulations Governing 2013 APWU National Elections."([2-2] DimondsteinAff. at ¶6, Ex. G.)The APWU also appointed a National Election Appeals Committee ("NEAC") to review internally election challenges in the 2013 Election.  ([9-1] Powell Dec. at ¶15, Ex. G (Art. 12, §10).)The plaintiffs were provided the Election Rules even before they formally declared their candidacies.  ([28] Am. Cmplt. at ¶23.)

A number of the NEC's Election Rules relate to administrative details of the Election. This Election, a total of 58 candidates ran for a range of national offices from President to Industrial Relations Director to National Business Agent positions in APWU offices around the country.  ([20-1] 2nd Powell Dec. at¶5, Ex. A.)In accordance with the Election Rules, ballots for voting in the various races were issued by the American Arbitration Association on Thursday, September 12, 2013, to the appropriate categories of members in good standing entitled under

the APWU Constitution to vote in the different races. ([2-2] DimondsteinAff. at ¶6, Ex. G (Rule VIII.D).)The deadline for ballots to be returned is today, October 7, 2013, at 2 p.m. at which time the NEC takes custody of the ballots and begins the ballot count.  ([2-2] DimondsteinAff. at ¶6, Ex. G (Rule VIII.K); [9-1] Powell Dec. at ¶16, Ex. H.)

To comply with Section 401(c) of the LMRDA, the Election Rules also set out a process for candidates to distribute campaign materials to the APWU membership.  The Election Rules make provision for all candidates to have their campaign literature mailed to the membership through a third-party mailing vendor.([2-2] DimondsteinAff. at ¶6, Ex. G (Rule VI).)Election Rule VI.B specifically identifies Kelly Press as the third party mail vendor for the 2013 Election, and Rule VI.C details Kelly Press' operations with regard to the mailings, including that Kelly Press will determine the cost of each mailing based on the candidates' orders.([2-2] DimondsteinAff. at ¶6, Ex. G.) Paying the cost of the mailings is entirely the responsibility of the candidates, and the Union is not involved in any candidate's order or arrangements with Kelly Press.([2-2] DimondsteinAff. at ¶6, Ex. G (Rule VI.B); 09/06/13(A.M.) Tr. at 7:14-17, 30:7-8.) Although the plaintiffs estimated the cost of a regular mailing to exceed $100,000, they took advantage of that mode of communicating with the APWU membership about their candidacies. ([28] Am. Cmplt. at ¶7; [2-1] Mem. Supp. Mot. Prelim. Inj. at 6.)

To comply with the Court's August 29th preliminary injunction, the NEC issued "supplemental rules" to all candidates on September 3rd setting out the process for candidates to send campaign materials by email to APWU members for whom the Union had email addresses on file.([26-2] Levy Aff. at ¶4, Ex.3; 09/06/13(A.M.) Tr. at 4:11-12.)The email opportunity was not time-limited; candidates could avail themselves of the opportunity an unlimited number of

8

times until balloting closed, today, October 7th.  ([26-2] Levy Aff. at ¶4, Ex.3.)The supplemental rules were sent by email and mail to all 58 candidates.(09/06/13(A.M.) Tr. at 7:6-7.)

As with candidate campaign materials sent by regular mail, the APWU identified Kelly Press as the third party email vendor.([26-2] Levy Aff. at ¶4, Ex.3.)During the preliminary injunction proceedings, plaintiffs' counsel expressed his preference that a third-party vendoradminister candidates' emails rather than the Union performing that function itself.(08/13/13Tr. at 16:9-10.)The APWU provided Kelly Press with the APWU's email address list, and candidates wishing to email campaign literature contracted directly with Kelly Press to do so. (09/06/13(A.M.) Tr. at 7:6-7, 14-17.)Kelly Press independently set pricing and the terms of payment for its email services without input from the Union, and candidates sending emails paid Kelly Press directly.  ([26-2] Levy Aff. at ¶7, Ex.6 ("Stacie Rudy from Kelly Press was very cooperative…it was Kelly Press that had decided as a matter of doing business not to take wire transfers and expose its bank account information, not the APWU that had asked them to adopt that restriction…").)Kelly Press' overall services, process, and business operations were nearly identical for candidate email services as for regular mail campaigncommunications including the Kelly Press point of contact, hours of operation, and payment terms.  ([2-2] DimondsteinAff. at ¶6, Ex. G; [26-2] Levy Aff. at ¶4, Ex. 3.)Kelly Press did prescribe additional requirements for candidates' emails not applicable to regular mail such as including in each email an unsubscribe option and identification of a sender.  ([26-2] Levy Aff. at ¶4, Ex. 3.)

The supplemental rules on campaign emails initially required all candidates to use the subject line: "2013 APWU National Officer Elections" for their email communications.  ([26-2] Levy Aff. at ¶4, Ex. 3.)To resolve the plaintiffs' challenge on September 5[th]to this requirement, the NEC agreed to withdraw the requirement.  (09/06/13(P.M.) Tr. at 3.)The NEC notified all of

the candidates as well as Kelly Press of the revocation of the subject line on Monday, September 9th. (Declaration of Hannah Lively at ¶¶3 and 4, Ex. 1 and 2.)  The first candidate email was sent by the plaintiffs later that day with a subject line of their own design.  (09/06/13(P.M.) Tr. at 4.)

**C.  Communications About Using the APWU Name/Initials in a Campaign Organization's Title.**

Both parties, in their correspondence about restrictions on the use of the APWU name or initials, raised their issues with one another only in the context of the 2013 Election.  According to the plaintiffs, theycreated a name for their slate, "APWU Members First," and registered a domain name for their "campaign web site that accurately depicted their slate name and their campaign platform…" in May, 2013.  ([28] Am. Cmplt. at ¶21.)  This was after the plaintiffs had received the Election Rules and other guidelines about establishing websites in APWU elections.  ([28] Am. Cmplt. at ¶23.)  They soon started distributing literature and using their website in support of their election to union office as the "APWU Members First Team."  ([28] Am. Cmplt. at ¶24.)

Over the summer, the parties, either through their counsel or directly, exchanged correspondence with one another about the use of the APWU logo, trademark, name and initials in the plaintiffs' slate name.  ([28] Am. Cmplt at ¶¶24-28.)  The APWU General Counsel wrote first, demanding that the plaintiffs not use "'APWU' to identify [their] election campaign organization" because doing so, he explained, violated the LMRDA as well as the Election Rules.  ([28] Am. Cmplt. at ¶24, Ex. 2.)  Plaintiffs' counsel responded a month later that "we reject your claim that opposing candidates cannot use the union's name as part of their campaign," but acknowledged that use of "APWU" violated the LMRDA if it suggested union sponsorship of the plaintiffs' candidacy. ([28] Am. Cmplt. at ¶26, Ex. 3.)  About the same time,

the NEC issued a reminder to all 58 candidates about use of the APWU logo in campaigning. ([28] Am. Cmplt. at ¶ 27, Ex. 4.)   A month after that reminder went out, the NEAC wrote Plaintiff Dimondstein about its review of an appeal presented to it by another candidate alleging a violation of the Election Rules by the APWU Members First slate for its use of the "APWU Logo and trademark on its campaign literature, buttons, website, and Facebook pages."  ([28] Am. Cmplt. at ¶28, Ex. 5.)  NEAC found a violation and issued a decision that it would re-run the Election if the plaintiffs were successful.  ([28] Am. Cmplt. at ¶28, Ex. 5.)  Oftentimes, these various letters and memorandum referenced one another; all of them, however, addressed the use of the various forms and formats of "APWU" in the plaintiffs' campaign organization name during the 2013 Election and were the extent of any action by either party to enforce their positions.

### III.   Arguments for Dismissing the Plaintiffs' Amended Complaint

1. The Plaintiffs' Section 401(c) Claim Over the Right to Email Union Campaign Literature During the 2013 APWU National Officer Election is Moot, and the Attendant Issue Regarding Email Vendors is Not Actionable.

The plaintiffs' first cause of action under Section 401(c) of Title IV of the LMRDA is moot and is therefore no longer justiciable.  The plaintiffs' first cause of action seeks to secure the ability of candidates to distribute campaign literature by email during the 2013 APWU National Officer Election.  The APWU complied fully with the Court's preliminary injunction granting the plaintiffs that ability in early September, and balloting in the 2013 Election is over. The email issue is moot − there is nothing more that the plaintiffs are seeking with regard to emailing in the 2013 Election thatthey do not already have.  The next national officer election is not until 2016, and prospective relief on future requests by candidates in the 2016 Election to email campaign literature is not ripe.  The plaintiffs' new allegation about Union liability for an

11

email vendor's fees does not rescue the underlying email access claim, and isinadequately pled to support relief on its own.  The reason for the plaintiffs' Title IV claim in the 2013 Election has been satisfied, and there is no legitimate and justiciable purpose served by continuing to litigate over the issue.  The Court should, therefore, dismiss the plaintiffs' Section 401(c) cause of action.

Claims that are moot or are not ripe are not justiciable.  Acourt is not "'empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before'" the Court.  Nedrow v. Roberts, 603 F.3d 1002, 1008 (D.C. Cir. 2010).  Cases become moot when "the activities for which an injunction is sought have already occurred and cannot be undone."  Monzillo, 735 F.2d at 1459.  Cases also have to be ripe and, as stated generally in similar-type cases about regulatory action, "[t]he ripeness requirement 'prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [ ] protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Ass'n of Am. Railroads v. Surface Transportation Board, 146 F.3d 942, 946 (D.C. Cir. 1998) (quotingAbbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)).The burden of proving the justiciability of claims rests ultimately with the plaintiffs."While the movant has the burden of proving mootness, a plaintiff must defend a motion to dismiss…by proving by a preponderance of the evidence that the court has jurisdiction to hear its claims."  Bender v. Jordan, 515 F. Supp. 2d 10, 16 (D.D.C. 2007).

The state of the record and the facts re-alleged by the plaintiffs in their Amended Complaint support the conclusion that the plaintiffs have already received all of the relief they

demand in their claim for the ability to email campaign literature during the 2013 APWU Election.  The relief pled by the plaintiffs in their Amended Complaint is almost identical to the relief they sought in the preliminary injunction motion granted by the Court.  The plaintiffs asked for the opportunity to email their candidate campaign literature to the membership in the 2013 Election.  The APWU complied fully and expeditiously with the Court's injunction ordering that opportunity.  Within one-and-a-half business days of the Court's order (the order was issued on Thursday before Labor Day weekend), the NEC revised the 2013 Election Rules to make specific provision for all 58 candidates to have the opportunity to email their campaign literature for the duration of the Election.  The 2013 Election ended today.  The plaintiffs sought, appropriately, a ruling only for emailing in the 2013 Election, and did not seek and are not entitled to email access outside of the 2013 Election.  Thus, as the D.C. Circuit held in Monzillo, "[t]he relief sought and granted by the district court has expired on its own terms; there is nothing left for us to review."  Monzillo, 735 F.2d at 1460.  The plaintiffs have achieved everything they sought with their cause of action about email access, making that cause of action moot.

    With the extinguishment of the plaintiffs' email access claim, there is no legitimate purpose served in perpetuating this litigation.  Any effort by the plaintiffs to have the Court enjoin the APWU prospectively is not justiciable and runs afoul of the jurisdictional limits of Section 401(c).  Once the specific relief a plaintiff seeks has been fulfilled, as here, there is no legitimate reason for or basis on which a court can rule prospectively on the lawfulness of possible conduct of a defendant in the future.  *See* Monzillo, 735 F.2d at 1460.  The 2013 Election Rules expire with the 2013 Election and will not be re-issued by the next NEC for three years.  As it is, the Rules are similar election-to-election and the final rules in the 2013 Election

13

include the email option.  But whether the 2016 Election Rules will permit candidate emails and whether a candidate in the 2016 Election will demand email access is completely unknown.  A declaration of candidates' rights in a future election is inconsistent with what the plaintiffs sought to achieve here and what the boundaries of justiciability permit.  Such a declaration or injunction is well beyond the facts pled by the plaintiffs, and binding the Union in 2016 is not supported by the plaintiffs' allegations in 2013.  Thus, the nature of the parties' differences, if they have any at all, is not clear, and "…if a new lawsuit were arise, the legal issues presented might be different." Monzillo, 735 F.2d at 1460; see Friends of Keeseville, Inc. v. F.E.R.C., 859 F.2d 230, 234 (D.C. Cir. 1988) ("Courts are less willing, however, to speculate as to the likely outcome of *future* events. This is not because such predictions are inherently less accurate than are assessments of how past events would have turned out if certain factors had been different. Rather, it is because a court asked to make predictive judgments often has the option of waiting to see what does in fact transpire before issuing a legal ruling.").  Issues arising in the future should be addressed on their own terms in their own time.  Anything beyond the injunction already entered for the 2013 Election is, therefore, not ripe.

Justiciability doctrines are particularly relevant to a Section 401(c) case because of the jurisdictional limits in the statute itself.  Section 401(c) expressly grants standing to only election candidates and an access right enforceable in and during the course of a union election.  As the Court noted in this case, the right the law grants depends on the factual circumstances of the moment.  The Court has already observed, for example, that the circumstances surrounding the plaintiffs' access request here determined whether the request was "reasonable" and therefore enforceable.  As the Court noted,

> The mere possibility that some future request by Plaintiffs might be unreasonable does not render Plaintiffs' current request to send e-mail communications prior to the upcoming election unreasonable.  Nevertheless, should Plaintiffs ultimately engage in repeated requests for e-mail communication such that they begin to impose an administrative burden on Defendant that cannot be lessened by passing financial costs onto Plaintiffs, these requests could ultimately be unreasonable, and are not covered by this preliminary injunction.

([24] Mem. Op. at 15.)  As the Court recognized, the circumstances and details surrounding a request and a response drive the lawfulness, and the Court's jurisdiction, under Section 401(c). Thus, as in all cases but particularly one being brought under Section 401(c), only claims about known circumstances, not those that may or may not be in the future, are properly within the Court's jurisdiction to adjudicate.

The plaintiffs' new claim about the cost of third party email vendors is invalid in its own right and does not make the plaintiffs' core email claim any more justiciable.  On September 5th, the plaintiffs requested by motion that they be allowed to use an email vendor of their choice who would, they claimed, charge less than Kelly Press and would agree to safeguards for protecting the Union's email address list.  The plaintiffs withdrew their request the next day, and agreed to use Kelly Press for their election emails.  In support of their initial request, the plaintiffs submitted evidence verifying that Kelly Press had set its email fees and payment termsindependently without input or influence from the Union.  Nonetheless, in their Amended Complaint, the plaintiffs contend that the Union is liable for allegedly uncompetitive rates charged by Kelly Press and should "refund" them the fees set and collected by Kelly Press for emails sent at the plaintiffs' direction.  The plaintiffs allege that the Court's equity jurisdiction under Section 401(c) extends to this damages claim against the Union for the fees charged and collected by a businesswholly unaffiliated with the Union.  Even assuming such a claim is cognizable under Section 401(c), the plaintiffs have failed to plead facts supporting their new

claim.  Instead, the plaintiffs have pled facts and a claim which would lead to relief that directly violates another subpart of Section 401.

Assuming the plaintiffs' damages claim is actionable, which is not easily done given the limited right protected by Section 401(c), *see* 29 C.F.R. §452.69 "Expenses of Campaign Literature" ("should the candidate be unable to bear such expense [of distributing literature], there is no requirement that the union distribute the literature of the candidate free of charge"), the plaintiffs have failed to plead facts stating a claim against the Union.  The plaintiffs allege no facts linking Kelly Press' fees or business operations to the Union.   To the contrary, the plaintiffs' evidence confirms that Kelly Press set its fees and payment terms without involvement or input from the Union.  Moreover, Kelly Press has the money the plaintiffs have put at issue; the Union received none of the fees charged by Kelly Press.   With no alleged connection between the Union and Kelly Press on the fees for sending candidate emails, it is impossible for the plaintiffs to have sufficiently pled any sort of damages claim (as part of the Court's equity powers, no less) against the Union for fees charged and collected by Kelly Press.

Moreover, Section 401(c) litigation is predicated on denial of a reasonable request, and the plaintiffs' request to use a different email vendor was withdrawn.  The Union never had the opportunity to reject a meaningful alternative to Kelly Press.  Only a day after first raising the idea, the plaintiffs abandoned it and agreed to use Kelly Press for their campaign emails. Notwithstanding that the plaintiffs may not have waived their legal claims about their purported statutory right to select their own mail vendor, an actionable claim requires sufficient facts which the plaintiffs here have failed to plead.  And as pled by the plaintiffs, their claim that the Union pay for their campaign emails violates the prohibition in Section 401(g) on unions providing money to candidates in furtherance of their candidacies.  (*See infra* at 19-20.)  If the Court were

16

to grant the plaintiffs the relief they seek, the APWU would be paying to send the plaintiffs' – and only the plaintiffs', not the other 54 candidates' – campaign emails.   There is no way the plaintiffs' allegations here support this action or can be squared with their obvious violation of the express provisions of Section 401(g).   As with the rest of the plaintiffs' email cause of action, therefore, the email vendor sub-claim should be dismissed.[2]

2.   The Plaintiffs' Free Speech Cause of Action Belongs Before The Secretary Of Labor and Should Be Dismissed By The Court For Lack Of Jurisdiction and Failure to State a Claim.

The plaintiffs' new second cause of action alleging a violation of an LMRDA free speech right to use the Union's name or initials in a candidate's election campaign organization name is not properly before the Court.   A Title I free speech claim brought solely in the context of a union election and that cannot be cured by the Court during the pendency of the election,must yield to the Secretary's exclusive jurisdiction to investigate, prosecute, and remedyunion election conduct violations under Section 402 of the Act.   Here, the plaintiffs' allegations of a free speech claim are based entirely on election conduct in an election that is over.   Moreover, resolution of their claim is dependent on the Secretary's determination of whether restrictions on the use of the union's name in campaign organization titles is permissible under Section 401(g) of the Act,which broadly prohibits the use of union assets in election campaigns.   There is no point to the plaintiffs' claims unless they are about the Election and its results.    Under these circumstances, the plaintiffs' second cause of action about limits on their speech during a union

---

[2]      The subject line allegation should be given the same treatment.  The NEC withdrew the rule, and it had no impact on any candidate emails, all of which were sent after the rule was withdrawn.  The Court reserved the option to litigate the subject line to the Union, and under these circumstances where the Election is over, the Union is not interested in engaging in a philosophical debate about the validity of a rule it rescinded.  If the plaintiffs intend the subject line issue to be its own stand-alone claim, it should be dismissed.

election risks too much interference with the Election and should be reviewed in the first instance by the Secretary, not the Court.

Title I of the LMRDA is a union member's bill of rights, and includes protection of members' speech in favor of or against their union.  29 U.S.C. §411.  The "Freedom of Speech and Assembly" permits members "to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization…"  29 U.S.C. §411(a)(2).  This right is subject to the "reasonable rules as…to his refraining from conduct that would interfere with [the union's] performance of its legal or contractual obligations."  Id.

The D.C. Circuit demands judicial restraint inadjudgingunion processes and democracy in Title I cases.  The D.C. Circuit has observed that "Congress did not leave courts without guidance in defining this concept of 'democracy' in the union setting, for the statute sets forth certain *specific regulations* governing internal union affairs. In other words, 'democracy' under the LMRDA is not merely a boundless ideal to be defined by the whim of any dissident voice; rather, the statutory notion of internal union democracy is precisely limited by the scope of the protections codified by Congress in the LMRDA."  Carothers v. Presser, 818 F.2d 928, 929 (D.C. Cir. 1987) (emphasis in original).  The Carothers court went on to find that "Title I of the LMRDA is not a mandate for courts to impose on labor unions whatever procedures or practices they regard as 'democratic,'" and held that only the specific rights enumerated in Title I are actionable, not "an amorphous and boundless notion of democracy."  Id. at 934.  Consistent with that precedent, courts in this Circuit have rejected equating the free speech right under the LMRDA with free speech rights under the First Amendment of the U.S. Constitution.  *See*Bishop v. Int'l Ass'n of Bridge, Structural, Ornamental and Reinforcing Ironworkers, 310 F.Supp.2d 33,

39 (D.D.C. 2004) ("Section 101(a)(2) 'incorporates "a principal First Amendment value – the right to speak one's mind without fear of reprisal," although its scope is more limited than the First Amendment.'" (*quoting* Callihan v. United Ass'n. of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, 2002 WL 799590 at *2 (D.D.C. 2002)); Quigley v. Giblin, 569 F.3d 449, 457 (D.D.C. 2009) ("…we are not convinced that a union member can bring a vagueness challenge to a union rule.")

Union free speech cases typically address alleged inequities in how union members' speech is restrained by union rules. United Steelworkers of Am. v. Sadlowski, 457 U.S. 102 (1982) (union constitution "outsider rule" prohibiting candidates from accepting campaign contributions from nonmembers); Quigley, *supra* (rule requiring candidate websites be password protected); Knight v. Int'l Longshoremen's Ass'n, 457 F.3d 331 (3rd Cir. 2006) (union constitutional provision prohibiting use of union name unless authorized by international officers). Critically, Section 101(a)(2) expressly allows that a restrictive rule can be valid and lawful if it serves a legitimate organizational or institutional purpose, such as protecting the union from legal liability.  As affirmed in Carothers, moreover, a *perceived* restriction is not actionable; a plaintiff must also allege how the union's conduct actually deprived the plaintiff of his or her right to express his or her "views, arguments, or opinions."  Carothers, 818 F.2d at 931; *see also* Knight, 457 F.3d at 338 (district court should not have abstained from reviewing union constitutional limit on use of the union name where record demonstrated provision at issue had been used to discipline union members at least twice).

The rights protected by Title IV, in comparison, have a specific purpose and are "more limited.  It sets out detailed regulations 'aimed solely at protecting union democracy through free and democratic elections.'"  McCafferty v. Local 254, SEIU, 186 F.3d 52, 57 (1st Cir. 1999).

One of those regulations is a strict prohibition on unions using their money or assets to promote a person's candidacy for union office.  29 U.S.C.§401(g) ("No moneys' received by any labor organization by way of dues, assessment, or similar levy…shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title.  Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.")  The Secretary of Labor, as affirmed by the courts, has enforced this prohibition as applying to use by a candidate of a union's identity in a campaign on the rationale that the union's identity is an asset of the union that may suggest union support for the candidate.  *E.g.*, McLaughlin v. Am. Fed. Of Musicians, 700 F.Supp. 726, 735 (S.D.N.Y. 2003) ("'No moneys' of section 401(g) has been interpreted to include anything of value in order to reflect Congress' intent that no illicit support of a candidate during a union election go unrecognized.")  This particular application of the assets prohibition has occurred in a number of different factual scenarios – a logo on a window in front of which a candidate's picture was taken, Solis v. Local 234, Transport Workers Union, 855 F.Supp.2d 329 (E.D. Pa. 2011); use of union letterhead for campaign letter, Hodgson v. United Mineworkers of Am., 344 F.Supp. 17 (D.D.C. 1972); use of the union logo in campaign advertisement, Brennan v. SindicatoEmpleados de EquipoPesado, 370 F.Supp. 872 (D.P.R. 1974).  The court in McLaughlin observed that most cases in which there is a challenge to use of union moneys during an election are lodged against incumbents, but noted that "[a]n even-handed application of section 401(g) promotes fairness and democracy in union elections" in agreeing that "as the Secretary argues, no special exemption from section 401(g) exists for challengers for union offices."  McLaughlin, 700 F.Supp. at 735.

  The two titles may overlapin substance, but they absolutely do not in their enforcement.

20

"While Title IV protects many of the same rights as does Title I, § 402 of Title IV sets up an exclusive method for protecting Title IV rights…"  Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley, 467 U.S. 526, 527(1984).  Normally, therefore, "Title I is enforceable in federal court" while "[e]nforcement of Title IV rests with the Secretary of Labor."  Molina v. Union De Trabajadores De Muelles, 762 F.2d 166, 167 (1st Cir. 1985).  The Supreme Court has clarified that whether a Title I claim raised during and about conduct in a union election can proceed in district court rather than before the Secretary depends on the remedy the plaintiffs are seeking:

> In sum, whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the remedy required to eliminate the claimed statutory violation. If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

Crowley, 467 U.S. at 550.  As the Supreme Court observed, a court may have jurisdiction over proper Title I claims "filed during the course of a lengthy union election" and authority to address "easily remediable" violations "while an election is being conducted."  Id. at 546.    It may also have jurisdiction when the Title I claims do not "directly challenge the validity of an election already conducted."  Id.at n.16.[3] If the court's jurisdiction is exercised much beyond these limits of easily remediated restrictions during the course of an election or to address claims that do not impact an election and its results, it becomes a situation demonstrating all of "the undesirable consequences that follow from judicial supervision of a union election."  Id. at 550.

---

[3]     Excepting, obviously, the district courts' limited jurisdiction under Section 401(c) regarding distribution of campaign literature.  Crowley, 467 U.S. at n.15.

A limitation that a court take jurisdiction over Title I claims only when those claims can be addressed without interfering with an election is certainly supported, if not required, by <u>Crowley</u>.

The <u>Crowley</u> decision does not specifically address another area of overlap between the two Titles that is implicated in this case – when the Union's compliance with Title IV's prohibitions is the reason for, as plaintiffs have alleged, a restriction on the rights protected by Title I.  Here, the APWU's challenge to the "speech" the plaintiffs are engaging in – using the APWU name and initials in the title of their campaign organization and slate – is based on the statutory prohibition on the use of union assets to promote a candidate for union office.  The APWU's prohibition applies to <u>all</u> candidates, not just the plaintiffs, and uneven compliance by the candidates has already resulted in avoidable election challenges lodged with the NEAC.  But the plaintiffs went ahead and named their slate "APWU Members First Team," registered a domain name under that title, and used the name/title constantly throughout the 2013 Election on campaign literature despite their awareness of the prohibitions on using the APWU name.  In June, the APWU reminded the plaintiffs that their misuse of the Union's name violated the Election Rules and the LMRDA.  In August, the NEAC granted a candidate's challenge that the plaintiffs' actions violated the Election Rules.  The NEAC wrote Plaintiff Dimondstein that it would rerun the Election based on the violation, and yet the plaintiffs' use of the APWU name did not stop.  In fact, the plaintiffs expressed their intent to challenge the NEAC's decision to the Secretary of Labor, and continued to use the APWU name and initials with impunity.

Under these circumstances, and consistent with the rationale of <u>Crowley</u>, the plaintiffs have not sufficiently alleged a Title I free speech claim that is actionable in court; rather, their allegations should be raised properly to the Secretary of Labor in accordance with his exclusive jurisdiction over election conduct under Section 402(b) of the Act.  The plaintiffs' Title I claim

22

about a limitation on their campaign speech can no longer be cured or addressed during the 2013 Election.  The 2013 Election is over.  The plaintiffs' campaign speech of naming their campaign organization using "APWU" was never prevented in a tangible way that the Court could or needs to remedy, especially now that the Election has ended.  And even though the plaintiffs admit in their allegations that the legal disagreement with the APWU on the plaintiffs' appropriate use of the APWU name was explicitly addressed by the Union over three months ago, the issue apparently was not urgent enough for the plaintiffs to raise until now, at the very end of the Election.  As pled by the plaintiffs, therefore, there is no purpose achievable within the 2013 Election to justify their invitation to involve the Court at this point.[4]  The plaintiffs' free speech claims do not satisfy the requirements of <u>Crowley</u> that a court take jurisdiction of election Title I claims when the court's involvement can be timely and limited.

Of course, the plaintiffs' free speech claim is not about protecting their speech during the Election, it is about getting a preemptive ruling from the Court to nullify the Secretary's review, an election challenge from a candidate who loses to one of the plaintiffs, and the obligation of the plaintiffs to bring and litigate valid and timely election challengesbefore the Department of Labor.  The plaintiffs' claims have no purpose except to impact the outcome of the Election by insulating the plaintiffs from any challenges against them on the basis of their misuse of the

---

[4]      The plaintiffs may contend that their demand for declaratory relief preserves the Court's jurisdiction, but this fails to acknowledge the power of a declaratory judgment.  A declaratory judgment still must resolve an actual case or controversy, and is a judgment against a party directing it in its performance and application of the law. *See* Coffman v. Breeze Corp., 323 U.S. 316, 324 (1945) (internal citations omitted) ("The declaratory judgment procedure is available in the federal courts only in cases involving an actual case or controversy, where the issue is actual and adversary, and it may not be made the medium for securing an advisory opinion in a controversy which has not arisen.")  A declaration is as equivalent a power as an injunction, and is no less obtrusive as a remedy in this case.

APWU's name.  This relief from the Court interferes with the Secretary's exclusive jurisdiction over election conduct and election outcomes.  But the courts are bound to review and act on the results of the Secretary's investigation and the exercise of his prosecutorial discretion, not undertake those responsibilities in the first instance.  <u>Theodus v. McLaughlin</u>, 852 F.2d 1380, 1387 (D.C. Cir. 1988) ("In fact, where an agency is interpreting a statute entrusted to the agency's administration which is silent or ambiguous on the point at issue, *Chevron* applies and 'we must defer to the [Agency's] interpretation if it is based upon a 'permissible' statutory construction.'").The plaintiffs are asking, however obtusely, for the Court to infringe on the Secretary's jurisdiction by declaring, without the Secretary's review and assessment, that Section 401(g) does not justify the Union's rule ora decision made by the NEAC.  The consequences of entering judgment either for or against the Union on whether its prohibition and internal review was valid devolves into consequences binding the Secretary's review of the Election and any legitimate Election challenges appealed to the Department of Labor, especially against the plaintiffs.  All of these results are entirely about the validity of the Election, and should therefore be out of the Court's reach.

The Supreme Court found it "most improbable that Congress deliberately settled exclusive enforcement jurisdiction on the Secretary and granted him broad investigative powers to discharge his responsibilities, yet intended the shape of the enforcement action to immutably fixed by the artfulness of a layman's complaint...."<u>Wirtz v. Laborers' Union</u>, 389 U.S. 477, 482 (1968).  This case is exactly the situation the Supreme Court warned courts to avoid by staying out of Title I-Title IV cases where the courts' involvement effects the outcome of a union election.  The plaintiffs know that is the situation here which is why they raise their claims now;

but the Court should not get involved where the Secretary has the exclusive jurisdiction to address the plaintiffs' election challenges and has not brought the issue to court himself.

This is all the more true when the Court considers that any post-election declaration from the Court on the plaintiffs' Title I rights during the Election necessarily requires the Court to decide whether the Union's restriction, or the plaintiffs' conduct, is required by or violates Title IV's prohibitions.  Like enforcement, interpretation of Title IV rests in the exclusive and expert jurisdiction of the Secretary, and for good reason. Crowley, 467 U.S. at 549 ("Thus, exclusive postelection enforcement by the Secretary serves 'as a device for eliminating frivolous complaints and consolidating meritorious ones.'" (quotation omitted)); Theodus, 852 F.2d at 1384 ("As we have noted in a previous construction of the LMRDA, '"the statute relies upon the special knowledge and discretion of the Secretary for determination of both the probable violation and the probable effect."'") (quoting Shelley v. Brock, 793 F.2d 1368, 1372 (D.C.Cir.1986)); Donovan v. Local 998, Amalgamated Transit Union, 570 F. Supp. 716, 719 (E.D. Wis. 1983) (noting the "special knowledge and expertise" of the Labor Secretary in overseeing union election matters).  Here, the Union's prohibition is intended to protect it from legal liability to all candidates and possible election re-runs under Title IV for violating Section 401(g).  The Secretary is best positioned to determine, based on a full investigation considering a number of factors described in the case law, whether that is legitimate under the Act if the plaintiffs' timely raise the issue in an election challenge to the Department of Labor.  There is no need, and no wisdom, in the Court litigating the investigation itself instead of waiting for a precise challenge to or enforcement of the Secretary's prosecution.

In addition to the fundamental jurisdictional problems with the plaintiffs' free speech claim, their claim lacks the requisite factual foundation to support a claim on which relief can be

25

granted.  Under <u>Carothers</u>, the plaintiffs' Title I claim is substantively deficient because it does not allege a specific Title I right to use the Union's name or initials in their campaign organization's title.  <u>Carothers v. Presser</u>, 818 F.2d at 929 ("…before granting relief, courts must first identify the specific statutory right that has been infringed.").  As the <u>Carothers</u>Court held, general allegations divorced from a specific statutory right do not appropriately present a cause of action under Title I.<u>Id.</u> ("The obstacle facing the appellees in the instant case is that the LMRDA contains no statutory language supporting the bold suggestion that Congress intended to grant union members an absolute "right of access" to their union's mailing list.").  The plaintiffs also admit in their allegations that they suffered no harm to their free speech rights, and harm is another necessary factual predicate that must be pled to sufficiently state a Title I claim. It is true that the NEAC threatened to re-run the Election based on the plaintiffs' misuse of the APWU name, but that threat is clearly not actionable given that it had, by the plaintiffs' own admission, absolutely no impact on their speech.  The plaintiffs have not alleged that they were curtailed in any way in their use of "APWU" in identifying their campaign organization during the Election.  In the absence of pleading these necessary components – a specific statutory right that has been infringed and actual harm to or curtailment of the plaintiffs' speech – the plaintiffs have failed to state a free speech claim on which relief from the Court can be granted.

Dismissal of the Title I claim does not necessarily dispose of the plaintiffs' entire second cause of action, and the Union asks the Court to dismiss the attendant free speech claims the plaintiffs appear to be raising there as well.  In addition to their Title Iclaim, the plaintiffs have also pled a free speech right to name their campaign organization arising under the First Amendment of the U.S. Constitution and unspecified trademark laws.  It is settled law in this Circuit, however, that alleged violations of Title I of the LMRDA do not give rise to a concurrent

26

claim of a violation of the First Amendment of the U.S. Constitution.  While First Amendment jurisprudence may inform the courts' understanding of Title I claims, it does not give rise to a private cause of action under the First Amendment.  *See* Bishop, *supra*, 310 F.Supp.2d 33; Quigley, *supra*, 569 F.3d 449.  The First Amendment claim is not actionable under this Circuit's precedent and should be dismissed.

Similarly, the plaintiffs broad, vague claim that unspecified trademark laws are "barred by the First Amendment and by section 101(a)(2)" is not actionable as a claim against the Union. (1st Am. Cmplt at ¶41.)  The plaintiffs do not refer to any particular trademark law, but seek a declaration that their conduct has not "infringed any trademark."  Whether the plaintiffs refer to trademark laws only as a precursor to their argument against an affirmative defense on the Title I claim is not clear.  Because the reference is made under the section of the Amended Complaint setting out the plaintiffs' second cause of action, however, the risk is present that it is meant as an independent cause of action.  If the reference to trademark laws is merely argument, it does no harm to the plaintiffs' case for the Court to clarify that it is dismissed as a claim.  If it is meant as an independent claim, however, the Court should dismiss the trademark claims for insufficient pleading "presenting no federal question suitable for decision" because the plaintiffs have failed to specify any federal trademark laws the Union has allegedly violated or that gives the Court federal question jurisdiction under 29 U.S.C. §1331(a). Tooley v. Napolitano, 586 F.3d 1006, 1009 (D.C. Cir. 2009).

27

IV.     <u>Conclusion</u>

For the foregoing reasons, and those supported by the record in this matter, the Union asks the Court to dismiss in its entirety the plaintiffs' First Amended Complaint.


Dated:  October 7, 2013                     Respectfully submitted,

                                            O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                            By:<u>/s/ Melinda K. Holmes</u>

                                            Darryl J. Anderson
                                            Melinda K. Holmes
                                            1300 L Street N.W., Suite 1200
                                            Washington, DC 20005-4178
                                            Telephone: (202) 898-1707
                                            mholmes@odsalaw.com